IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

SAMSON TUG & BARGE, CO. INC.,

                            Plaintiff,

v.

INTERNATIONAL LONGSHORE &
WAREHOUSE UNION, ALASKA
LONGSHORE DIVISION, and, ILWU UNIT
222,

                            Defendants.

Case No. 3:20-cv-00108-TMB
Case No. 3:20-cv-00248-TMB
Consolidated

**ORDER ON PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION
(DKT. 47)**

## I.    INTRODUCTION

The matter comes before the Court on Plaintiff Samson Tug and Barge, Co., Inc.'s

("Samson") Motion for Preliminary Injunction (the "Motion").[1] The Motion was fully briefed by

the Parties,[2] and the Court heard oral argument, witness testimony, and received evidence on the

matter.[3] For the reasons stated below, Samson's Motion is **DENIED**.

## II.    BACKGROUND

Samson is an Alaska corporation that provides marine tug and barge transportation services

between Washington and Alaska and has operated at its Kodiak Womens Bay Terminal for

decades under a series of leases with the Terminal's prior owner, LASH Corporation ("LASH").[4]

---

[1] Dkts. 47 (Mtn. for Preliminary Injunction); 48 (Memorandum in Support of Mtn.); 49 (Baggen Decl.); 54 (Revised Baggen Decl.).

[2] Dkts. 63 (ILWU Response); 64 (Maglio Decl. & Exs.); 65 (Tentis-Major Decl.); 66 (Young Decl.); 67 (ILWU's Objections); 71 (Samson Reply).

[3] Dkt. 78 (Minute Entry).

[4] Dkts. 1 at ¶ 10 (Petition); 80 at 7:11-13 (Tr. of Feb. 16, 2021 Hearing).

1

Case 3:20-cv-00108-TMB   Document 81   Filed 03/01/21   Page 1 of 29

At Womens Bay, Samson employs Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") members.[5] MEBA is an unincorporated labor organization representing employees at ports and on oceangoing vessels, which includes Samson employees through IBU-MEBA.[6] MEBA is party to a collective bargaining agreement ("CBA") with Samson.[7] Samson has historically utilized individuals represented by MEBA to unload and load cargo at its Womens Bay operation.[8] According to MEBA, Samson presently employs approximately 10 MEBA-represented individuals at Womens Bay Terminal.[9]

Defendants International Longshore and Warehouse Union and ILWU Unit 222 (collectively, "ILWU") is an unincorporated labor organization with offices nationwide, including in Alaska.[10] Matson Navigation Company of Alaska ("Matson") purchased the terminal in Womens Bay from LASH in 2016 or 2017.[11] Besides acting as landlord, Matson is also an

---

[5] Dkt. 1 at ¶ 8.

[6] *Id.* at ¶¶ 4, 8.

[7] *Id.* at ¶ 7.

[8] Dkts. 24 at 5 (MEBA Opposition to ILWU Mtn. to Dismiss). After initially joining Samson in the present litigation, MEBA sought voluntary dismissal under Federal Rule of Civil Procedure 41. Dkt. 72 (MEBA's Stip. of Dismissal); 80 at 14:7-12, 16:8–17:4 (Baggen discussing the importance of using MEBA employees, who were "integrated with all the other ports," to Samson's operations in the region.).

[9] Dkts. 24 at 5 (citing Baggen Decl. at ¶ 4); 80 at 14:7-12 (noting Samson employed 9 MEBA employees during its most recent payroll cycle).

[10] Dkts. 1 at ¶¶ 5–6; 12 at 7–8.

[11] Dkts. 1 at ¶ 12; 12 at 12 (Memorandum in Support of Motion to Dismiss); 46 at 7 (ILWU's Consolidated Reply); 80 at 66:20-21. Matson personnel also note that after learning of the present litigation, it determined that Matson "could not get in the middle of a jurisdiction dispute, now in federal court, between ILWU and MEBA as we have bargaining relationships with both." Dkt. 64-6 at 2, 28 ¶ 4 (Tungel Aff.).

2

employer and a party to a multi-employer CBA called the All Alaska Longshore Agreement ("AALA")[12] with ILWU, American President Lines LTD ("APL"), and others.[13] Samson and MEBA are not parties to the AALA.[14] After Matson purchased Womens Bay Terminal from LASH, it continued leasing the property to Samson under an amended lease.[15] The amended lease modified the lease term to month-to month.[16]

### A. Underlying Arbitration Decision at Issue

Samson states that until 2018, Samson shipped cargo for APL through the Womens Bay Terminal.[17] Because APL was a signatory to AALA, Samson subleased a portion of Samson's leased Womens Bay Terminal to APL for the limited purpose of establishing a restricted area, informally called the "DMZ," where Samson could receive APL outbound cargo and deliver APL inbound cargo.[18] In furtherance of its claim to all the work at Womens Bay, ILWU filed a grievance against Matson under the AALA, demanding that all cargo handling at the Womens Bay Terminal

---

[12] "While the AALA has expired, all but a few provisions remain operative. The AALA was in effect at all time periods relevant to the arbitration awards at issue in this matter." Dkt. 13 at 2 ¶ 3; *see also* Dkt. 13-1 (AALA) ("This Agreement effective July 1, 2015 through June 30, 2020").

[13] Dkts. 1 at ¶¶ 6, 12–13; 1-7 (NLRB Decision, 369 NLRB No. 63, Case 19-CED-225672, 19-CD-225674) (Apr. 28, 2020). According to testimony at the February 16, 2021 Hearing, Matson is not conducting its own cargo operations out of Womens Bay Terminal and is merely acting as a landlord at this location. Dkt. 80 at 42:8-13.

[14] *See* Dkt. 1 at ¶¶ 6–7.

[15] Dkts. 1-3 (Agreement to Amend Lease); 80 at 10:16–11:1.

[16] Dkts. 1-3 at 2; 80 at 10:20–11:1; *cf.* Dkt. 43-1 at 6 (Lease Agreement Between Lash & Samson, Aug. 1, 2014).

[17] Dkt. 48 at 5 (Memorandum in Support of Preliminary Injunction).

[18] *Id.*

3

be performed by ILWU labor because the terminal was now under Matson's control.[19] The Alaska Arbitrator[20] ruled that because there was no evidence that Matson was using Samson as a subterfuge to move cargo on Matson's behalf, and because there was no claim that Matson or any other AALA member had a financial interest in Samson, ILWU was not entitled to the cargo handling work; ILWU appealed the decision to the Coast Arbitrator.[21]

On February 13, 2020, Coast Arbitrator John Kagel issued his Opinion & Decision (the "Decision") vacating Item 5 in the underlying Alaska Arbitration Decision.[22] This Decision stated that Matson was now required to assign all cargo handling work at Womens Bay to ILWU.[23] The Coast Arbitrator found that the Decision was enforceable because "Matson had substantial leverage over Samson, including by terms of its lease[.]"[24] ILWU also states that in March 2020, Matson and ILWU came to an agreement that: "(1) Matson will comply with the Coast Arbitrator Kagel's award, and (2) ILWU will accept time in lieu (i.e. unpaid wages and benefits) from Matson until Matson negotiated a terminal service agreement with Samson and obtained necessary cargo

---

[19] *Id.*

[20] The dispute resolution process as set out in the AALA requires parties to the agreement to first present their dispute to the Joint Port Labor Relations Committee (JPLRC); if agreement cannot be reached, parties may appear before the designated Alaska Arbitrator. Dkt. 13-1 at 13–15 (AALA). A party dissatisfied with the arbitration decision may seek to have the matter referred to the Alaska Area Committee. *Id.* at 15. If the Committee cannot reach an agreement, the issue may be referred to the Coast Arbitrator. *Id.* at 15–16.

[21] Dkt. 48 at 6.

[22] Dkt. 13-6 (Coast Arbitrator's Decision).

[23] *See id.* at 9–10.

[24] *Id.* at 9.

4

handling equipment to perform the work."[25] As a result, ILWU submitted "time in lieu" cards to Matson consistent with the minimum manning both Matson and ILWU agreed was appropriate.[26] Matson did not appeal the Coast Arbitrator's Decision, and neither ILWU nor Matson sought judicial confirmation of the Decision.

### B. Petition to Vacate Arbitration Decision and Complaint for Damages

On May 12, 2020, Samson and MEBA filed a Petition to Vacate the Coast Arbitrator's Decision under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and § 10 of the Federal Arbitration Act, 9 U.S.C. § 10 in this case.[27]  On October 5, 2020, Samson also filed a Complaint for Damages under Section 303 of the LMRA, 29 U.S.C. § 187 in the companion Case No. 3:20-cv-248-TMB. The Petition to Vacate involves the arbitration decision which is the basis for the damages incurred in Case No. 3:20-cv-00248-TMB. Because the present case and the companion case are both based on the same underlying facts, and each action challenges the legality of imposing the burdens of an arbitration decision on Samson, an entity that was not party to the arbitration, the Parties' request to consolidate the cases was granted.[28]

In June 2020, Samson and Matson entered into a Terminal Service Agreement ("TSA") which provides that if Samson pays "time in lieu" wages for ILWU claimed work, Samson may continue its cargo operations at Womens Bay with its own MEBA employees.[29] The term of the

---

[25] Dkt. 63 at 11 (emphasis removed).

[26] *Id*. (citing Tentis-Major Decl. at ¶ 2).

[27] Dkts. 1 at ¶¶ 1–2; 11 at 2.

[28] On November 23, 2020, Case No. 3:20-cv-00248-TMB was consolidated under the present case. Dkts. 36 (Order Granting Unopposed Motion to Consolidate); 35 (Motion to Consolidate).

[29] Dkt. 43-5 (TSA).

TSA is June 16, 2020 through June 30, 2022, or until Samson's lease with Matson is terminated.[30]

ILWU claims that it was unaware of the TSA until December of 2020.[31]

In relevant part, Article VII of the TSA provides:

Carrier [Samson] and Contractor [Matson] agree that on Carrier's request Carrier's own labor may be used for terminal services performed at the Terminal as an alternative to Contractor providing terminal services under this Agreement. If the ILWU submits "time in lieu" claims to Contractor for such services performed at the Terminal by Carrier's own labor, Contractor will invoice Carrier for such "time in lieu" claims in accordance with Article VI. Despite the effective date of this Agreement, Carrier expressly agrees to pay such "time in lieu" claims dating back to February 13, 2020. In the event that a Court or Arbitrator determines that any such ILWU "time in lieu" claims were improper, Carrier's recourse shall be from ILWU and not Contractor. Carrier may only use its own labor for terminal services with Contractor's advance written permission.[32]

Samson and Matson agreed to a scheduled billing rate for ILWU labor, noting that the billing rates were subject to change after July 1, 2020, based on negotiations between Matson and ILWU.[33] Samson states it has been invoiced for ILWU "time in lieu" charges for the time period from March through December 2020 in the sum of $648,866.90 but that Samson's actual labor cost for its MEBA employees for the Womens Bay cargo handling during that period was $250,431.21.[34]

---

[30] *Id.* at 1–2.

[31] Dkt. 63 at 12.

[32] Dkt. 43-5 at 5.

[33] *Id.* at 8–9 ("Schedule A" & "Schedule B").

[34] *See* Dkts. 49 at ¶ 9; 48 at 3; *see also* Dkt. 1 at ¶¶ 22–23 ("ILWU has submitted time cards to Matson which charge Matson for labor hours claimed by ILWU for work done by Samson's IBU-MEBA represented individuals at Womens Bay, including the work in excess of that awarded by the Coast Arbitrator. . . . Matson intends to charge Samson for the time card labor hours submitted by ILWU for work done by Samson's IBU-MEBA represented individuals at Womens Bay.").

On July 22, 2020, ILWU moved to dismiss Samson and MEBA's Petition to Vacate Arbitration Decision pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[35] Samson and MEBA both filed oppositions to ILWU's Motion to Dismiss the Petition to Vacate and requested oral argument.[36] ILWU also filed a second Motion to Dismiss Samson's Complaint for Damages under Section 303 and Motion to Strike Confidential Settlement Communications pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).[37] Samson filed an opposition to the Motion to Dismiss and Motion to Strike and requested oral argument.[38] ILWU then filed a consolidated reply in support of its two Motions to Dismiss.[39]

### C. Preliminary Injunction

On February 3, 2021, Samson moved for a preliminary injunction.[40] Samson seeks equitable relief including an order: (1) prohibiting ILWU from collecting further "time in lieu of wages" charges for Womens Bay operations, and (2) requiring ILWU to deposit all such previously collected charges in an account to be distributed with future orders of this Court.[41]

Although Samson does not cite to Rule 65, it does argue that the Court should grant Samson a preliminary injunction because: (1) it is likely to succeed on the merits because ILWU's actions are a clear violation of 29 U.S.C. § 158(b)(4) as ILWU is using an arbitration in which Samson

---

[35] Dkts. 11 (Mtn. to Dismiss Petition to Vacate); 12 (Memorandum in Support of Mtn. to Dismiss).

[36] Dkts. 24; 26 (Samson Opposition to Mtn. to Dismiss).

[37] Dkts. 38 (Mtn. to Dismiss and to Strike); 39 (Memorandum in Support of Mtn. to Dismiss).

[38] Dkt. 42 (Samson Opposition to Mtn. to Dismiss).

[39] Dkt. 46 (Consolidated Reply).

[40] Dkt. 47.

[41] Dkts. 49 at ¶ 14; 48 at 25.

7

was not a party to coerce Samson to hire ILWU members;[42] (2) it will suffer irreparable harm in the form of financial ruin by making the "time in lieu" of wage payments to ILWU, or vacating the premises with no alternative space to operate, or terminating its employees and replacing them with ILWU employees; (3) the equities tip in favor of Samson because no party will be harmed if the injunction is granted, but if the arbitration Decision is enforced and Matson uses it substantial leverage to force Samson to replace its entire workforce or be evicted, great harm will result; (4) public interest favors injunction because there is a strong public policy against the unfair labor practices in which ILWU is currently engaged.[43] Tangentially, as part of its argument that it will succeed on the merits, Samson also argues that ILWU should have sought a Section 10(k) determination, 29 U.S.C. § 160(k), because the dispute in reality is a jurisdictional fight between rival unions: MEBA and ILWU.[44] Samson points out that had ILWU pursued this avenue, Samson would have a right to be involved in such a proceeding.[45]

More specifically, Samson argues it will be harmed if the Court does not intervene because ILWU is currently before the Coast Arbitrator seeking to force Samson to use ILWU represented workers *immediately*.[46] Samson states it is not a party to this arbitration and can only protect its rights by challenging the Arbitrator's Decision in this Court. In support of this assertion, Samson

---

[42] Samson argues it will likely succeed in *both* of its cases: in its Section 303 damages claim and with its Section 301 Petition to Vacate Arbitration Award. Dkt. 48 at 10–16.

[43] Dkt. 48 at 2–3, 9–25.

[44] *Id.* at 16–18.

[45] *Id.*

[46] *Id.* at 3.

8

attaches a declaration by its owner, George Baggen and, another copy of the March 5, 2020 email.[47]

Additionally, Samson states ILWU recently increased pressure on Matson and Samson; instead of receiving "time in lieu" wages, ILWU now demands that ILWU members perform all cargo handling at Womens Bay.[48] This demand, if followed, would result in Samson's eviction from the Matson terminal, and, Samson claims, will likely put it out of business.[49]

Samson has been unable to locate alternative cargo handling terminals to conduct its Kodiak operations.[50] Samson asserts it will face considerable liability for termination of its own workforce. If the arbitration Decision is enforced, Samson will incur significant expenses and lose its skilled and reliable employees and lose its ability to function efficiently in its main hub port for Western Alaska.[51] Samson is seeking a preliminary injunction preventing ILWU from taking any action to enforce the arbitration Decision of February 13, 2020.[52] Samson seeks equitable relief including an order: (1) prohibiting ILWU from collecting further "time in lieu of wages" charges

---

[47] *See* Dkts. 49; 54; 54-3 (Email Correspondence). It appears Samson first attached this email correspondence to its Complaint in 3:20-cv-00248-TMB filed on October 5, 2020 at Docket 1-5. ILWU also claims Samson knew about ILWU's concerns regarding Matson's compliance (or lack thereof) with the Coast Arbitrator's Decision by December 21, 2020, at the latest. Dkt. 63 at 13.

[48] Dkt. 48 at 7.

[49] *Id.* at 6, 21.

[50] Dkt. 49 at ¶ 12.

[51] *Id.* at ¶¶ 4, 11.

[52] Dkt. 48 at 25.

for Womens Bay operations and (2) requiring ILWU to deposit all such previously collected charges in an account to be distributed with future orders of this Court.[53]

ILWU opposes Samson's Motion for Preliminary Injunction on two primary grounds: (1) the Court lacks jurisdiction to order the injunctive relief Samson requests, and (2) even if the Court had jurisdiction, Samson has failed to demonstrate a preliminary injunction is warranted in this case.[54]

As to the first ground, ILWU argues (1) the only remedy under LMRA Section 303, 29 U.S.C. § 187, is compensatory damages, and (2) Samson has failed to join Matson, a necessary party for injunctive relief under LMRA Section 303.[55] ILWU argues that because both parties to the CBA are necessary parties under Federal Rule of Civil Procedure 19(a)(1), Matson is a necessary party who has an interest in this action and its absence would impair Matson's ability to protect its interest and would leave ILWU at risk of inconsistent obligations.[56]

As to the second ground, ILWU argues that even if the Court had jurisdiction, Samson failed to demonstrate that preliminary injunctive relief is warranted.[57] Samson has no likelihood of success on its claims because it lacks standing to petition to vacate the Coast Arbitrator's Decision under Section 301 of the LMRA, and because Samson cannot establish that ILWU violated Section 8(b)(4)(ii)(D) of the National Labor Relations Act ("NLRA").[58] Additionally,

---

[53] Dkts. 49 at ¶ 14; 48 at 25.

[54] Dkt. 63.

[55] *Id.* at 13–15.

[56] *Id.* at 15–21.

[57] *Id.* at 22.

[58] *Id.* at 22–25.

Samson cannot demonstrate irreparable injury where it unreasonably delayed in prosecuting its claims and where it only alleges an unmitigated monetary injury.[59] Finally, the balance of hardships tips sharply against issuance of an injunction because Samson's request "threatens to disrupt and interfere" with the collective bargaining process between ILWU and Matson and contravene NLRA policy.[60]

ILWU also argues that the Court cannot grant the preliminary injunction on the additional grounds that Samson's request for an escrow account is impermissible and may result in a federal crime under LMRA Section 302.[61] Lastly, Samson fails to support its accusations with admissible evidence.[62]

In Reply, Samson acknowledges that Section 303 of the LMRA does not allow for injunctive relief.[63] However, Samson argues that the Court may still issue a preliminary injunction to protect a damages remedy.[64] Samson cites to a Seventh Circuit case for the holding that a preliminary injunction may be appropriate, and a damages remedy inadequate where "'[t]he damage award may come too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business.'"[65] Samson argues ILWU is incorrect that the preliminary

---

[59] *Id.* at 12, 25–27.

[60] *Id.* at 27–29.

[61] *Id.* at 29–30 (citing Section 302, 29 U.S.C. § 186, prohibits any transfer of money from an employer to a union, subject to certain exceptions)

[62] *Id.* at 30–31.

[63] Dkt. 71 at 2.

[64] *Id.* at 2–3.

[65] *Id.* at 3–4 (quoting *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380 (7th Cir. 1984)).

injunction Samson seeks is "'within the exclusive jurisdiction of the NLRB."[66] Further, Samson argues the Coast Arbitrator exceeded the scope of his authority by ordering Matson to use its leverage to force Samson to replace its employees, which "is contrary to public policy."[67]

### D. Hearings

On February 4, 2021, the Court held an initial hearing on the preliminary injunction.[68] During the course of the February 4 hearing, ILWU informed the Court that it had sought clarification of the arbitration decision underlying this action.[69] In an effort to maintain the status quo in advance of the omnibus hearing and the Court's resolution of the pending motions, ILWU contacted Matson and the two agreed to delay seeking clarification before the Coast Arbitrator.[70]

On February 16, 2021, the Court held an omnibus hearing, during which Parties were permitted to call witnesses, present evidence, and give oral argument regarding the Motion for Preliminary Injunction. The Court also heard oral argument on the other outstanding dispositive motions.

/ / /

/ / /

---

[66] *Id.* at 4 (quoting Dkt. 63 at 15).

[67] *Id.* at 5.

[68] Dkts. 56 (Minute Entry); 59 (Tr. re Hearing).

[69] Dkt. 59 at 8:4–11 ("[W]hen the Union received Samson's opposition to its motion to dismiss the 303 damages complaint, [Samson] attached a document which was a contract between Matson and Samson, which the ILWU believes violates the arbitration award. So in December, which, you know, counsel for Samson knew in December, the Union went to -- submitted a request for clarification to the arbitrator, to determine whether or not Matson was in compliance with the award.").

[70] *Id.* at 8:7–9:25, 12:21–16:22; Dkt. 55 (ILWU Notice re Pending Request to Arbitrator).

12

### III. LEGAL STANDARDS

*A. Federal Rule of Civil Procedure 65*

Under Federal Rules of Civil Procedure ("Rule") 65 a court may issue a preliminary injunction:

> A plaintiff seeking a preliminary injunction [can] establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.[71]

Further, a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."[72]

"Under the 'sliding scale' approach to preliminary injunctions observed in [the Ninth Circuit], 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'"[73] Plaintiffs must, however, "establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction."[74] In evaluating a motion for preliminary injunctive relief, a court is not limited to the facts alleged in

---

[71] *Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (quoting *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[72] Fed. R. Civ. P. 65(c).

[73] *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134–35 (9th Cir. 2011) (discussing post-*Winter* circuit split over continuing viability of the sliding scale approach and joining the Seventh and Second Circuits in retaining it).

[74] *Cottrell*, 632 F.3d at 1131 (emphasis in original).

13

the complaint, and can consider other evidence in the record as well, even evidence that would be inadmissible at trial.[75]

B.  *Rule 19*

A party seeking compulsory joinder under Federal Rule of Civil Procedure 19(a)(1) must establish that either:

> (A) in the person's absence, the court cannot accord complete relief among the existing parties; or
>
> (B) that person claims an interest relating to the subject matter of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Ninth Circuit has explained that the term "necessary" describes parties or "persons to be joined if feasible."[76] "[I]t is still possible under Rule 19(b) for the case to proceed without the joinder of the so-called 'necessary' absentee."[77]  Rather, "Rule 19(a) 'defines the persons whose joinder in the actions is *desirable*' in the interests of just adjudication."[78]  Such desirable persons are "persons having an interest in the controversy, and who ought to be made parties, in order that the court may act."[79]

---

[75] *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (citing *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *K–2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972)).

[76] *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (quoting Fed. R. Civ. P. 19(a)) (internal alterations omitted); *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 917 (D. Haw. 2019).

[77] *Peabody W. Coal Co.*, 400 F.3d at 779.

[78] *Id.* (quoting Fed. R. Civ. P. 19 Advisory Committee Note (1966)).

[79] *Id.* (citation and internal quotation marks omitted).

14

If an absentee is a necessary **party under Rule 19(a), the** court must determine whether it is feasible to order that the absentee be joined. Joinder is not feasible when venue is improper, when the absentee is not subject to personal jurisdiction, and when joinder would destroy subject matter jurisdiction.[80] If joinder is not feasible, a court must determine "whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed."[81]

Further, if a person has not been joined as required, the court must order that the person be made a party. A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.[82] A court with proper jurisdiction may also consider *sua sponte* the absence of a required person and dismiss for failure to join.[83]

### C. *Section 301 of the LMRA*

In its Petition, Samson alleges that Jurisdiction is conferred upon this Court by Section 301 of the LMRA, 29 U.S.C. § 185 through 28 U.S.C. § 1337(a). Section 301(a) of the National Labor Relations Act states:

(a) Venue, amount, and citizenship

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district

---

[80] *See* Fed. R. Civ. P. 19(a).

[81] *Peabody W. Coal Co.*, 400 F.3d at 779; *Dawavendewa v. Salt River Project Ag. Improvement & Power Dist.*, 276 F.3d 1150, 1155–57 (9th Cir. 2002).

[82] Fed. R. Civ. P. 19 (a)(2); *Estate of Mendez v. City of Ceres*, 390 F. Supp. 3d 1189, 1200–01 (E.D. Cal. 2019) (ordering mother of decedent be joined as a plaintiff in a wrongful death action).

[83] *Republic of Philippines v. Pimentel*, 553 U.S. 851, 861 (2008) (citations omitted).

court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.[84]

"A district court only has jurisdiction to confirm, vacate or correct 'final and binding' arbitration awards under § 301 of the LMRA[.]"[85] The Ninth Circuit has repeatedly stated that "[t]o assert jurisdiction under § 301(a), a litigant must allege a breach of contract between an employer and a labor organization or between labor organizations in an industry affecting commerce."[86] While jurisdiction is conferred if a party to the contract (usually a collective bargaining agreement) sues, or if a third party beneficiary sues, the Ninth Circuit has stated that jurisdiction can be conferred "even though [the party] is not a signatory to the [a]greement."[87] A Section 301 action "do[es] not necessarily have to be employers or labor organizations. The word 'between' in § 301(a) refers to 'contracts' between an employer and a

---

[84] 29 U.S.C. § 185(a).

[85] *New United Motor Mfg., Inc. v. United Auto Workers Local 2244*, 617 F. Supp. 2d 948, 954 (N.D. Cal. 2008) (citations omitted).

[86] *Painting & Decorating Contractors Ass'n of Sacramento, Inc. v. Painters & Decorators Joint Committee of the East Bay, Inc.*, 707 F.2d 1067, 1070 (9th Cir. 1983); *see Garvey v. Roberts*, 203 F.3d 580, 587 (9th Cir. 2000) ("Jurisdiction is proper under LMRA § 301(a) where (1) the suit is based on an alleged breach of contract between an employer and a labor organization and (2) the resolution of the lawsuit is focused upon and governed by the terms of the contract."); *Nu Image, Inc., v. IATSE*, 893 F. 3d 636, 639 (9th Cir. 2018) (Section 301 "is an exception to the primary jurisdiction doctrine of the NLRB designed to afford . . . courts jurisdiction to resolve labor disputes that focused on the interpretation of the terms of the collective bargaining agreement. Section 301(a) is designed to allow federal courts the limited role of enforcing collective bargaining agreements.") (internal citations, alterations, and quotation marks omitted).

[87] *Painting & Decorating*, 707 F.2d at 1071; *Rehmar v. Smith,* 555 F.2d 1362, 1366 (9th Cir. 1976) ("Section 301 jurisdiction is not dependent upon the parties to the suit but rather the nature or subject matter of the action. Jurisdiction exists as long as the suit is for violation of a contract between a union and employer even if neither party is a union or an employer."); *Lauser v. City College of San Francisco*, No. C-07-6464 SC, 2008 WL 2357246, at *4 (N.D. Cal. June 6, 2008), *aff'd*, 359 F. App'x 755 (9th Cir. Nov. 17, 2009).

16

labor organization, not to 'suits' between them."[88] However, "for jurisdiction to be proper . . . the suit [must] be based on an alleged breach of contract between an employer and a labor organization and that the resolution of the lawsuit be *focused upon and governed by the terms of the contract*."[89]

### D. Section 303 of LMRA

Section 303 of the LMRA, under which Samson brings its Complaint for damages, states:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.[90]

LMRA Section 303 provides a private right of action for compensatory damages to a party injured by reason of "a union's unfair labor practices" under NLRA § 8(b)(4).[91] Unfair labor practices under 29 U.S.C. § 158(b)(4) include:

to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class.[92]

---

[88] *Painting & Decorating*, 707 F.2d at 1070 n.2 (citation omitted).

[89] *Id.* at 1071 (emphasis added).

[90] 29 U.S.C. § 187.

[91]; *Am. President Lines, Ltd. v. ILWU, AKLD*, 721 F.3d 1147, 1153, 1156 (9th Cir. 2013); 29 U.S.C. § 187.

[92] 29 U.S.C. § 158(b)(4).

"[F]orcing or requiring any person . . . to cease doing business with any other person" in violation of 29 U.S.C. § 158(b)(4)(ii)(B), "is regarded as impermissible secondary boycotting, being "directed at parties who are not involved in the labor dispute."[93] "Section 8(b)(4)(ii)(B) proscribes the creation of 'a separate dispute with the secondary employer' in order to coerce the primary employer."[94]

## IV.    DISCUSSION

The Court concludes that Samson lacks standing to seek injunctive relief under Section 301 and Samson's other claim under Section 303 does not provide a basis for injunctive relief. Additionally, because Samson seeks relief that directly implicates a non-party, Matson, Samson's Motion for a Preliminary Injunction is **DENIED**.

### A.    *Samson Lacks Standing Under Section 301*

#### 1.    Section 301 Permits Injunctive Relief

Section 301 "is not to be given a narrow reading."[95] Instead, Section 301(a) "'authorizes federal courts to fashion a body of federal law.'"[96] Courts have permitted and issued injunctive

---

[93] *NLRB v. International Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers Union, Local 433*, 891 F.3d 1182, 1184 (9th Cir. 2018) (citing *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 943 (9th Cir. 2014)).

[94] *Id.* (quoting *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 72 (1964)).

[95] *Smith v. Evening News Ass'n*, 371 U.S. 195, 199 (1962).

[96] *Serv. Emp. Int'l Union v. Nat. Union of Healthcare Workers*, 598 F.3d 1061, 1069 (9th Cir. 2010) (citing, *inter alia*, *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403, (1988)); *but see United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987) (emphasizing that judicial review is extremely limited when the parties have agreed to arbitration pursuant to a collective bargaining agreement).

18

relief sought under Section 301.[97] District courts have also concluded they have jurisdiction under Section 301 of the LMRA to grant preliminary injunctive relief in a suit to enforce an arbitration decision.[98]

### 2. Jurisdiction and Standing Under Section 301

"To have standing to bring an action for breach of a collective bargaining agreement, a party must be either a member of the collective bargaining unit covered by the agreement or a third party beneficiary of that agreement."[99] Samson was not a party to the arbitration and is not party to the AALA. Samson has also not alleged a violation of the AALA. Instead, Samson argues that the Court should confer standing to petition to vacate the Decision by adopting the approach of a Second Circuit case, *Association of Contracting Plumbers of the City of New York v. Local Union No. 2 United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry*

---

[97] *Serv. Emp. Int'l. Union v. Nat. Union of Healthcare Workers*, 598 F.3d 1061, 1066, 1072–73 (9th Cir. 2010) (affirming a district court's jurisdiction to issue a temporary restraining order affording various injunctive relief under Section 301).

[98] *See ILWU, Local 34 v. Cargill, Inc.*, 357 F. Supp. 608, 610–11 (N.D. Cal. 1973) (citing *Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union No. 7 of Neb. v. Lueder Construction Co.*, 346 F. Supp. 558 (D. Neb. 1972)); *see also* Dkt. 63 at 15.

[99] *Sepulveda v. PMA*, 878 F.2d 1137, 1139 (9th Cir. 1989); *see also Milne Emp. Ass'n v. Sun Carriers*, 960 F.2d 1401, 1407 (9th Cir. 1991) ("[W]e hold that a nonsignatory to a CBA has standing to remove a case on the basis of section 301 preemption if resolution of the state law claim requires interpretation of the collective bargaining agreement."); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Hoosier Cardinal Corp.*, 383 U.S. 696, 699–700 (1966) (union had standing under Section 301 to sue for wages on behalf of members); *Pace v. Honolulu Disposal Serv, Inc.*, 227 F.3d 1150, 1155 (9th Cir. 2000) (concluding union members had "standing to assert claims for benefits; such claims constitute uniquely personal rights, similar to wages, conferring standing to sue under § 301"); *Bd. of Direct. of The Motion Pic. Indus. Pension Plan v. Oil Factory Inc.*, No. CV 15-9841-RSWL-AGRx, 2016 WL 3027337, at *3 (C.D. Cal. May 25, 2016) ("Section 301 of the LMRA has ben[sic] interpreted broadly to include suits by third party beneficiaries of an agreement between an employer and a labor organization.").

*of the United States and Canada* ("*Contracting Plumbers*"),[100] and by virtue of the underlying dispute and its effects on Samson.[101]

In *Contracting Plumbers*, the court concluded it had jurisdiction under Section 301 to set aside an arbitration award under Section 10 of the Federal Arbitration Act.[102] *Contracting*

---

[100] 841 F.2d 461 (2nd Cir. 1988).

[101] Dkts. 48 at 19–20; 80 at 74:13-22

[102] *Contracting Plumbers*, 841 F.2d at 466–67. The Federal Arbitration Act ("FAA") governs arbitration proceedings and "replace[d] judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443 (2006) (alterations in original)); 9 U.S.C. § 10 *et seq*. "Case law recognizes that, in order to provide a relatively expeditious and inexpensive dispute resolution, arbitration is not governed by the federal courts' strict procedural and evidentiary requirements." *U.S. Life Ins. Co. v. Super. Nat. Ins. Co.*, 591 F.3d 1167,1172–73 (9th Cir. 2010) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003) (en banc)). When interpreting and applying the FAA, courts should not impose "the federal courts' procedural and evidentiary requirements on the arbitration proceeding; rather, [courts'] responsibility is to ensure that the FAA's due process protections were afforded." *Id.* at 1173.

Section 10 of the FAA, 9 U.S.C. § 10, sets forth the exclusive grounds to vacate an arbitration award. Section 10(a) provides:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Plumbers* involved two appeals. In the first, a local union appealed from a district court order vacating an arbitration award and permanent injunctions interpreting the collective bargaining agreement between the local union and employer associations to require local unions to continue performing work which the international parent union ("parent union") had determined fell within the work jurisdiction of another of its affiliated unions ("Local 638").[103] In the second appeal, two local unions challenged the procedure employed by the parent union in determining that the disputed work belonged to Local 638.[104] The parent union was not a party to the initial arbitration dispute.[105] The employer associates sued under Section 9 of the FAA to have the arbitration awards confirmed.[106] The parent union and Local 638 intervened claiming the arbitration award was the result of collusion between the local unions and employer groups, to which the employer associations argued that the parent union and Local 638 lacked standing to challenge the award.[107] The Second Circuit affirmed the district court's conclusion that although the intervenors were not parties to the arbitration, the arbitration awards and injunctions "'affect the intervenors in a sufficiently substantial and concrete manner as to confer [Article III] standing to move to set them aside.'"[108] The Second Circuit further concluded that the arbitration decisions directly affected the parent union's rights to establish work jurisdictions among its local unions and that the local unions "were not free to arbitrate jurisdictional disputes under the arbitration clauses" of their collective

---

[103] *Contracting Plumbers*, 841 F.2d at 463.

[104] *Id.*

[105] *Id.* at 466.

[106] *Id.*

[107] *Id.*

[108] *Id.* at 466–68.

bargaining agreements.[109] The court reasoned that "[r]efusing to recognize [the parent union's] standing to challenge the arbitration awards and injunctions would undermine one of the primary reasons for the [parent union's] existence: to avoid trade line jurisdiction disputes between the local unions" and noting the parent union's "Constitution is paramount to the individual [collective bargaining agreements] of its members."[110]

At its core, *Contracting Plumbers* stands for the proposition that a third party not participating in an arbitration whose interests are affected "in a sufficiently substantial and concrete manner" has standing to challenge the arbitration award under Section 301(a) jurisdiction.[111] However, *Contracting Plumbers* is distinguishable from the present case in that it involved standing by a parent union with contractual relationships to its local unions to intervene under Federal Rule of Civil Procedure 24 in suit already in federal court brought by parties to the arbitration under the FAA. Additionally, not allowing the parent union to challenge the arbitration awards of its local unions undermined the policy rationale behind the parent union's existence. *Contracting Plumbers* has been interpreted and characterized as such by district courts in the Ninth Circuit.[112] The Ninth Circuit has not adopted its rationale.

---

[109] *Id.* at 466–67.

[110] *Id.* at 467.

[111] *See id.* at 466–67.

[112] *See, e.g.*, *Golden Temple of Or., LLC v. Puri*, No. 3:11–cv–01358–HZ, 2013 WL 4046326, at *4 (D. Or. Aug. 7, 2013) (describing *Contracting Plumbers'* holding that non-party with a "substantial interest in the arbitrations" could intervene as a matter of right under Rule 24(a) and noting the Ninth Circuit has not adopted this rationale); *Baseden v. Alaska*, No. 1:08-cv-00010 TMB, 2009 WL 10705049, at *3 n.13 (D. Alaska Feb. 25, 2009) (noting it was unclear whether union member had standing to vacate arbitration award in dispute brought by his non-party against his former employer, and citing to *Contracting Plumbers*, "'we are not persuaded by those cases which have held that an individual union member, who was not a party to the arbitration, lacked standing under § 10 to challenge the results of an arbitration between his union and his employer,'" but

Although Samson initially made an argument that the Coast Arbitrator's Decision should be set aside under the FAA,[113] Samson has since abandoned this argument after acknowledging the FAA "does not apply to employment contracts for workers engaged in interstate commerce, which ILWU workers almost certainly are."[114]

Samson admits it is not a party to the AALA.[115] Therefore, under current law, the only possible way Samson can have standing under Section 301 is if the Court finds Samson is a third-party beneficiary to the AALA. The Court must look to state law to determine whether petitioners are third-party beneficiaries.[116] Under Alaska law, a third party is an intended beneficiary of a contract if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either; (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."[117] Here it does not appear, and Samson does not allege, any provision of the AALA provides Samson rights or

---

ultimately concluding "[i]n the absence of controlling authority from the Ninth Circuit, and any clear guidance from outside circuits, the Court declines to rest its decision on this ground.").

[113] Dkt. 48 at 19–20 ("Under the [FAA]. . . . the court may vacate arbitration awards 'where the arbitrators exceeded their powers.' . . . Although the FAA does not expressly allow a non-party to the arbitration to seek to vacate an arbitration award, there are circumstances where a non-party may challenge an arbitration decision.").

[114] Dkt. 71 at 5 ("Samson would like to correct an error in its briefing. Samson made the argument that general princip[les] of arbitration law require the petition to be vacated, citing the [FAA.] The [FAA] does not apply to employment contracts for workers engaged in interstate commerce, which ILWU workers almost certainly are. Nonetheless the same princip[les] do apply in labor law and an arbitrator may not issue an award contrary to public policy."); 9 U.S.C. § 1.

[115] *See* Dkt. 1 at ¶¶ 7, 13.

[116] *See Sepulveda*, 878 F.2d at 1139.

[117] *Rathke v. Corr. Corp. of Am.*, 153 P.3d 303, 310 (Alaska 2007) (quoting Restatement (Second) of Contracts § 302 (Am. Law Inst. 1981)).

23

benefits.  Because Samson is not a party to or beneficiary of the AALA, Samson lacks standing under Section 301.

The Court finds merit to Samson's argument that it is substantially impacted by the Decision and Samson's appeals to the Court's equitable powers to confer standing.[118] The Court also acknowledges Samson's commonsense argument that the Coast Arbitrator's interpretation of the AALA mandates an unfair labor practice and contravenes public policy, which should be enough for Samson to gain standing to challenge the decision. However, absent more guidance from the Ninth Circuit, because Samson is not a party to or beneficiary of the AALA, the Court concludes Samson lacks standing under Section 301 to pursue this action.[119]

Perhaps more importantly, the Court lack jurisdiction to hear Samson's Section 301 claim. Section 301 jurisdiction is not dependent upon the parties to the suit, but rather the nature or subject matter of the action, and jurisdiction exists as long as the suit is for violation of a contract between the union and employer, even if neither party is a union or an employer.[120] However, to meet the jurisdictional and standing requirements of Section 301, Samson must still allege a violation of the AALA.[121]  It has failed to do so here. Instead, Samson argues ILWU's motivation behind pursuing

---

[118] *See, e.g.*, Dkt. 80 at 75:9-25, 77:9-20 ("The courts have jurisdiction and even a moral obligation, I would say, to step in and say the arbitrator can't do that.").

[119] *See* Dkt. 80 at 80:7-16 (ILWU points out that Samson has not cited "a single case that says an employer who is not covered by a collective bargaining agreement has standing to petition to vacate.").

[120] *See Lauser*, No. C-07-6464 SC, 2008 WL 2357246, at *4.

[121] *Painting & Decorating*, 707 F.2d at 1071 ("All that is required for jurisdiction to be proper under § 301(a) is that the suit be based on an alleged breach of contract between an employer and a labor organization and that the resolution of the lawsuit be focused upon and governed by the terms of the contract.") (citation omitted).  The Court also notes the cases interpreting jurisdiction under Section 301 as dependent on the dispute and not the parties have largely analyzed the dispute giving rise to jurisdiction in the context of suits brought by a third party beneficiary, which the Court already concluded Samson was not. Furthermore, Samson has provided no authority for the

arbitration and the Coast Arbitrator's ultimate interpretation of the AALA amounts to an unfair labor practice. Because Samson has not alleged there was a violation of the AALA, the Court lacks jurisdiction over Samson's Section 301 claim.

### 3. Section 303 Does Not Provide for Injunctive Relief

"[A]n employer cannot seek injunctive relief from a secondary boycott under [S]ection 303; only damages are available."[122] More generally, "the NLRA does not permit employers to seek injunctions against the activity that it does prohibit. It grants to the . . . NLRB[] exclusive authority to seek injunctions against some forms of secondary activity."[123] Therefore, "congressional policy, as expressed in the NLRA, remains that employers are not permitted to obtain injunctions of secondary activity."[124] Section 303 has been interpreted as providing exclusively for damages as a remedy, and not injunctive relief.[125]

/ / /

---

proposition that an AALA provision that allegedly contravenes public policy or mandates an unfair labor practice is a sufficient grounds for jurisdiction.

[122] *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997) (citing *Burlington N. R.R. v. Bhd.of Maintenance of Way Emp.*, 481 U.S. 429, 448 (1987)); *Cal. Ass'n of Emp. v. Building & Constr. Trades Council of Reno,* 178 F.2d 175, 178 (9th Cir. 1949) ("The [LMRA] did not give private litigants the right to obtain injunctive relief even in those situations where a suit for damages was allowed.").

[123] *Burlington N. R.R.*, 481 U.S. at 448 (citing 29 U.S.C. § 158(b)(4), 160(j), 160(l)).

[124] *Id.*

[125] *See, e.g.*, *San Antonio Cmty. Hosp.*, 125 F.3d at 1235; *Adobe Drywall, L.L.C. v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, No. CV-08-2105-PHX-SRB, 2009 WL 10707035, at *5 (D. Ariz. Feb. 5, 2009) ("[T]he Court may not order injunctive relief pursuant to § 303[.]"); *Adobe Drywall, L.L.C. v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, No. CV-08-2105-PHX-SRB, 2009 WL 10707036, at *5 (D. Ariz. July 10, 2009) (An "employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available.' . . . Therefore, Adobe cannot obtain injunctive relief on the basis of its claims that Defendants engaged in unfair labor practices under § 158(b)(4).")).

25

4. <u>Analysis of Standing and Jurisdiction</u>

Neither party raises whether Samson has Article III standing.[126] Instead, ILWU's argues that Samson lacks standing to bring a claim under Section 301 (to seek a preliminary injunction or to petition to vacate the arbitration award) because Samson is not a party to the AALA—the agreement between ILWU and Matson; is not a third party beneficiary of the AALA; has no contractual relationship with ILWU; none of Samson's rights and obligations are dependent upon an interpretation of the AALA; and Samson has not alleged that the Coast Arbitrator's Decision violates the AALA.[127] Additionally, Ninth Circuit case law states that "[t]o assert jurisdiction under § 301(a), a litigant must allege a breach of contract between an employer and a labor organization or between labor organizations in an industry affecting commerce,"[128] which Samson does not allege. Moreover, ILWU, argues, and Samsons does not contest, that Section 303 does not allow for injunctive relief.[129]

---

[126] To invoke the jurisdiction of the federal courts, a plaintiff must demonstrate that it has Article III standing. *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654 (9th Cir. 2011). To do so, a plaintiff must show it suffered an injury-in-fact that is "both 'concrete and particularized.'" In addition, this injury must be "fairly . . . traceable to the challenged action of the defendant" and redressable—"likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 654–55 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–611 (1992)).

[127] Dkts. 12 at 18–23; 63 at 15.

[128] *Painting & Decorating*, 707 F.2d at 1070; *see Garvey*, 203 F.3d at 587 ("Jurisdiction is proper under LMRA § 301(a) where (1) the suit is based on an alleged breach of contract between an employer and a labor organization and (2) the resolution of the lawsuit is focused upon and governed by the terms of the contract.").

[129] Dkts. 63 at 13–15; 80 at 92:17-21 ("[U]nder Section 303, the Ninth Circuit held in *San Antonio Community Hospital* and also *California Association of Employers* that 303 is not a basis for preliminary injunction. Full stop at that point. There is no basis under [Section] 303."); 71 at 2.

26

The Court agrees with the parties that Section 303 does not provide for injunctive relief.[130] Thus, despite the fact that the parties do not dispute that Samson has standing under Section 303 to bring a claim for damages against ILWU,[131] the Court cannot grant injunctive relief under Section 303.

### B. Matson as a Necessary Party

Moreover, even if the Court concluded Samson has standing to seek a preliminary injunction, absent Matson's presence, the Court could not adequately afford the injunctive relief Samson seeks. "[B]y definition, [necessary] parties to be joined under Rule 19 are those against whom no relief has formally been sought but who are so situated as a practical matter as to impair either the effectiveness of relief or their own or present parties' ability to protect their interests."[132]

Samson argues that due to the precarious situation with its lease agreement with Matson, it does not want to involve Matson in this litigation in an effort to maintain good relations between the companies.[133] Additionally, Samson states that Matson need not be joined because it has not committed unfair labor practices as it is "only a pass through entity which receives time in lieu

---

[130] *See San Antonio Cmty. Hosp.*, 125 F.3d at 1235 ("[A]n employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available.") (citing *Burlington Northern R.R.,* 481 U.S. at 448 (because the NLRB has exclusive authority to seek injunctions under the National Labor Relations Act, "employers are not permitted to obtain injunctions of secondary activity."); *see also* Dkts. 63 at 13–15; 71 at 2–3.

[131] *See* Dkt. 80 at 80:12-21 ("[A]nyone who is injured by reasons of an unfair labor practice can make a claim for damages, solely damages[.]"); *see also Am. President Lines, Ltd.*, 721 F.3d at 1153.

[132] *Peabody W. Coal Co.*, 400 F.3d at 783 (internal quotation marks, alterations, and citation omitted).

[133] Dkts. 71 at 6 ("Sometimes it is best not to poke the bear"); 80 at 69:6-12.

27

demands from ILWU[.]"[134] These arguments are unavailing. Samson's own description of the underlying rationale for bringing the preliminary injunction that "Matson will enforce [ILWU's claim] by demanding that Samson use ILWU labor or quit the premises,"[135] evinces that Matson is a necessary party to this Motion to afford the relief Samson seeks.

Additionally, the fact that ILWU is seeking clarification with the Coast Arbitrator to determine whether Matson is violating the Decision through the TSA or other contract between Samson and Matson, further weighs in favor of finding Matson a necessary party to a motion seeking to pause rights and obligations under a contract. The TSA is a contract between Samson and Matson that Samson now asks the Court to enjoin and to hold any pending payments due under this contract in a trust account.[136] Such a request for relief directly implicates the two parties to the contract, and it does not appear the Court could grant such relief absent Matson's participation.[137] Moreover, any decision about the underlying contract in Matson's absence would impair Matson's ability to protect its own interests. Although Samson may be correct that Matson need not be part

---

[134] Dkts. 71 at 6; 80 at 68:25–69:2, 70:14–71:20.

[135] Dkt. 59 at 7:4-7, 10:20-22.

[136] *See* Dkts. 59 at 13:9–14 ("ILWU understands that Matson has required Samson to make payments that it is passing through. But the Union members' entitlement to the time-in-lieu has nothing to do with Samson or the money coming from Samson. It is all about Matson's obligations under its contract with the ILWU[.]"); 55 at 3 ("ILWU is entirely uninvolved in Matson's decision to pass through these charges and because ILWU never agreed to accept time in lieu payments from Matson beyond the period of time needed for Matson to negotiate a terminal services agreement with Samson and obtain required cargo handling equipment."); 46 at 7 ("Samson seeks reimbursement from the ILWU of money it paid to non-party Matson under a contract between Matson and Samson to which ILWU is a stranger.").

[137] *See* Fed. R. Civ. P. 19; *Ward v. Apple*, 791 F.3d 1041, 1053 (9th Cir. 2015) (citing *Wilbur v. Locke*, 423 F.3d 1101, 1113 (9th Cir. 2005) ( "[I]t is well-established that all parties to a contract are necessary in an action to set aside the contract.").

of the litigation for the Court to resolve the ultimate issue of whether ILWU engaged in unfair labor practices,[138] it appears Matson is necessary for the equitable relief Samson seeks.[139]

### C. The Merits of Samson's Motion for Preliminary Injunction

The Court concludes it lacks jurisdiction over Samsons' Section 301 claim, Samson lacks standing to seek injunctive relief under Section 301, Section 303 does not provide for injunctive relief, and Matson is a necessary party to this Motion. Therefore, the Court need not weigh the four factors of (1) whether Samson is likely to succeed on the merits; (2) whether Samson he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in Samson's favor; and (4) if that an injunction is in the public interest. Further, the Court need not address ILWU's other arguments as to why Samsons' Motion should be denied.

Accordingly, Samson's Motion for a Preliminary Injunction is **DENIED**.

## V. CONCLUSION

For the forgoing reasons, Samson's Motion for Preliminary Injunction at Docket 47 is **DENIED**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 1st day of March, 2021.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[138] *But see Surf City Steel, Inc. v. ILWU*, No. CV 14-05604BRO (SSx), 2016 WL 10637079, at *10 (C.D. Cal. Dec. 28, 2016) (both parties to a collective bargaining agreement are necessary parties where the action challenges the terms of the agreement or requires interpretation of the CBA).

[139] Although Matson is a necessary party to the Motion for Preliminary Injunction, because the Court concludes Samson's Motion fails for lack of standing and jurisdiction, the Court need not analyze whether Matson is indispensable or order Matson be joined under Rule 19(a)(2).