IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMSON TUG AND BARGE CO., INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, ALASKA DIVISION; and ILWU, UNIT 222,<br><br>Defendants. | Consolidated Case Nos.:<br>3:20-cv-00108-TMB<br>3:20-cv-00248-TMB<br><br>**ORDER ON INTERNATIONAL LONGSHORE AND WAREHOUSE UNION'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. 169)** |

This matter comes before the Court on Defendant International Longshore and Warehouse Union's (the "International") Motion to Dismiss the Second Amended Complaint (the "Motion").[1] The International seeks dismissal of Plaintiff Samson Tug and Barge Company's ("Samson") claims solely against the International pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Samson's Second Amended Complaint ("SAC") fails to state a claim on which relief can be granted.[2] Samson opposes the Motion on the merits.[3] The International requested oral argument on the Motion.[4] However, the Court finds that oral argument would not be helpful to the Court's disposition of the Motion and therefore denies this request.[5] For the following reasons, the Motion at Docket 169 is **GRANTED**.

---

[1] Dkt. 169 (Motion); Dkt. 170 (Memorandum); Dkt. 174 (Reply).
[2] Dkt. 169 at 2.
[3] Dkt. 171 (Opposition).
[4] Dkt. 169 at 1; Dkt. 170 at 1.
[5] *See* L. Civ. R. 7.1(f).

1

# I. BACKGROUND

*A. Background and Procedural History*[6]

The International Longshore and Warehouse Union ("ILWU") is an unincorporated labor organization with offices nationwide, including in Alaska.[7] ILWU is party to a multi-employer collective bargaining agreement called the All Alaska Longshore Agreement ("AALA") with employer Matson Navigation Company of Alaska ("Matson") and others.[8]

In 2016 or 2017, Matson purchased the Womens Bay Terminal in Kodiak from LASH Corporation ("LASH"), which had for decades leased space to Samson at the terminal under a series of leases.[9] During the purchasing process, Samson—an Alaska corporation that provides marine tug and barge transportation services between Washington and Alaska—agreed to modify its lease to a month-to-month term.[10] Samson employs Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") members at the Womens Bay Terminal.[11] Samson and MEBA are not parties to the AALA.[12]

In 2018, ILWU filed a grievance against Matson, seeking assignment of work at the Womens Bay Terminal to ILWU-represented longshoremen under the AALA.[13] Alaska Arbitrator Herald C. Ugles arbitrated the grievance at a proceeding in Anchorage and ultimately denied it.[14] On appeal, Coast Arbitrator John Kagel vacated the Alaska Arbitrator's decision, finding that Matson was required under the AALA to assign all cargo handling work at the Womens Bay

---

[6] A detailed background of this case is set forth in detail in the Court's Orders at Dockets 81 and 82 and will not be repeated here.
[7] Dkt. 161 ¶¶ 5, 5.5 (Second Amended Complaint).
[8] *Id.* ¶ 13.
[9] *Id.* ¶¶ 10, 12.
[10] *Id.* ¶¶ 4, 12.
[11] *Id.* ¶ 7.
[12] *Id.* ¶ 13.
[13] *Id.* ¶ 14; Dkt. 161-4 (Decision of Alaska Arbitrator).
[14] Dkt. 161 ¶¶ 15, 49; Dkt. 161-4.

Terminal to ILWU-represented longshoremen.[15] Samson continued its cargo operations at Womens Bay with its own MEBA employees and began paying "time in lieu" wages for ILWU claimed work, which Samson submits it did under threat of enforcement of the Coast Arbitrator's decision and eviction by Matson.[16]

In October 2020, Samson filed a complaint against the ILWU, Alaska Longshore Division (the "Division") and ILWU Unit 222 ("Unit 222") (collectively, the "Alaska Defendants") for damages under Section 303 of the Labor Management Relations Act.[17] Section 303 provides a private cause of action in district court to a party injured by a union's unfair labor practice ("ULP") as defined in § 8(b)(4) of the National Labor Relations Act.[18] In its initial Complaint, Samson alleged that the Alaska Defendants committed the ULP defined in § 8(b)(4)(D): threatening, coercing, or restraining an employer with the objective of forcing it to assign work to a particular union instead of another.[19] This ULP is one of four defined in § 8(b)(4).[20] Each subsection makes it a ULP to "threaten, coerce, or restrain any person[21] engaged in commerce or in an industry affecting commerce" but for varying prohibited objectives.[22]

In December 2021, Samson filed a motion to amend the Complaint, seeking to add new legal theories—specifically, that the Alaska Defendants' actions constitute ULPs under two

---

[15] Dkt. 161 ¶ 16; Dkt. 161-5 (Opinion and Decision of Coast Arbitrator).
[16] Dkt. 161 ¶ 19; *see also* Dkt. 171 at 5.
[17] Case No. 3:20-cv-00248-TMB, Dkt. 1 (Complaint). This is Samson's sole remaining claim. The Court dismissed Samson's petition to vacate an arbitration award and claim for injunctive relief. Dkt. 82 (Order Denying Motion for Preliminary Injunction); Dkt. 85 (Order on Motion to Dismiss and Motion to Strike).
[18] 29 U.S.C. § 187 (Section 303); 29 U.S.C. § 158(b)(4) (§ 8(b)(4)).
[19] 29 U.S.C. § 158(b)(4).
[20] *Id.*
[21] *See* 29 U.S.C. § 152(1) ("The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11, or receivers.").
[22] 29 U.S.C. § 158(b)(4).

3

additional subsections, 8(b)(4)(A) and (B).[23] These subsections define prohibited objectives as "forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by [29 U.S.C. § 158(e)]" and "forcing or requiring any person to . . . cease doing business with any other person."[24] Samson also sought to update its claim for damages to include the increased amounts suffered since it filed the initial Complaint.[25] The Court granted Samson's motion;[26] Samson filed its First Amended Complaint in March 2022.[27]

In June 2022, Samson filed a second motion to amend the Complaint, this time seeking to add the International as a defendant.[28] The Court granted this motion[29] and in September 2022, Samson filed its Second Amended Complaint ("SAC").[30]

### B. Second Amended Complaint

In the SAC, Samson alleges that the International is liable for the Alaska Defendants' Section 303 violations because it "instigated, authorized, solicited, ratified, condoned, or adopted" the unlawful conduct of these affiliates.[31] Samson alleges that the International "had actual knowledge of all actions taken by . . . the [Alaska] Defendants in furtherance of the [alleged ULPs]," and that this knowledge may be imputed from two sources.[32] First, Samson alleges that Willie Adams, President of the International, and Chuck Wendt, a member of the International

---

[23] 29 U.S.C. § 158(b)(4)(ii)(A)
[24] 29 U.S.C. § 158(b)(4)(ii)(B).
[25] Dkt. 125 (Motion to Amend Complaint).
[26] Dkt. 131 (Order).
[27] Dkt. 132 (First Amended Complaint).
[28] Dkt. 142 (Second Motion to Amend Complaint).
[29] Dkt. 147 (Text Order).
[30] Dkt. 161.
[31] *Id.* ¶ 57.
[32] *Id.* ¶ 48.

4

Executive Board—"the highest governing body of the International"—had knowledge of the Alaska Defendants' unlawful actions because they "were present at the arbitration proceeding in Anchorage . . . brought by Unit 222 seeking a ruling that required Matson to force Samson to use ILWU labor."[33] Second, Samson alleges that President Adams and two other International officers, Vice President Bobbie Olivera and Secretary-Treasurer Ed Ferris, had knowledge of the Alaska Defendants' unlawful actions because they were copied on an email sent by the Division's Dennis Young to MEBA seeking to force Samson to use ILWU labor.[34] According to Samson, these allegations demonstrate that the International may be held liable because they show that the International actually knew of the Alaska Defendants' unlawful actions yet "took no measures to stop the[se] actions or express disapproval."[35]

### C. The International's Motion to Dismiss

The International moves to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).[36] The International argues that the SAC fails to state a claim against it because an international union is not liable for the actions of its affiliates unless the affiliates were acting as the international's agents, and Samson fails to allege facts plausibly establishing agency.[37] Specifically, the International contends that its "passive attendance" at the Anchorage arbitration and receipt of Young's email "could at most support the inference that the International knew

---

[33] *Id.* ¶¶ 47, 49–51.
[34] *Id.* ¶¶ 49, 51. Samson states that the email sought to "force Samson to accept one of three options: (1) recognize ILWU jurisdiction at Pier 2 in Kodiak, thereby replacing Samson's MEBA employees with ILWU employees at Pier 2; (2) use ILWU members to perform all longshore services at the LASH terminal at Womens Bay; or (3) that Matson should terminate Samson's lease of the LASH terminal at Womens Bay," should Samson not acquiesce to options 1 or 2. *Id.* ¶ 49.
[35] *Id.* ¶¶ 58–59.
[36] Dkt. 169.
[37] Dkt. 170 at 5, 7–11.

about the Alaska Defendants' conduct."[38] According to the International, liability under an agency theory requires more than mere knowledge or observation of its affiliates' allegedly unlawful conduct and a subsequent failure to act.[39] The International also seeks dismissal of Samson's claims for injunctive relief and attorney's fees, arguing that Section 303—Samson's sole legal theory—does not provide for either form of relief.[40]

Samson opposes the Motion, arguing that the SAC contains sufficient facts to show that the International may be held vicariously liable for the Alaska Defendants' alleged ULPs.[41] For one, Samson asserts that President Adams and Executive Board Member Wendt's presence at the arbitration show that the International "took an active interest in" and "approved" the Alaska Defendants' conduct.[42] Moreover, Samson contends that President Adams, Vice President Olivera, and Secretary-Treasurer Ferris's "actual knowledge of the [Alaska Defendants'] coercion" supports the reasonable inference that the International "condoned and ratified the wrongful conduct."[43] Samson also argues that the International's acceptance of time in lieu payments for work performed by MEBA members demonstrates that the International ratified the Alaska Defendants' unlawful conduct.[44] Samson does not oppose the Motion to the extent that the Motion requests dismissal of Samson's claims for injunctive relief and attorney's fees.[45]

## II. LEGAL STANDARD

The International filed the Motion pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking dismissal of all claims against it. A motion to dismiss for failure to state a claim under

---

[38] *Id.* at 8.
[39] Dkt. 174 at 5.
[40] *Id.* at 11–13.
[41] Dkt. 171 at 1.
[42] *Id.* at 8–9, 11, 20.
[43] *Id.* at 21.
[44] *Id.*
[45] *Id.* at 1 n.1.

6

Rule 12(b)(6) seeks dismissal of a claim against a party based solely upon the statements made in the pleadings.[46] To avoid dismissal, a complaint must (1) set forth "a short and plain statement of the claim showing that the pleader is entitled to relief"[47] and (2) "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[48] A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[49] "Factual allegations must be enough to raise a right to relief above the speculative level."[50] Thus, there must be "more than a sheer possibility that a defendant has acted unlawfully."[51] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief."[52]

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[53] In ruling on a Rule 12(b)(6) motion, the court must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party."[54] However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."[55]

---

[46] *See* Fed. R. Civ. P. 12(b)(6), (d).
[47] Fed. R. Civ. P. 8(a)(1).
[48] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).
[49] *Id.*
[50] *Twombly*, 550 U.S. at 555.
[51] *Iqbal*, 556 U.S. at 678.
[52] *Id.*
[53] *Id.* at 679 (citation omitted).
[54] *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 923 (9th Cir. 2001) (quoting *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000)).
[55] *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### III.  DISCUSSION

*A. Samson Has Not Alleged Facts Plausibly Establishing that the Division and Unit 222 Acted as the International's Agents*

Samson alleges that the Alaska Defendants acted as agents of the International in committing ULPs, thus making the International vicariously liable for the Alaska Defendants' violation of Section 303.[56] The International argues that Samson has failed to allege facts plausibly showing that the Alaska Defendants were acting as its agents.[57] Namely, the International contends that "[t]he allegations that an International officer and [an] Executive Board member attended an arbitration and that International officers were copied on an email do not [establish agency]" because these allegations "at most support the inference that the International knew about the Alaska Defendants' conduct."[58] According to the International, "knowledge of unlawful conduct by an affiliate is insufficient to establish agency as a matter of law."[59]

Samson argues that it has alleged sufficient facts showing that the International ratified the "improper objectives of the arbitrations."[60] First, Samson suggests that President Adams and an Executive Board member's attendance at the Anchorage arbitration demonstrates the International's "[a]ctive interest in the [Alaska Defendants'] wrongful conduct."[61] Second, Samson contends that the International officers' silence in response to Young's email—which allegedly demonstrated the Alaska Defendants' attempts to coerce Samson into using ILWU labor—permits a reasonable inference that the International had "actual knowledge of and condoned the improper objectives of the arbitrations."[62] Third, Samson argues that the International's

---

[56] Dkt. 161 at 11–15.
[57] Dkt. 170 at 10–11.
[58] *Id.*
[59] *Id.* at 11.
[60] *Id.* at 17.
[61] *Id.*
[62] *Id.*

acceptance of time in lieu payments for work performed by MEBA members shows that the International ratified the Alaska Defendants' unlawful conduct.[63] Together, Samson argues, these facts are enough to plausibly establish agency.[64]

An international union may be responsible for the actions of an affiliate if the international "instigated, supported, ratified or encouraged the [affiliate's] activities . . . ."[65] Common law agency principles apply when determining whether an international union may be held liable for the alleged actions of an affiliate.[66] Under these principles, "if the [affiliate] engages in illegal conduct in furtherance of its role as an agent of the international, the international will be liable for the local's actions."[67] However, "if the [affiliate] exercises considerable autonomy in conducting its affairs, it cannot be regarded as an agent of the international, and the international accordingly cannot be held liable under an agency theory for the [affiliate's] actions."[68]

---

[63] *Id.* at 21.
[64] *Id.* at 19–21.
[65] *Moore v. Loc. Union 569 of Int'l Bhd. of Elec. Workers*, 989 F.2d 1534, 1543 (9th Cir. 1993). Samson suggests that a more sweeping standard applies, submitting that an international union may be liable for its affiliate's actions if the international union "'instigated, authorized, solicited, ratified, condoned, or adopted' . . . the unlawful conduct." Dkt. 171 at 15 (quoting *Iron Workers Dist. Council of Pac. N.W. v. Nat'l Lab. Rel. Bd.*, 913 F.2d 1470, 1477 (9th Cir. 1990). However, the case Samson cites for this proposition involved a district council's joint liability for the local's unlawful conduct, *see Iron Workers Dist. Council of Pac. N.W.*, 913 F.2d at 1477, as opposed to an international union's vicarious liability for its affiliate's unlawful conduct—a distinct issue that was squarely addressed in *Moore* and is at issue in this case. As a result, the Court applies *Moore*'s more limited standard here and does not address Samson's argument that the International may be liable because it "condoned" the Alaska Defendants' conduct. *See* Dkt. 171 at 17.
[66] *See Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17 (1979) (applying common law principles and affirming that an international union could not be held liable for an unauthorized strike by one of its local unions); *see also* 29 U.S.C. § 185(e).
[67] *Laughon v. Int'l All. of Theatrical Stage Emps., Moving Picture Technicians, Artists & Allied Crafts of the U.S. & Canada*, 248 F.3d 931, 935 (9th Cir. 2001) (citing *Carbon Fuel Co.*, 444 U.S. at 217).
[68] *Id.* (citing *Carbon Fuel Co.*, 444 U.S. at 217); *Shimman v. Frank*, 625 F.2d 80, 97–98 (6th Cir. 1980), *overruled on other grounds by Shimman v. Int'l Union of Operating Engineers, Local 18*, 744 F.2d 1226 (6th Cir. 1984)).

9

As an initial matter, the Court notes that Samson has not alleged a control-based theory of agency, which would require application of the analysis set out in *Laughon v. International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States and Canada*.[69] Rather, Samson alleges that the International supported or ratified the Alaska Defendants' allegedly unlawful activities, focusing on the International's knowledge of these activities as demonstrated by (1) President Adams and an Executive Board member's attendance at the Anchorage arbitration and (2) President Adams and two other International officers' receipt of Young's email. The nature of these allegations renders *Laughon* not especially useful because the analysis in that case focuses primarily on the structural relationship between an international and its affiliates instead of the parties' specific conduct.[70] The *Laughon* analysis is therefore not determinative of whether the Alaska Defendants acted as the International's agents. The Court's analysis is instead guided by *Moore v. Local Union 569 of International Brotherhood of Electrical Workers*, which requires evaluating whether Samson has alleged facts which plausibly demonstrate that the International "instigated, supported, ratified or encouraged" the Alaska Defendants' allegedly unlawful activities.[71]

With these principles in mind, Samson has not alleged sufficient facts plausibly showing that the International may be held liable for the Alaska Defendants' actions. The key flaw in Samson's allegations is that Samson suggests that to the extent the International endorsed the Alaska Defendants' conduct, it did so only passively and indirectly.[72] In *Carbon Fuel Company v.*

---

[69] *See* 248 F.3d 931, 935 (9th Cir. 2001) (examining international union's constitution and "the actual relationship between the local and the international," as evidenced by "the local's election of its own officers, ability to hire and fire its own employees, maintenance of its own treasury and independent conduct of its daily business," in determining existence of agency relationship).
[70] *Id.*
[71] *Moore*, 989 F.2d at 1543.
[72] *See* Dkt. 161 at 11–15.

10

*United Mine Workers of America*, the Supreme Court held that an international union could not be liable "for its failure to take certain steps in response to actions of the local," reasoning that the Labor Management Relations Act expressly limits an international union's legal responsibility for the acts of its affiliates.[73] By requiring a showing that the international union "instigated, supported, ratified or encouraged the [affiliate's] activities," the Ninth Circuit in *Moore* reiterated that some degree of active involvement or an affirmative act of assent is required to establish an agency relationship under this type of agency theory.[74]

This requirement of active involvement or an affirmative act of assent also applies at the pleading stage. Although Samson may be correct that seemingly small actions, such as "[a] single telephone call[,] can be sufficient to infer participation in illegal conduct,"[75] these actions must still entail more than the international union's inaction in the face of an affiliate's conduct. The cases Samson cites in its briefing indicate as much.[76] For example, in *Abreen Corporation v. Laborers' International Union, N.A.*, the First Circuit Court of Appeals affirmed the district court's

---

[73] 444 U.S. at 217–18.
[74] *See* 989 F.2d at 1543; *see also Instigate*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To goad or incite (someone) to take some action or course."); *Support*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/support (last accessed Jan. 6, 2023) ("[T]o promote the interests or cause of[; or to] assist, help."); *Ratify*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/ratify ("[T]o approve and sanction formally."); *Encourage*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To instigate; to incite to action; to embolden; to help.").
[75] *See* Dkt. 171 at 15.
[76] The Court notes that Samson cites several cases involving unions' responsibility for actions of their own members or officers in contempt proceedings over the unions' compliance with a court order. *See* Dkt. 171 at 16–17 (citing *Hooks v. Int'l Longshore & Warehouse Union*, 72 F. Supp. 3d 1168, 1186 (D. Or. 2014); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000)). The Court agrees with the International that these cases are inapposite because the considerations involved in evaluating a union's liability for failure to comply with a court order requiring or forbidding certain conduct are distinct from those considerations posed by the specific issue in this case: an international's vicarious liability for the actions of its affiliates. *See Carbon Fuel Co.*, 444 U.S. at 216–18 (explaining that "Congress took such care to construct" shield protecting international unions from liability for failure to act in response to affiliates' actions).

11

finding that an international union was liable for its affiliate's unlawful conduct because the international union's vice president "implicitly threaten[ed]" the vice president of a secondary employer with economic pressure during a phone call.[77] The appellate court held that it was not error to find that the phone call, made the day before the affiliate began picketing in a way that put undue pressure on secondary employers, constituted a "veiled threat" of labor trouble on behalf of the affiliate.[78] For reasons consistent with *Abreen*, a vast number of courts have rejected an international or national union's liability for their affiliates' conduct under an agency theory premised only on the international or national union's passive involvement or failure to disapprove of the relevant conduct.[79]

---

[77] 709 F.2d 748, 757–58 (1st Cir. 1983).

[78] *Id.*

[79] *See Baird v. Holway*, 539 F. Supp. 2d 79, 92–93 (D.D.C. 2008) (granting national union's motion to dismiss because plaintiff "merely asserted that [the national union] neglected to take action in response to plaintiff's repeated complaints," which "alone [was] insufficient to constitute the 'specific evidence' of agency required to impose vicarious liability upon [the national union]"); *Chapa v. Loc. 18*, 737 F.2d 929, 932 (11th Cir. 1984) (refusing to hold national union liable for retaliatory discipline by local union despite national official's presence at local meeting where unlawful discipline was meted out because plaintiff had "introduced no evidence proving that [alleged agent of national] took any part in the action against him at the local level" and alleged agent "was a spectator, not a participant, at the local meetings"); *Brenner v. Loc. 516, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1289 (3d Cir. 1991) ("[N]either the fact that several . . . letters to the [i]nternational mentioned hiring hall abuses nor the failure of [the international's representative of its General President] to take actions after witnessing the verbal and physical attack on a union member demonstrates encouragement or ratification [of the local's conduct]."); *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Can.*, 973 F.2d 1050, 1062 (2d Cir. 1992) (holding that an international representative's attendance at meetings of locals' business managers at which plaintiffs' complaints were mentioned "provided no evidence of ratification [of] or participation" in locals' unlawful scheme); *Berger v. Iron Workers Reinforced Rodmen Loc. 201*, 843 F.2d 1395, 1429 (D.C. Cir. 1988) (explaining that "a union's failure to act in opposition to discriminatory practices of an organization with which it has no agency relationship" is insufficient grounds to render the parent union vicariously liable for the local's practices); *see also Loc. Union 984, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO v. HumKo Co.*, 287 F.2d 231, 242 (6th Cir. 1961), *disapproved of on other grounds by Summit Valley Indus. Inc. v. Loc. 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717 (1982) (holding that the trial court properly found that the international union participated in, authorized, and ratified the local union's

12

Here, in contrast, the SAC does not contain allegations that the International was actively involved in or supported the Alaska Defendants' conduct: it alleges only that President Adams and an Executive Board member attended—but not that they participated or played any active role in—an arbitration to which the Alaska Defendants were parties, and that President Adams and two other International officers were copied on an email demonstrating the Alaska Defendants' unlawful conduct.[80] Because these allegations do not present "more than a sheer possibility that a defendant has acted unlawfully,"[81] they are insufficient to allow the Court to draw the reasonable inference that the International may be held liable.

This conclusion does not change after considering the SAC's allegations concerning the International's "actual knowledge" of the Alaska Defendants' conduct. "An international union has no independent duty to intervene in the affairs of its local chapters, *even where the international has knowledge of the local's unlawful acts*."[82] Samson appears to argue that the International's liability may be established by its actual knowledge that the Alaska Defendants engaged in unlawful conduct and the International's subsequent failure to act. In making this argument, Samson relies heavily on the *Moore* court's statement that "*constructive* knowledge of the Local's possibly illegal activity d[id] not impose on the International a legal duty to

---

unlawful actions in a boycott because an agent of the international participated in negotiations in labor dispute between the local and an employer); *Rodonich v. House Wreckers Union Loc. 95 of Laborers' Int'l Union*, 817 F.2d 967, 973 (2d Cir. 1987) (explaining that ratification under common law "can only occur when the principal, having knowledge of the material facts involved in a transaction, evidences an intention to ratify it," and that in this instance, "ratification would occur if [the international] *affirmed* the discipline imposed on plaintiffs with full knowledge that it was part of an overall scheme to suppress dissent in violation of the [Labor Management Reporting and Disclosure Act of 1959]" (quotation omitted) (emphasis added)).
[80] *See* Dkt. 161.
[81] *See Iqbal*, 556 U.S. at 678.
[82] *Phelan*, 973 F.2d at 1061–62 (emphasis added) (citing *Carbon Fuel Co.*, 444 U.S. at 217–18); *see also Rodonich*, 817 F.2d at 974 (observing that it "is established law" that international has no independent duty to intervene in affairs of a local).

13

intervene."[83] But Samson extrapolates too far in interpreting this statement, which provides merely that constructive knowledge is not enough to create a duty to intervene, to mean that *actual* knowledge creates such a duty. The *Moore* court favorably cited *Chapa v. Local 18*, where the Eleventh Circuit refused to hold an international union liable for retaliatory discipline imposed by its affiliate, despite an international official's presence at the affiliate meeting when the unlawful discipline was handed down.[84] Like the plaintiff in *Chapa*, Samson's theory of agency is based on key International officials' presence at events where the affiliates' unlawful conduct was on display, giving the International actual—as opposed to merely constructive—knowledge of the unlawful conduct. And like the plaintiff in *Chapa*, this theory cannot succeed without allegations that the International officials were more than a "spectator" at the proceedings.[85]

Furthermore, the Court is not persuaded by Samson's argument that the standard for ratification by inaction set forth in the Restatement (Third) of Agency ("Restatement") applies in this context.[86] The commentary to Section 4.01 of the Restatement provides that "[a] principal may ratify an act by failing to object to it or to repudiate it" and that "[f]ailure to object may constitute such a manifestation when the person has notice that others are likely to draw . . . an inference from silence [that the person has assented]."[87] Samson submits that the International ratified the Alaska Defendants' actions by failing to express disapproval to the local officials prosecuting the arbitrations and by failing to respond to the post-arbitration email, because this silence made others likely to infer that the International approved of the allegedly unlawful

---

[83] *See* 989 F.2d at 1543 (emphasis added).
[84] 989 F.2d at 1543.
[85] 737 F.2d at 932; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility'" that the plaintiff is entitled to relief").
[86] *See* Dkt. 171 at 19.
[87] Restatement (Third) of Agency § 4.01 cmt. f (Am. L. Inst. 2006).

14

actions.[88] However, applying the Restatement standard for ratification by inaction in the context of an international union's liability for the actions of its affiliates would directly conflict with *Carbon Fuel Co.* and its progeny, which—as discussed above—require more active involvement or an affirmative act of assent to prove ratification.[89]

For similar reasons, Samson's allegations pertaining to the International's "knowing[] accept[ance]" of the "benefits of the time in lieu charges paid to ILWU members" fail to support a ratification theory.[90] With respect to this issue, the SAC alleges only that the Alaska Defendants have demanded Samson pay time in lieu charges for cargo handling work performed by Samson's employees at Womens Bay.[91] Samson appears to contend in its Opposition that the International's receipt or retention of the "benefits of the time in lieu charges" constitutes ratification.[92] But crucially, the SAC contains no allegations suggesting that the International actively accepted or even received the time in lieu payments, or that the International received benefits from the Alaska Defendants beyond union dues to which they were already entitled.[93]

Accordingly, the Court **DISMISSES** Defendant the International from this case.

---

[88] *See* Dkt. 171 at 19.
[89] Moreover, the Court agrees with the International that even if the Restatement standard applied in this context, the allegations in the SAC would be insufficient to demonstrate ratification because they do not include the critical allegation that "the International has any authority or control over the Alaska Defendants as a general matter." *See* Dkt. 174 at 6; RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. f (indicating that inaction may constitute ratification only when a principal-agent relationship already exists).
[90] *See* Dkt. 171 at 19–21.
[91] Dkt. 161 ¶ 33.
[92] Dkt. 171 at 19, 21 (citing RESTATEMENT (THIRD) OF AGENCY § 4.06 cmt. g (providing that "[a] person may ratify an act . . . by receiving or retaining benefits it generates if the person has knowledge of material facts . . . and no independent claim to the benefit")).
[93] *See* Dkt. 161 ¶ 44.

### B. Samson's Injunctive Relief and Attorney's Fees Claims Are Dismissed

The SAC requests that the Court grant Samson relief that includes: (1) "an Order blocking further time in lieu charges by ILWU for cargo handling work performed by Samson's employees at Womens Bay"; (2) "[Samson's] costs and fees of suit incurred herein and interest as required by law"; and (3) any "other and further . . . equitable relief that the Court may deem just and proper."[94]

The International argues that Samson's injunctive relief claims should be dismissed because the Court has already twice ruled that injunctive relief is unavailable under Section 303, which is the same and sole cause of action that Samson pleads in the SAC.[95] Samson acknowledges that "the Court has previously addressed this issue" and states that it does not oppose dismissal of its injunctive relief claims.[96] The Court therefore **DISMISSES** these claims.

The International also argues that Samson's attorney's fees claim should be dismissed because Section 303 does not provide for attorney's fees as a remedy.[97] Samson similarly elects not to oppose dismissal of this claim.[98] The Court agrees with the International and therefore **DISMISSES** Samson's attorney's fees claim.[99]

---

[94] Dkt. 161 ¶¶ 1, 3–4.
[95] *See* Dkt. 81 at 10; Dkt. 85 at 21–22.
[96] Dkt. 171 at 1 n.1.
[97] Dkt. 170 at 13.
[98] Dkt. 171 at 1 n.1.
[99] *See Mead v. Retail Clerks Int'l Ass'n, Loc. 839*, 523 F.2d 1371, 1381 (9th Cir. 1975) (holding that attorney's fees are unavailable to prevailing plaintiffs under Section 303).

16

## IV.     CONCLUSION

For the foregoing reasons, the International's Motion to Dismiss the Second Amended Complaint at Docket 169 is **GRANTED**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 28th day of February, 2023.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE