# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMSON TUG AND BARGE CO., INC.,<br><br>                      Plaintiff,<br><br>     v.<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, ALASKA DIVISION; and ILWU, UNIT 222,<br><br>                      Defendants. | Consolidated Case Nos.:<br>3:20-cv-00108-TMB<br>3:20-cv-00248-TMB<br><br><br>**ORDER ON DEFENDANTS' MOTION TO COMPEL**<br>**(DKT. 175)** |

This matter comes before the Court on Defendants International Longshore and Warehouse Union, Alaska Longshore Division and ILWU Unit 222's (collectively, "ILWU") Motion to Compel (the "Motion").[1] ILWU seeks: (1) *in camera* review of all documents that Plaintiff Samson Tug and Barge Co., Inc. ("Samson") currently withholds based on the common-interest doctrine; (2) an order directing Samson to produce any such documents ruled discoverable, or, in the alternative, an order directing Samson to produce a more detailed privilege log; and (3) an award of reasonable expenses pursuant to Federal Rule of Civil Procedure ("Rule") 37(a)(5).[2] Samson opposes the Motion on the merits.[3] For the following reasons, the Motion at Docket 175 is **GRANTED in part and DENIED in part**.

---

[1] Dkt. 175 (Motion); Dkt. 186 (Reply).
[2] Dkt. 175 at 2.
[3] Dkt. 182 (Response).

1

## I.  BACKGROUND

*A.  Background of the Case*

This case arises from the alleged unfair labor practices committed by ILWU under Section 303 of the Labor Management Relations Act ("LMRA").[4] ILWU is party to a multi-employer collective bargaining agreement called the All Alaska Longshore Agreement ("AALA") with several maritime employers, including Matson Navigation Company of Alaska ("Matson").[5]

In 2016 or 2017, Matson purchased Womens Bay Terminal in the Port of Kodiak.[6] Until that point, the terminal had been owned by the LASH Corporation ("LASH").[7] For decades, LASH had leased space at Womens Bay Terminal to Samson, which provides marine tug and barge transportation services between Washington and Alaska.[8] Samson has historically employed Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") members at the terminal to load and unload cargo, including cargo for American President Lines, Inc. ("APL").[9] Before Matson purchased Womens Bay Terminal, Samson agreed to modify its lease to a month-to-month term, with a right of termination with 30 days' notice by either party.[10]

According to ILWU, Matson informed APL in early 2018 that it would no longer ship APL's cargo.[11] ILWU states that Matson then ordered Samson, under threat of eviction, to terminate its sublease with APL at Womens Bay Terminal and to cease handling APL cargo at that

---

[4] *See* Dkt. 161 (Second Amended Complaint).
[5] Dkt. 175 at 5; *see also* Dkt. 161 ¶¶ 31, 33.
[6] Dkt. 175 at 5; Dkt. 161 ¶ 12.
[7] Dkt. 175 at 5; Dkt. 161 ¶ 12.
[8] Dkt. 175 at 5; Dkt. 161 ¶¶ 4, 10.
[9] Dkt. 161 ¶¶ 7, 11; Dkt. 175 at 5. According to the parties, APL is a party to the AALA, while Samson and MEBA are not. Dkt. 175 at 5; Dkt. 161 ¶ 7.
[10] Dkt. 175 at 6; Dkt. 161 ¶ 12; Dkt. 161-3 at 2 (Agreement to Amend Lease).
[11] Dkt. 175 at 6.

Case 3:20-cv-00108-TMB   Document 202   Filed 06/29/23   Page 2 of 26

location.[12] Samson reportedly complied.[13] ILWU states that up until this point, APL had been hiring ILWU-represented longshoremen pursuant to the AALA and a 2015 agreement between APL and Matson.[14] ILWU asserts that Matson "unilaterally broke this agreement, which eliminated work opportunities for ILWU" at Womens Bay Terminal.[15]

ILWU proceeded to file a grievance against Matson, seeking assignment of work at Womens Bay Terminal to ILWU-represented longshoremen under the AALA.[16] Alaska Arbitrator Herald C. Ugles arbitrated the grievance at a proceeding in Anchorage and ultimately denied it.[17] On appeal, Coast Arbitrator John Kagel vacated the Alaska Arbitrator's decision, finding that Matson was required under the AALA to assign all cargo handling work at Womens Bay Terminal to ILWU-represented longshoremen.[18] Samson subsequently entered into an agreement with Matson to continue its cargo operations at Womens Bay Terminal with its MEBA employees as long as it reimbursed Matson and paid additional "time in lieu" wages for ILWU-claimed work.[19]

Samson then filed a Complaint in this case.[20] Samson alleges that ILWU unlawfully "threaten[ed], coerc[ed], or restrain[ed]" Samson with the objective of: (1) forcing it to assign work to a particular union instead of another; (2) "forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by [29 U.S.C. § 158(e)]"; and (3) "forcing or requiring any person to . . . cease doing

---

[12] *Id.*; *see also* Dkt. 161 ¶ 19.
[13] Dkt. 175 at 6; *see also* Dkt. 161 ¶ 19.
[14] Dkt. 175 at 6.
[15] *Id.*
[16] Dkt. 161 ¶ 14; Dkt. 175 at 6; Dkt. 161-4 (Decision of Alaska Arbitrator).
[17] Dkt. 161 ¶¶ 15, 49; Dkt. 161-4.
[18] Dkt. 161 ¶ 16; Dkt. 175 at 6; Dkt. 161-5 (Opinion and Decision of Coast Arbitrator).
[19] Dkt. 161 ¶ 19; Dkt. 175 at 6–7.
[20] Dkt. 1 (Complaint); *see also* Dkt. 132 (First Amended Complaint); Dkt. 161.

3

business with any other person."[21] Specifically, Samson alleges that ILWU has demanded that: (1) Samson "use ILWU represented employees to perform all of Samson's cargo operations at Womens Bay . . . rather than Samson's MEBA represented employees"; (2) "Matson apply the Coast Arbitrator's [D]ecision by terminating Samson's Womens Bay lease . . . if Samson does not use ILWU" members for Samson's Womens Bay operations or pay time in lieu charges; and (3) Samson use ILWU members in its cargo operations at other ports, "including the waterside operations at Pier II, a separate Kodiak terminal."[22]

According to ILWU, APL obtained a Terminal Operation Contract from the City of Kodiak in August 2018—after Matson required Samson to terminate its sublease with APL—and started loading and unloading its cargo on and off Samson barges at Pier II.[23] APL's use of Pier II resulted in a jurisdictional dispute between ILWU and MEBA over whether ILWU or MEBA was entitled to perform work handling APL's containers at Pier II.[24] In April 2020, the National Labor Relations Board ("NLRB") issued a decision finding that MEBA-represented employees were entitled to the disputed work at Pier II.[25]

ILWU maintains that although the Pier II dispute is not directly relevant to work at Womens Bay Terminal, "the circumstances surrounding [it] are relevant to ILWU's affirmative

---

[21] 29 U.S.C. § 158(b)(4). This LMRA claim is Samson's sole remaining claim. The Court dismissed Samson's petition to vacate an arbitration award and claim for injunctive relief. Dkt. 82 (Order Denying Motion for Preliminary Injunction); Dkt. 85 (Order on Motion to Dismiss and Motion to Strike); *see also* Dkt. 188 (Order Granting Motion to Dismiss Defendant International).
[22] Dkt. 161 ¶¶ 17, 19, 20.
[23] Dkt. 175 at 7.
[24] *Id.*; Dkt. 161 ¶ 21; Dkt. 161-7 (NLRB Decision). The jurisdictional dispute arose under Section 10(k) of the National Labor Relations Act. Dkt. 161-7; *see also* 29 U.S.C. § 160(k).
[25] Dkt. 175 at 7; Dkt. 161 ¶ 21; Dkt. 161-7.

4

defenses that Samson is not a neutral player in the Womens Bay Terminal dispute which led to this lawsuit."[26]

## B. Meet-and-Confer History

On April 19, 2022, ILWU served Samson with an initial set of document production requests.[27] Samson served its responses on May 19, 2022.[28] On June 24, 2022, ILWU began the meet-and-confer process by letter, identifying certain issues with Samson's responses.[29] Samson responded by letter on July 8, 2022, indicating that it was withholding certain communications based on the "common interest doctrine":[30] specifically, those involving (1) Samson's counsel and APL's counsel, and (2) Samson's counsel and MEBA's counsel.[31] Samson added that that it would create a privilege log identifying these communications.[32]

On August 1, 2022, Samson provided ILWU with a declaration from William G. Royce, one of Samson's attorneys, explaining the basis for its assertion of the common-interest doctrine ("First Royce Declaration").[33] Royce declared that Samson and APL had a common legal interest in the NLRB proceedings pertaining to Pier II, and that Samson and MEBA had a common legal interest in "the protection and preservation of the work of Samson['s] MEBA union member

---

[26] Dkt. 175 at 7.

[27] Dkt. 176 ¶ 2 (Maglio Declaration); Dkt. 176-1 (ILWU's Requests for Production of Documents, Set One).

[28] Dkt. 176 ¶ 2; Dkt. 176-2 (Samson's Responses to ILWU's First Requests for Production).

[29] Dkt. 176 ¶ 3; Dkt. 176-3 (ILWU Letter).

[30] As explained in detail below, the common-interest doctrine is an extension of attorney-client or work-product privilege and constitutes "an exception to the rule on waiver where communications are disclosed to third parties." *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 299 F.R.D. 638, 646 (E.D. Cal. 2014).

[31] Dkt. 176 ¶ 4; Dkt. 176-4 (Samson Letter). Samson also indicated that it was withholding communications involving Samson's counsel and Matson's counsel, but Samson later withdrew this assertion of privilege. Dkt. 176-15 at 1 (Emails re Initial Privilege Logs).

[32] Dkt. 176-4 at 4, 6–7.

[33] Dkt. 176 ¶ 6; Dkt. 176-9 (First Royce Declaration).

5

employees who worked at . . . Womens Bay [Terminal]."[34] Royce maintained that Samson's counsel had separately agreed with MEBA's counsel and APL's counsel "to communicate and exchange documents while maintaining the attorney-client privilege in order to most effectively represent their respective clients in th[ese] matter[s]."[35] In accordance with these agreements, Royce declared that Samson was withholding "[m]aterials and responses to discovery which seeks information, documents, and communications which occurred between": (1) counsel for Samson and MEBA "on topics related to this litigation"; and (2) counsel for Samson and APL "on topics related to the NLRB matter."[36] Royce reiterated that Samson would prepare a privilege log listing these withheld records.[37]

On October 14, 2022, Samson provided ILWU with an initial set of privilege logs.[38] This initial set of privilege logs consisted of 32 pages of entries, organized by tables identifying for each entry the type of document withheld, the sender and receiver(s) of the document, a "brief description" of the document, the privilege asserted with respect to the document, and the document's Bates number.[39] Under the "brief description" column, the majority of entries contained one of two descriptions: "MEBA" or "Pier II."[40]

On October 18, 2022, ILWU emailed Samson, asking to discuss the privilege logs.[41] ILWU also noted that Samson had included several communications in the privilege log involving

---

[34] Dkt. 176-9 ¶¶ 2, 5.

[35] *Id.* ¶¶ 2, 6.

[36] *Id.* ¶¶ 4, 7.

[37] *Id.*

[38] Dkt. 176 ¶ 10; Dkt. 176-13 (Initial Privilege Logs). The Court observes that the parties engaged in considerable correspondence regarding a privilege log before Samson eventually produced one. *See* Dkt. 176 ¶¶ 4–5, 7–8.

[39] *See* Dkt. 176-13.

[40] *See id.*

[41] Dkt. 176 ¶ 11; Dkt. 176-15 at 1.

individuals who worked for Matson or Alaska Marine Lines ("AML"), which appeared to be in error because Samson did not assert privilege with respect to these communications.[42] ILWU further stated that it would ask Samson in the parties' upcoming meeting to provide "more detail[ed]" brief descriptions of the withheld documents, because "[m]any, if not all [of these descriptions], fail to provide sufficient detail for [ILWU] to assess whether the privilege was properly asserted."[43] In response, Samson acknowledged that there were "discrepanc[ies]" in the privilege logs and promised to produce "any documents which were intended to be produced [but] were instead withheld."[44]

On October 28, 2022, Samson provided ILWU with a set of Second Amended Privilege Logs.[45] On October 31, 2022, ILWU emailed Samson, asking to discuss this new set of privilege logs.[46] ILWU insisted that Samson's "one[-]to[-]two[-]word" descriptions of the withheld documents remained inadequate, and provided an example of privilege log entries that provided "the degree of detail necessary for the description of the documents[.]"[47]

On November 2, 2022, the parties participated in a conference call where they discussed the types of communications that should be included in Samson's privilege logs.[48] Samson also acknowledged that it had mistakenly included communications with Matson in its privilege logs and agreed to produce those documents and to remove the corresponding entries from the privilege logs.[49]

---

[42] Dkt. 176-15 at 1, 5.
[43] *Id.* at 1.
[44] *Id.* at 3–5.
[45] Dkt. 176 ¶ 12; Dkt. 176-16 (Second Amended Privilege Logs).
[46] Dkt. 176 ¶ 13; Dkt. 176-17 at 2 (Emails re Second Amended Privilege Logs).
[47] Dkt. 176-17 at 2 (citing *Engurasoff v. Zayo Grp. LLC*, No. C-14-00689 DMR, 2015 WL 335793, at *2 (N.D. Cal. Jan. 23, 2015)).
[48] Dkt. 176 ¶ 13; Dkt. 176-17 at 5–6.
[49] Dkt. 176 ¶ 13; Dkt. 176-17 at 5.

7

On November 12, 2022, Samson provided ILWU with a set of Third Amended Privilege Logs.[50] The Third Amended Privilege Logs assert only one "type of privilege"—the common-interest doctrine—and describe all withheld documents with one of two terms: "MEBA" or "Pier II."[51] On November 14, 2022, Samson informed ILWU that it believed it had sufficiently described each document, noting that "[t]he degree of specificity required in a privilege log is an open issue" and arguing that it had "clear[ly] stated its basis for asserting the common-interest doctrine in the First Royce Declaration.[52] Samson also explained that it had asserted the common-interest doctrine "only for a discrete period of time of intense legal work as the common objective was pursued," observing that "[t]here are hundreds of communications: some are mundane matters of scheduling, however others concern matters of strategy, research, drafting, cooperative editing, planning, and legal advice - all in pursuit of the common interest."[53] Nevertheless, to address ILWU's concerns, Samson also provided a sample of entries from its privilege logs with "more detailed" descriptions, such as "Investigation," "Factual Info," and "Witness Affidavit."[54]

ILWU responded on November 15, 2022, reiterating its issues with Samson's descriptions of the withheld documents.[55] ILWU asserted that the sample of entries with these different labels was still largely inadequate, and that the sample appeared to include at least one non-privileged communication between APL and Samson, leading ILWU to suspect that Samson might have overbroadly applied privilege when withholding documents.[56] Finally, ILWU asked whether

---

[50] Dkt. 176 ¶ 14; Dkt. 176-18 (Third Amended Privilege Logs).
[51] *See* Dkt. 176-18.
[52] Dkt. 176-19 at 3 (Emails re Third Amended Privilege Logs).
[53] *Id.*
[54] *Id.* at 3–5.
[55] Dkt. 176 ¶ 15; Dkt. 176-19 at 2.
[56] Dkt. 176-19 at 2. Specifically, ILWU observed that an email from APL to Samson with the description "Notification of picketing" did not appear to be privileged because "[i]t is relevant to

Samson would provide another set of amended privilege logs.[57] On December 2, 2022, Samson indicated that it did not intend to comply with this request because it believed it had provided a "legally sufficient privilege log" with enough information to allow ILWU to evaluate its assertions of privilege.[58]

### C. The Motion

On December 9, 2022, ILWU filed the Motion, requesting: (1) *in camera* review of all documents that Samson currently withholds based on the common-interest doctrine; (2) an order directing Samson to produce any of these documents ruled discoverable, or, in the alternative, an order directing Samson to produce a more detailed privilege log; and (3) an award of reasonable expenses pursuant to Rule 37(a)(5).[59] ILWU maintains that Samson has failed to provide descriptions of withheld documents sufficient to allow ILWU to assess whether the documents are properly withheld, and that *in camera* review is appropriate because Samson may be withholding non-privileged documents.[60] ILWU contends that the parties have spent many months meeting and conferring on the adequacy of Samson's privilege logs and "are no longer able to make progress toward resolution [of this issue] without the Court's intervention."[61]

---

know how Samson learned that picketing was taking place" and "is not a joint strategy discussion." *Id.*
[57] *Id.*
[58] Dkt. 176 ¶ 16; Dkt. 176-20 at 2 (Dosik Email re Privilege Log).
[59] Dkt. 175.
[60] *Id.* at 11–14; Dkt. 186 at 3–9.
[61] Dkt. 175 at 11. ILWU also indicated in early January 2023 that Samson had not yet "clearly identified" the documents that Samson had previously acknowledged to have inadvertently withheld, creating uncertainty as to whether Samson had produced all such documents. Dkt. 187 at 2 (Declaration of Micah Clatterbaugh). In May 2023, the Court requested a joint status report from the parties with an update on this issue. Dkt. 195 at 1 (Order Setting Deadlines). In that status report, Samson represents that it acknowledged inadvertently withholding only two documents, and that it has since produced both. Dkt. 196 at 2 (Status Report). ILWU "accepts Samson's representation." *Id.* Based on this recent information, Samson's production of the documents it acknowledged inadvertently withholding is no longer in dispute.

9

Samson opposes all three of ILWU's requests, arguing that it has provided information to ILWU sufficient to permit evaluation of its assertions of privilege and that, therefore, *in camera* review is unnecessary and an award of expenses is unwarranted.[62] Furthermore, Samson includes another declaration from Royce that elaborates on the nature of the common-interest relationship that Samson asserts with respect to APL and MEBA ("Second Royce Declaration").[63] In particular, Royce declares that "[m]aterials and responses to discovery requests which seek information, documents, and communications which occurred between counsel (and senior management) for Samson, APL, and MEBA under the [two] common interest agreements . . . have been . . . withheld pursuant to the respective common interest agreements."[64]

On May 4, 2023, the Court ordered the parties to file supplemental briefing addressing whether "any . . . circumstances exist that would make it unjust to award expenses" to ILWU pursuant to Rule 37.[65] In its supplemental brief, Samson suggests that an award of expenses would be unjust because it has been "diligen[t]" in addressing issues that have arisen during the "painstaking and lengthy discovery process" in this case.[66] ILWU responds that these arguments merely "obfuscate [Samson's] failure to meet its discovery obligations" and do not excuse Samson's "inadequate privilege log[s] and improper refusal to produce responsive documents."[67]

## II.    LEGAL STANDARD

If a party withholds discovery information on the basis of privilege, Rule 26(b)(5) requires the party to: "(i) expressly make the claim; and (ii) describe the nature of the documents,

---

[62] Dkt. 182 at 12–17.
[63] Dkt. 183 (Second Royce Declaration).
[64] *Id.* ¶ 12.
[65] Dkt. 195 at 1.
[66] Dkt. 197 at 2–4 (Samson Supplemental Brief); *see also* Dkt. 200 (Declaration and Exhibits in Support of Supplemental Brief).
[67] Dkt. 201 at 4–6 (ILWU Supplemental Brief).

10

communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."[68] The party asserting privilege has the burden of establishing the privileged character of the documents or communications.[69] When a party fails to provide discovery, Rule 37(a) authorizes the requesting party to move to compel it.[70] A motion to compel may raise the issue of the withholding party's compliance with its Rule 26(b)(5) obligations.[71] "[B]road discretion is vested in the trial court to permit or deny discovery."[72]

## III. DISCUSSION

### A. *Samson Has Not Made a Prima Facie Showing that Privilege Applies to All Withheld Documents*

Samson currently withholds 713 documents comprising 2,266 pages and identifies each withheld document in its Third Amended Privilege Logs.[73] Samson asserts that the common-interest doctrine protects each document from disclosure.[74] In its Third Amended Privilege Logs, Samson describes each withheld document in one of two ways: "MEBA" or "Pier II."[75]

In addition to its privilege logs, Samson relies on the two Royce Declarations in asserting privilege.[76] The First Royce Declaration provides that, pursuant to the common interest agreement between Samson and MEBA, Samson withholds "[m]aterials and responses to discovery which

---

[68] Fed. R. Civ. P. 26(b)(5).
[69] *See United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011).
[70] Fed. R. Civ. P. 37(a)(1).
[71] *See Club Level, Inc. v. City of Wenatchee*, 618 Fed. App'x 316, 319 (9th Cir. 2015) (holding that district court did not abuse its discretion by denying motion to compel that put the sufficiency of a privilege log at issue); *see also Bullion Monarch Mining, Inc. v. Newmont USA Ltd.*, 271 F.R.D. 643, 653 (D. Nev. 2010).
[72] *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002); *see also Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).
[73] Dkt. 185 at 3 (Declaration of Kristina Rathbun).
[74] Dkt. 176-9; Dkt. 176-16.
[75] *See* Dkt. 176-16.
[76] *See* Dkt. 182 at 17.

Case 3:20-cv-00108-TMB   Document 202   Filed 06/29/23   Page 11 of 26

seek[] information, documents, and communications which occurred between counsel" for these parties "on topics related to th[e] litigation" in this case.[77] The First Royce Declaration also explains that, due to the common interest agreement between Samson and APL, Samson withholds such records between counsel for these parties "on topics related to the . . . NLRB [proceedings concerning Pier II]."[78] The Second Royce Declaration supplements these statements, providing that "[m]aterials and responses to discovery requests which seek information, documents, and communications which occurred between counsel (and senior management) for Samson, APL, and MEBA under the [two] common interest agreements . . . have been . . . withheld pursuant to the respective common interest agreements."[79]

ILWU argues that "the single-word descriptions in Samson's [Third Amended] [P]rivilege [L]ogs are totally inadequate" because they "do not allow any possibility of assessing whether the withheld communications relate to the legal interests described by Samson" in asserting privilege.[80] ILWU contends that this inadequacy, along with the large number of communications withheld by Samson and Samson's erroneous inclusion of non-privileged documents in the past, suggest that Samson is applying the common-interest doctrine "well beyond its bounds."[81]

Samson responds that it has met its obligations to "provide adequate information regarding the assertion of privilege" without divulging privileged information.[82] Samson argues that the information contained in its Third Amended Privilege Logs, together with information contained in Royce's First and Second Declarations, is sufficient to allow ILWU to evaluate the assertions

---

[77] Dkt. 176-9 ¶ 4.
[78] *Id.* ¶¶ 5, 7.
[79] Dkt. 183 ¶ 12.
[80] Dkt. 175 at 12; *see also* Dkt. 186 at 6–9.
[81] Dkt. 186 at 4–5, 7.
[82] Dkt. 182 at 12.

of privilege.[83] Moreover, Samson asserts that disclosing more detailed information regarding the "specific topics" of the disputed communications would inappropriately reveal attorney work product and its joint legal strategies with APL and MEBA.[84]

        1.   <u>Samson has not provided information sufficient to allow ILWU to evaluate its claims of privilege.</u>

To address the parties' arguments, the Court must first examine the basis for Samson's assertions of privilege: the common-interest doctrine, which is an extension of attorney-client or work-product privilege.

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice."[85] However, attorney-client privilege is typically waived when these communications are made in the presence of, or shared with, third parties because "the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality" is destroyed.[86] Work-product privilege, which protects "documents and tangible things prepared by a party or his representative in anticipation of litigation" from discovery,[87] may be waived in similar fashion: namely, by "disclosure to third parties which results in disclosure to an adversary party."[88]

There is an exception to these waiver rules. In the attorney-client privilege context, "[c]lients without a common attorney may communicate among themselves and with the separate attorneys on matters of common legal interest, for the purpose of preparing a joint strategy, and

---

[83] *Id.* at 14.
[84] *Id.* at 15.
[85] *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).
[86] *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (quoting 1 PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 4:35, at 195 (1999 ed.)).
[87] *Sanmina Corp.*, 968 F.3d at 1119.
[88] *Nidec Corp.*, 249 F.R.D. at 578.

13

the attorney-client privilege will protect those communications to the same extent as it would communications between each client and [its] own attorney."[89] Similarly, parties may disclose attorney work product with individuals that share a common interest without waiving privilege.[90]

This "common-interest" doctrine is not a standalone privilege: rather, it functions as an "exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common . . . strategy to communicate with each other."[91] In other words, "[c]ourts apply the common interest doctrine . . . only where there is a predicate, privileged communication that—but for a waiver—already meets the criteria of the . . . privilege."[92]

To be properly invoked, the common-interest exception to waiver of attorney-client privilege requires that: (1) "the communication [was] made by separate parties in the course of a matter of common [legal] interest; (2) the communication [was] designed to further that effort; and (3) the privilege has not been waived."[93] One way in which a communication may be designed to further a common legal effort is by "formulating a common legal strategy."[94] But simply "demonstrating that a communication took place between parties who purportedly share a common interest" is insufficient to show that a communication was designed to further a common legal

---

[89] *Id.* (quoting 1 PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 4:35, at 192 (1999 ed.)).

[90] *Cal. Sportfishing Prot. All.*, 299 F.R.D. at 646.

[91] *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012).

[92] *Genentech, Inc. v. Trustees of Univ. of Penn.*, No. C 10-2037 PSG, 2011 WL 5079531, at *3 (N.D. Cal. Oct. 24, 2011) (internal quotation marks omitted).

[93] *Nidec Corp.*, 249 F.R.D. at 578 (quoting *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003)); *see also Rodriguez v. Seabreeze Jetlev LLC*, No. 420CV07073YGRLB, 2022 WL 3327925, at *5 (N.D. Cal. Aug. 11, 2022).

[94] *Nidec Corp.*, 249 F.R.D. at 579 (quoting *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999)); *see also Lectrolarm Custom Sys., Inc. v. Pelco Sales, Inc.*, 212 F.R.D. 567, 572 (E.D. Cal. 2002) (noting that the "doctrine only protects communication[s] when they are part of an ongoing and joint effort to set up a common defense strategy").

14

effort.[95] Instead, "the party seeking to invoke the doctrine must first establish that the communicated information would otherwise be protected from disclosure by" attorney-client or work-product privilege.[96] And under the attorney-client privilege, when "advice sought is not legal advice, . . . then the privilege does not exist."[97]  "Therefore, to invoke the common interest doctrine, a party first must demonstrate the elements of [attorney-client] privilege and then must demonstrate that the communication was made in pursuit of common legal claims including common defenses."[98]

In the work product context, common interests are construed more broadly.[99] For instance, a shared interest "may be only financial or commercial in nature."[100] When assessing whether the common-interest exception saves otherwise-protected work product from waiver, "a court must determine if disclosure [to the third party with a purported common interest] is consistent with the work product doctrine's purpose of preserving the adversary system."[101]

Finally, the party asserting privilege has the burden of proving that the privilege applies to the information it intends to withhold.[102] Specifically, the asserting party must "describe the nature of the documents . . . in a manner that, without revealing information itself privileged or protected,

---

[95] *Waymo LLC v. Uber Techs., Inc.*, 870 F.3d 1350, 1359–60 (Fed. Cir. 2017) (quoting *OXY Res. Cal. LLC v. Superior Court of Solano Cnty.*, 9 Cal. Rptr. 3d 621, 635 (Cal. App. 2004)).

[96] *Id.* at 1360 (quoting *OXY Res. Cal. LLC*, 9 Cal. Rptr. 3d at 635).

[97] *Sanmina Corp.*, 968 F.3d at 1116.

[98] *Id.*

[99] *Cal. Sportfishing Prot. All.*, 299 F.R.D. at 646 (citing *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1298–99 (D.C. Cir.1980); *McMorgan & Co. v. First Cal. Mortg. Co.*, 931 F. Supp. 703, 709 (N.D. Cal. 1996)).

[100] *Cal. Sportfishing Prot. All.*, 299 F.R.D. at 646 (citing *Pecover v. Elec. Arts Inc.*, 2011 WL 6020412, at *2 (N.D. Cal. Dec. 2, 2011)).

[101] *Id.* (citing *Am. Tel. and Tel. Co.*, 642 F.2d at 1299; *United States v. Deloitte LLP*, 610 F.3d 129, 141 (D.C. Cir. 2010)).

[102] *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009); *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002); Fed. R. Civ. P. 26(b)(5)(A).

will enable other parties to assess the claim" of privilege.[103] One way to satisfy this obligation is with a privilege log. The Ninth Circuit has held that a privilege log is generally adequate when it identifies "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated."[104] However, "[n]ot every case requires strict adherence to th[is] list of items."[105] For example, in cases where a party asserts privilege with respect to "voluminous" documents, "details concerning time, persons, general subject matter, etc., . . . may be unduly burdensome[,] . . . particularly if the items can be described by categories."[106] Relatedly, "claims of privilege may pass muster despite an inadequate privilege log,"[107] particularly where other proof, such as briefs or declarations, exists to establish the nature of the documents.[108]

---

[103] Fed. R. Civ. P. 26(b)(5)(A)(ii); *see also Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1148 (9th Cir. 2005) (explaining that a party claiming privilege must "provide sufficient information to enable other parties to evaluate the applicability of the claimed privilege or protection." (citing Fed. R. Civ. P. 26(b)(5) Advisory Committee's Note (1993 Amendments))).

[104] *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992) (citing *Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989)).

[105] *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 638 (D. Nev. 2013).

[106] Fed. R. Civ. P. 26(b)(5) Advisory Committee's Note (1993 Amendments); *see also In re Imperial Corp. of Am.*, 174 F.R.D. 475, 478–79 (S.D. Cal. 1997) (concluding that party claiming privilege was not required to create a document-by-document privilege log because that task would have been "unreasonable and overly burdensome" in light of the "hundreds of thousands, if not millions, of documents" generated in discovery).

[107] *Apple Inc. v. Samsung Elec. Co.*, 306 F.R.D. 234, 237 (N.D. Cal. 2015).

[108] *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 267 (D. Md. 2008) ("If . . . the requesting party challenges the sufficiency of the assertion of privilege protection, the asserting party may no longer rest on the privilege log, but bears the burden of establishing an evidentiary basis—by affidavit, deposition transcript, or other evidence—for each element of each privilege protection claimed for each document or category of document.").

With these principles in mind, Samson's Third Amended Privilege Logs—considered together with the two Declarations—do not contain information sufficient to support its assertions of the underlying attorney-client or work-product privileges. In particular, these items do not assure that all documents identified in the privilege logs were either furnished for the specific purpose of giving legal advice or prepared by Samson, APL, or MEBA in anticipation of litigation.[109] Without this assurance, which is especially crucial given the large volume of documents Samson withholds, it is impossible to determine whether these documents are privileged in the first instance. Consequently, if privilege applies, it is also impossible to determine whether the common-interest doctrine may operate to prevent waiver by disclosure to a third party.

2. *In camera review is not warranted at this stage.*

ILWU argues that the appropriate remedy is for the Court to grant *in camera* review of the withheld documents in dispute, rather than require Samson to submit another set of amended privilege logs or other additional information that adequately describes the withheld documents.[110] Based on Samson's poor track record of inadvertently withholding non-privileged documents, ILWU contends that *in camera* review is necessary to ensure that Samson is not improperly withholding other documents.[111] If the Court were to grant *in camera* review, ILWU requests that this review be referred to a magistrate judge.[112] Samson responds that *in camera* review is unnecessary, but that if the Court were to deem it necessary, it would be appropriate to refer the matter to a magistrate judge.[113]

---

[109] *See Apple Inc.*, 306 F.R.D. at 238 ("Even as to communications involving individuals who may be lawyers, '[t]he fact that a person is a lawyer does not make all communications with that person privileged.'" (quoting *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (alteration in original))).

[110] Dkt. 175 at 13.

[111] *Id.*

[112] Dkt. 186 at 3.

[113] Dkt. 182 at 3–4; Dkt. 197 at 3.

17

The party requesting *in camera* review must meet a "relatively minimal" evidentiary threshold for courts to exercise their discretion to conduct this review.[114] Specifically, the party requesting *in camera* review must provide a factual basis sufficient to support a "reasonable, good-faith belief" that *in camera* review of the allegedly privileged documents may reveal evidence to establish the claim that the privilege applies or does not apply.[115] Once this threshold showing is made, courts should consider several factors in deciding whether *in camera* review is warranted, including: (1) "the amount of material they have been asked to review"; (2) "the relevance of the alleged privilege[d] material to the case"; and (3) "the likelihood that *in camera* review will reveal evidence to establish the applicability of the . . . [privilege]."[116]

As an initial matter, ILWU has provided a factual basis sufficient to support a reasonable, good-faith belief that *in camera* review may reveal evidence showing that privilege does not apply with respect to at least some of the disputed documents. The volume of documents Samson withholds—713 documents comprising 2,266 pages—is unusually large, both on its own and in proportion to the 5,525 pages of documents Samson has produced in response to ILWU's first set of discovery requests.[117] Combined with Samson's past missteps in withholding non-privileged documents,[118] ILWU has shown ample reason to believe that privilege may not protect all of the disputed documents.

---

[114] *In re Grand Jury Investigation*, 974 F.2d at 1072 (explaining that this burden is "set sufficiently low to discourage abuse of privilege and to ensure that mere assertions of . . . privilege will not become sacrosanct").

[115] *Id.* at 1072–73 (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

[116] *Id.* (citing *Zolin*, 491 U.S. at 572).

[117] *See* Dkt. 185 at 3.

[118] *See, e.g.*, Dkt. 176-17 at 5 (mistakenly including certain communications with Matson in privilege logs); Dkt. 176-19 at 3–5 (claiming privilege with respect to at least some non-privileged documents, including those involving "mundane matters of scheduling").

The Court nevertheless declines to grant the "extreme measure" of *in camera* review because the record does not show evidence that Samson has withheld any documents in bad faith.[119] To the contrary, it appears that Samson has readily acknowledged errors it has made in withholding documents and has agreed to produce those it has inadvertently withheld.[120] Combined with the quantity of records at issue, the Court believes a more appropriate remedy at this stage is an order for Samson to review the disputed documents, produce any that are not in fact privileged, and provide ILWU with supplemental information that satisfies Samson's obligation to adequately describe the nature of the withheld documents. The Court trusts that Samson will timely comply with such an order.

In coming to this conclusion, the Court recognizes ILWU's concern that any applicable privilege must be "narrowly drawn" so that it can obtain discovery on certain issues, including: (1) MEBA's jurisdictional claim to Samson for the work in dispute at Womens Bay Terminal; (2) potential collusion between Samson and MEBA to "artificially manufacture a[] [Section] 8(b)(4)(D) dispute"; and (3) ILWU's "affirmative defense that that Samson is not a neutral, and therefore not protected by [LMRA] Section 8(b)(4)."[121] For the reasons above, however, the Court is satisfied that this concern may be properly addressed without resorting to *in camera* review at this time.

---

[119] *See Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 84 (D.D.C. 2020) ("[I]n camera review would be burdensome and inappropriate because there is no bad faith or contradictory evidence in the record.").
[120] *See, e.g.*, Dkt. 176-15 at 3–5; Dkt. 176-17 at 5.
[121] Dkt. 186 at 8–9.

3. Samson must review the disputed records, disclose any that have been improperly withheld, and provide additional information sufficient to allow ILWU to assess the claims of privilege.

In sum, Samson has not provided information sufficient to evaluate whether it has properly claimed the attorney-client or work-product privilege underlying its assertions of the common-interest doctrine. Furthermore, in light of the large number of records Samson withholds and its history of errors in asserting privilege, there are legitimate questions concerning whether Samson has overbroadly applied any applicable privilege. Although the Court will not order *in camera* review of the disputed records, it is clear that further review of these records is needed to confirm that privilege applies to each.

To that end, Samson is **ORDERED** to review all documents with respect to which it is currently asserting the common-interest exception to privilege waiver, and to produce any of those documents to which this doctrine does not apply. In addition, Samson is **ORDERED** to provide ILWU with: (1) an amended privilege log that reflects Samson's review of the documents to which it is currently asserting the common-interest exception; and (2) additional information describing the nature of the remaining withheld documents that is sufficient to allow ILWU to assess Samson's claims of privilege.[122]

Finally, the Court's denial of *in camera* review is without prejudice; ILWU may renew its request for *in camera* review if it develops evidence showing that Samson has not complied with this Order.

---

[122] Samson's review of the documents in dispute may determine whether individualized descriptions of each document, additional declarations, or other tools are sufficient to satisfy its obligation to describe the nature of the withheld records. *See* Fed. R. Civ. P. 26(b)(5) Advisory Committee's Note (1993 Amendments); *Victor Stanley, Inc.*, 250 F.R.D. at 267. Because the Court does not know what Samson's review will yield, the Court will not specify the form in which Samson must provide the required information.

20

## B. ILWU Is Entitled to a Partial Award of Reasonable Expenses

Once a court has ruled on a motion to compel, Rule 37(a)(5) allows the prevailing party to recover an award of reasonable expenses incurred in litigating the motion. A Rule 37(a)(5) award is mandatory if a court grants or denies a motion to compel in its entirety, unless (1) the non-prevailing party's position was "substantially justified" or (2) "other circumstances make an award of expenses unjust."[123] A Rule 37(a)(5) award is only discretionary, however, where—as here—the motion is granted in part and denied in part. In such cases, the court "may . . . apportion the reasonable expenses for the motion" between the parties.[124] Yet no matter whether an award is mandatory or discretionary, "[t]he party contesting the discovery sanction on a properly brought motion under Rule 37(a)(5) bears the burden of establishing substantial justification or that other circumstances make an award of expenses unjust."[125] A position on a discovery issue is "substantially justified" if the parties had a "genuine dispute" or if "reasonable people could differ" as to the appropriate outcome.[126]

---

[123] Fed. R. Civ. P. 37(a)(5)(A)–(B).

[124] Fed. R. Civ. P. 37(a)(5)(C)

[125] *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, No. 221CV00194FLAMAAX, 2021 WL 4974050, at *16 (C.D. Cal. July 8, 2021) (citing *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994)); *see also Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 784 (9th Cir. 1983) ("The party against whom an award of expenses is sought has the burden of showing the special circumstances that make his or her failure to comply substantially justified"); *W. Mortg. & Realty Co. v. KeyBank Nat'l Ass'n*, No. 113CV00216EJLREB, 2016 WL 11643651, at *1 (D. Idaho Jan. 4, 2016) ("Ultimately, the analysis of Plaintiff's request under subsection 37(a)(5)(A) or 37(a)(5)(C) is the same, and arguments pertaining to the exceptions to Rule 37(a)(5)(A) are equally applicable to the Court's determination of whether attorney fees should be apportioned under Rule 37(a)(5)(C).").

[126] *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (elaborating that substantial justification requires more than a showing that a party is "merely undeserving of sanctions for frivolousness"); *Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982) ("A request for discovery is 'substantially justified' under the rule if reasonable people could differ as to whether the party requested must comply."); *see also Hyde & Drath*, 24 F.3d at 1171 (9th Cir. 1994) ("[A] good faith dispute concerning a discovery question might, in the proper case, constitute 'substantial justification' . . . ." (citation omitted)).

21

ILWU argues that a Rule 37(a)(5) award is warranted because the Motion would not have been necessary had Samson not "resist[ed]" discovery in a "willfully improper" manner throughout the months-long meet-and-confer process.[127] ILWU seeks to recover 57.35 hours of attorney's fees spent meeting and conferring with Samson regarding its privilege logs, briefing the Motion, and potentially preparing for oral argument of the Motion.[128]

Samson rejects the notion that it improperly resisted discovery, stating that it "fully complied" with its obligation to provide information regarding its assertions of privilege to ILWU.[129] Samson also notes that ILWU rejected its proposal to request the appointment of a special master to review the withheld documents to avoid burdening the Court with this dispute.[130] Samson argues that the Motion was therefore unnecessary, and that its refusal to provide the more detailed information ILWU sought was substantially justified such that sanctions are inappropriate.[131] Samson further suggests that an award of expenses would be unjust because it

---

[127] Dkt. 175 at 14.

[128] *Id.*

[129] Dkt. 182 at 18.

[130] *Id.*

[131] *Id.* Samson also contends that Rule 37 does not provide for an award of expenses in this case because ILWU is allegedly seeking only *in camera* review and not "an order compelling disclosure or discovery." *Id.*; *see also* Fed. R. Civ. P. 37(a)(1) ("On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."). ILWU argues that although it requests *in camera* review, it is ultimately seeking either (1) "an order to produce any . . . documents [withheld on the basis of the common interest rule] the Court deems discoverable" or (2) "an order directing Samson to provide privilege logs with sufficient descriptions of each document[.]" Dkt. 175 at 2. In light of this requested relief, the Court agrees with ILWU that the Motion is properly brought under Rule 37 and that discovery sanctions are therefore authorized. This conclusion is further strengthened by Rule 37's general purpose: to deter discovery abuses and promote "full and efficient discovery." *See Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936–37 (9th Cir. 1994). Furthermore, the Motion was prompted by Samson's refusal to provide information meeting the requirements of Rule 26, and a key purpose of Rule 37 expenses is to "discourage unnecessary involvement of the court in discovery" when a

22

has been "diligen[t] in addressing discovery issues," as evinced by its proposal to have a special master review the documents at issue.[132] Samson adds that awarding expenses to ILWU would also be unjust in light of the "painstaking and lengthy discovery process," which has involved "numerous documents" and considerable correspondence with ILWU.[133]

On the one hand, Samson was substantially justified in disagreeing with ILWU about the degree of detail with which it was required to describe the withheld documents at issue.[134] In the parties' written correspondence, ILWU tended to focus on the inadequacy of each individual "brief description" and suggested that Samson needed to provide significantly more detailed descriptions for each of the 700-plus documents with respect to which Samson claims privilege. For instance, in one email, ILWU stated that "[a]ll of the items listed in the privilege logs fail to meet th[e] [applicable] standard—rather the descriptions are one to two words (like "MEBA," or "LASH," or "Conference Call") that do not provide any way near the degree of information ILWU Alaska needs to determine if the privilege was properly asserted."[135] In that same email, ILWU asserted that "the degree of detail *necessary* for the description of the documents in [Samson's] privilege log" was set out in an unpublished case from the Northern District of California.[136] In that case, the district court described a privilege log that listed 90 emails with brief descriptions such as "Discussion re: Serge's Commission, requesting legal advice from Christopher Yost," "Discussion

_____

party's discovery conduct necessitates a motion to compel. *Marquis v. Chrysler Corp.*, 577 F.2d 624, 642 (9th Cir. 1978).

[132] Dkt. 197 at 3–4; *see also* Dkt. 200 (Declaration and Exhibits in Support of Supplemental Brief).

[133] Dkt. 197 at 2–3.

[134] In accordance with the rule explained above, the Court observes that the parties' focus on whether Samson's conduct necessitated the Motion does not bear on the appropriateness of sanctions as much as whether Samson's positions in this discovery dispute were "substantially justified" or whether an award of expenses would be "unjust." *See* Fed. R. Civ. P. 37(a)(5)(A)(ii)–(iii).

[135] Dkt. 167-17 at 2.

[136] *Id.* (emphasis added).

re: Serge's Violation of Outside Employment Policy forwarding Christopher Yost's legal comments and advice," and "Email re: Serge's return to work directly responding to Christopher Yost's attorney client communication of 5/9/13."[137] However, not only did that court not rule on the sufficiency of these descriptions,[138] but—as explained above—what might satisfy a party's obligation to adequately describe documents withheld on the basis of privilege in one case might not be necessary in another.[139] For these reasons, there was a genuine dispute regarding Samson's need to describe each individual record in its privilege logs in the degree of detail that ILWU suggested.

On the other hand, Samson was *not* substantially justified in its refusal to provide any information beyond what it had already provided in its Third Amended Privilege Logs and the two Declarations.[140] As explained above, Samson is incorrect that it has "fully complied" with its obligation to provide sufficient information to ILWU regarding its assertions of privilege. It cannot be reasonably disputed that the information Samson provided was enough to allow ILWU to assess its assertions of privilege.[141] Samson was plainly required to provide at least some additional information establishing the applicability of the underlying attorney-client or work-product privilege, but failed to do so.

Moreover, Samson has not carried its burden to show that an award of expenses would be unjust. Samson had numerous opportunities to provide information that would allow ILWU to

---

[137] *Engurasoff v. Zayo Grp. LLC*, No. C-14-00689 DMR, 2015 WL 335793, at *2 (N.D. Cal. Jan. 23, 2015).
[138] *See id.* (noting that plaintiff had not asserted that the privilege log was "legally deficient").
[139] *See* Fed. R. Civ. P. 26(b)(5) Advisory Committee's Note (1993 Amendments)*; In re Imperial Corp. of Am.*, 174 F.R.D. at 478–79.
[140] *See* Dkt. 176-20 at 2.
[141] *Cf. Big City Dynasty v. FP Holdings, L.P.*, 336 F.R.D. 507, 513 (D. Nev. 2020) (awarding expenses under Rule 37(a)(5) where "resolution of the . . . motion [was] not a close call").

Case 3:20-cv-00108-TMB   Document 202   Filed 06/29/23   Page 24 of 26

evaluate its assertions of privilege. Yet Samson failed to do so in each instance and ultimately refused to provide any further information because it believed it had fully satisfied its Rule 26 obligations.[142] These repeated failures reflect a mistaken understanding of the law and cannot be attributed to the discovery process in this case, even if that process has been "painstaking and lengthy."[143] Nor can these failures be brushed aside by Samson's proposal for a special master to review the documents at issue or by Samson's other actions over the course of this dispute that it references in its briefing.[144]

Accordingly, the Court exercises its discretion in granting ILWU an award of partial expenses incurred in bringing the Motion. A partial award is appropriate because ILWU has prevailed with respect to only some requests made in the Motion: the Court has denied ILWU's request for *in camera* review and the corresponding request for an order directing Samson to produce documents ruled discoverable after *in camera* review. Therefore, the Court finds that ILWU is entitled to an award of 30% of its reasonable expenses incurred since October 28, 2022— the date on which Samson provided ILWU with its Second Amended Privilege Logs[145]—in pursuing this discovery dispute.[146] To recover this award, ILWU is directed to file billing records supporting its request for expenses.

---

[142] Dkt. 176 ¶ 16; Dkt. 176-20 at 2.

[143] *See* Dkt. 197 at 3; *cf. Brewer v. Leprino Foods Co.*, No. CV-1:16-1091-SMM, 2019 WL 356657, at *7 (E.D. Cal. Jan. 29, 2019) (holding that even if the plaintiff's discovery conduct was not intentional, it was at least negligent, rendering an award of reasonable expenses appropriate).

[144] *See* Dkt. 197 at 3–4.

[145] Dkt. 176 ¶ 12.

[146] The record demonstrates that the amount of time ILWU has spent on this discovery dispute is reasonable. It is clear that before filing the Motion, ILWU spent substantial time meeting and conferring with Samson on a number of relevant matters, including Samson's delays in producing privilege logs and deficiencies in the multiple sets of privilege logs eventually produced.

## IV.    CONCLUSION

For the foregoing reasons, the Motion at Docket 175 is **GRANTED in part and DENIED in part**, and Samson is **ORDERED** to:

- Review the documents with respect to which Samson is currently asserting the common-interest exception to privilege waiver in response to ILWU's first set of document production requests, and produce any of those documents to which the exception does not apply. Any such documents that Samson has not yet produced shall be provided to ILWU **on or before July 28, 2023.**

- Provide ILWU with (1) an amended privilege log that reflects Samson's review of the documents to which it is currently asserting the common-interest exception to privilege waiver, and (2) additional information describing the nature of the remaining withheld documents that is sufficient to allow ILWU to assess Samson's claims of privilege.[147] These items shall be provided to ILWU **on or before July 28, 2023**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 29th day of June, 2023.

/s/ *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[147] The Court reiterates that what constitutes "sufficient" additional information will depend on what Samson's review of the documents in dispute yields.

26