IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SAMSON TUG AND BARGE, CO., INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, ALASKA LONGSHORE DIVISION, and ILWU, UNIT 222,<br><br>Defendants. | Case No. 3:20-cv-00108-TMB<br>Case No. 3:20-cv-00248-TMB<br>Consolidated<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKTS. 231, 232, 249, 270)** |

## I.     INTRODUCTION

The matter comes before the Court on Defendants International Longshore and Warehouse Union, Alaska Longshore Division, and International Longshore and Warehouse Division, Unit 222's (collectively, "ILWU") Motion for Summary Judgment (the "Motion")[1] and Plaintiff Samson Tug and Barge Co., Inc.'s ("Samson") Motion for Partial Summary Judgment on Affirmative Defenses (the "Cross-Motion").[2] Pursuant to Federal Rule of Civil Procedure ("Rule") 56, ILWU seeks "summary judgment dismissing all Plaintiff Samson Tug and Barge Co., Inc.'s claims on the grounds that there are no genuine issues of material fact warranting trial, and that ILWU is entitled to judgment as a matter of law."[3] Samson opposes the Motion,[4] and "moves

---

[1] Dkt. 232 (ILWU's Redacted Notice of Motion and Motion for Summary Judgment); Dkt. 270 (ILWU'S Unredacted Notice of Motion and Motion for Summary Judgment).
[2] Dkt. 231 (Samson's Motion for Partial Summary Judgment on Affirmative Defenses); Dkt. 249 (Samson's Corrected Motion for Partial Summary Judgment as to Affirmative Defenses). Samson also filed a Motion for Partial Summary Judgment on Liability. Dkt. 230 (Samson's Motion for Partial Summary Judgment on Liability); Dkt. 245 (Samson's Motion for Partial Summary Judgment as to Liability Under NLRA Section 8(b)(4)).
[3] Dkt. 270 at 2.
[4] Dkt. 274 (Samson's Response in Opposition to ILWU's Motion for Summary Judgment).

-1-

for partial summary judgment against [ILWU] . . . dismissing [ILWU's] non-neutral affirmative defense and work preservation affirmative defense."[5] ILWU opposes the Cross-Motion,[6] and requested oral argument,[7] but the Court finds that it would not be helpful. For the reasons stated below, the Court **GRANTS** ILWU's Motion at Dockets 232 and 270 and **DENIES** Samson's Cross-Motion at Dockets 231 and 249.

## II. BACKGROUND

*A. Procedural History.*

This case arises from alleged unfair labor practices committed by ILWU under Section 303 of the Labor Management Relations Act ("LMRA").[8]

ILWU Alaska Longshore Division and ILWU, Unit 222 are unincorporated labor organizations representing longshore workers in certain Alaskan ports, including the Port of Kodiak.[9] ILWU is party to a multi-employer collective bargaining agreement called the ILWU All Alaska Longshore Agreement ("AALA"), along with Matson Navigation Company of Alaska ("Matson"), American President Lines, Ltd. ("APL"), CMA Terminals of Alaska ("CMAT-A"), and other signatory employers.[10] The AALA was in effect at all relevant times in this matter, and covers the Port of Kodiak.[11]

---

[5] Dkt. 249 at 8.
[6] Dkt. 271 (ILWU's Response in Opposition to Samson's Motion for Partial Summary Judgment on Affirmative Defenses).
[7] Dkt. 270 at 1.
[8] *See* Dkt. 225 (Samson's Third Amended Complaint for Damages) at 2; Dkt. 270 at 10–11.
[9] Dkt. 225 at 3; Dkt. 270 at 10–11; Dkt. 270-23 (Corrected Declaration of Dennis Young) at 2; Dkt. 270-13 (All Alaska Longshore Agreement) at 83 (listing Kodiak as an "ILWU Port").
[10] Dkt. 225 at 5; Dkt. 270 at 11; Dkt. 13 (Declaration of Dennis Young in Support of ILWU's Motion to Dismiss Petition to Vacate Arbitration Award) at 2; *see also* Dkt. 270-13 at 73–140.
[11] Dkt. 270 at 11; Dkt. 270-23 at 3.

-2-

The AALA requires signatory employers[12] to "use [their] best efforts and act in good faith in preserving as much as possible all of the work covered by this Contract for the registered work force."[13] ILWU asserts that "registered work force" refers to "all ILWU longshore workers in all covered ports."[14] A Letter of Understanding ("LOU No. 12") implementing the AALA requires that "ILWU Longshoremen shall operate all cargo[-]handling equipment on facilities owned or operated by Signatory Employers for movement and handling of the cargo/equipment on behalf of the Employer."[15] It further prohibits "[n]on-signatory employees [from] operat[ing] any cargo[- ]handling equipment on facilities owned or operated by Signatory Employers beyond an area designated and agreed to jointly by the parties."[16]

All AALA employers employ longshore workers in all covered ports based on a single, centrally governed list of registered longshore workers statewide.[17] Further, ILWU longshore workers' benefits are centrally administered by ILWU and AALA signatory employers, allowing employees to receive benefits from pooled funds, earned annually through combined hours worked for any signatory employers in any covered ports.[18]

Samson is an Alaska corporation that operates tug and barge services within the State of Alaska.[19] Samson is not a party to or beneficiary of the AALA or any other agreements or contracts

---

[12] The AALA defines a signatory employer as "[a]n Employer in a port covered by this Contract Document who is signatory to this agreement or joins the Association of Employers signatory hereto subsequent to the execution [who] becomes subject to this Contract Document. Employers working a port covered by this agreement, must sign this agreement."). Dkt. 270-13 at 83 (setting out AALA § 1.81).
[13] Dkt. 270-13 at 107 (setting out AALA § 7.641).
[14] Dkt. 270 at 13.
[15] Dkt. 270-14 (Letter of Understanding No. 12) at 26.
[16] *Id.*
[17] Dkt. 270 at 12; Dkt. 270-23 at 4.
[18] Dkt. 270 at 12; Dkt. 270-23 at 4–5.
[19] Dkt. 225 at 3–4.

with ILWU.[20] Samson leases space from Matson in the Port of Kodiak to conduct its operations there.[21] Historically, Samson employed Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") members at the terminal to load and unload cargo, including cargo for American President Lines, Inc. ("APL").[22] Samson has never employed ILWU-represented employees.[23]

In 2015, the Kodiak Joint Port Labor Relations Committee and AALA bargaining parties formalized an agreement for operations in the Port of Kodiak at a dock owned by LASH Corporation ("LASH"), a non-AALA employer.[24] This agreement established a "neutral zone" to operate the LASH Dock, where Samson employees would drop APL containers after unloading, and ILWU workers would pick them up and load them onto Samson's barges.[25] This neutral zone operation was binding on all AALA employers at the Port of Kodiak, including Matson.[26] Samson subleased a portion of the LASH Dock to APL to operate this neutral zone.[27]

On August 5, 2016, Samson and Matson renegotiated the terms of their lease agreement, modifying Samson's lease from a multi-year to a month-to-month term, with a right of termination with 30 days' notice by either party.[28] On or around March 1, 2017, Matson purchased the LASH Dock from LASH, renaming it Womens Bay Terminal and assuming LASH's sublease with Samson with the month-to-month modification.[29] ILWU was not involved in or aware of this

---

[20] *Id.*; Dkt. 270-23 at 5.
[21] Dkt. 225 at 4–5; *see* Dkt. 270-13 (Agreement to Amend Lease) at 32–34; Dkt. 270-14 (Second Agreement to Amend Lease) at 133–55.
[22] Dkt. 225 at 3–4. According to the parties, APL is a party to the AALA, while Samson and MEBA are not. Dkt. 175 (ILWU Motion to Compel) at 5.
[23] Dkt. 270 at 13.
[24] *Id.* at 15; Dkt. 270-23 at 7.
[25] Dkt. 270 at 15–16; Dkt. 270-23 at 7–8.
[26] Dkt. 270 at 15–16; Dkt. 270-23 at 7–8.
[27] Dkt. 270 at 15; Dkt. 270-23 at 7; *see* Dkt. 270-14 at 133–155.
[28] Dkt. 270 at 16; Dkt. 270-23 at 8; Dkt. 270-13 at 32–34; Dkt. 270-14 at 133–55.
[29] Dkt. 270-13 (LASH Warranty Deed) at 6–7; Dkt. 270 at 16; Dkt. 270-23 at 8.

renegotiation.[30] But ILWU asserts, and Matson concedes, that this lease gave Matson greater "control over [Samson's] day-to-day operations" than LASH had, both because Matson could pressure Samson with the threat of eviction on one month's notice and because Matson owned the terminal and could set rates.[31]

According to ILWU, in early 2018, Matson informed APL that it would no longer ship APL's cargo.[32] ILWU states that Matson then ordered Samson, under threat of eviction, to terminate its sublease with APL at Womens Bay Terminal and to cease handling APL cargo at that location, eliminating the neutral zone at LASH Dock.[33] Samson reportedly complied.[34]

After the LASH Dock neutral zone was eliminated, APL moved its operations to another pier in the Port of Kodiak ("Pier II"), which had different needs for workers, particularly truck drivers.[35] ILWU states that up until this point, APL had been hiring ILWU longshore workers pursuant to the AALA and a 2015 agreement between APL and Matson.[36] ILWU asserts that Matson "unilaterally broke this agreement, which eliminated work opportunities for ILWU" at Womens Bay Terminal.[37] ILWU alleges that it "lost all of the truck driving work [there], amounting to approximately 3,600 hours of work per year," and lost work and advancement opportunities for the approximately 21 casual workers who worked as truck drivers "almost exclusively" at Womens Bay Terminal.[38]

---

[30] Dkt. 270 at 17 n.6, 26; Dkt. 270-23 at 8, 12–13.
[31] Dkt. 270 at 16; Dkt. 270-23 at 8; Dkt. 270-11 (Deposition of Jennifer Tungul) at 47.
[32] Dkt. 175 at 6.
[33] Dkt. 270 at 17; Dkt. 270-22 (Declaration of Gary Fincher) at 3–4; Dkt. 270-23 at 8.
[34] Dkt. 175 at 6.
[35] Dkt. 270 at 18; Dkt. 270-22 at 4.
[36] Dkt. 270 at 18.
[37] *Id.*
[38] *Id.*; Dkt. 270-22 at 4–5.

ILWU proceeded to file a grievance against Matson, seeking assignment of work at Womens Bay Terminal to ILWU-represented longshore workers under the AALA.[39] On June 3, 2019, Alaska Arbitrator Herald C. Ugles found that Matson's ownership of the dock facility at Womens Bay did not violate sections of the AALA and denied ILWU's grievance.[40] Specifically, the Alaska Arbitrator found that "Samson's operation at the . . . dock was not a subterfuge for Matson operating without [ILWU] participation."[41] ILWU appealed the decision to the Alaska Area Committee and then to the Coast Arbitrator, John Kagel.[42]

On February 13, 2020, Coast Arbitrator Kagel issued an Opinion & Decision vacating the Alaska Arbitrator decision and finding that the AALA and LOU No. 12 required Matson to assign all cargo-handling work at Womens Bay Terminal to ILWU-represented longshore workers (the "February 2020 Award").[43] Coast Arbitrator Kagel found that the AALA was enforceable because "[Matson] had substantial leverage over Samson, including by terms of its lease[.]"[44] Further, he noted that

> [LOU No. 12] Section 3, by its own language, goes further, barring non-signatory, non-ILWU employees from operating cargo[-]handling equipment on the Matson owned dock for any shipper, whether they are signatory Employers other than Matson, or others, without [ILWU] agreement. . . . The Alaska Arbitrator found that Matson had no financial interest in Samson's operation, other than rent, and that Samson's operation at the LASH dock [Womens Bay Terminal] was not a subterfuge for Matson operating without [ILWU] participation. However, while that conclusion is not disputed, that alone is not what the Agreement requires, for the Agreement must be applied as written . . . and Section 3 of the LOU cannot be ignored. The Agreement requires it be so enforced.[45]

---

[39] Dkt. 270 at 19; Dkt. 270-23 at 8–9.
[40] Dkt. 270-13 (Alaska Arbitrator's Decision) at 8–9.
[41] *Id.*
[42] Dkt. 270 at 19; Dkt. 270-23 at 10.
[43] Dkt. 270-13 (Coast Arbitrator's February 13, 2020 Decision) at 10–18.
[44] *Id.* at 17.
[45] *Id.* at 16–17.

Therefore, pursuant to the AALA and LOU No. 12, in the February 2020 Award, Coast Arbitrator Kagel ordered Matson to ensure that ILWU-represented longshore workers handled Samson cargo operations at Womens Bay Terminal.[46]

On March 4, 2020, Matson and ILWU reached an agreement to implement the February 2020 Award.[47] Under this agreement, "(1) Matson [would] comply with [the] Coast Arbitrator['s] . . . [A]ward, and (2) ILWU [would] accept time in lieu (i.e. unpaid wages and benefits) *from Matson* until Matson negotiated a terminal service agreement with Samson and obtained necessary cargo[-]handling equipment to perform the work."[48] As a result, ILWU submitted "time in lieu" cards to Matson consistent with agreed-upon minimum manning at Womens Bay Terminal.[49]

On May 5, 2020, President of ILWU Alaska Longshore Division Dennis Young ("Young") contacted MEBA and proposed a compromise whereby MEBA would disclaim work at Pier II and ILWU would disclaim work at Womens Bay Terminal on non-AALA cargo, which would preserve the workforces of both unions.[50] The email also reported that "Matson met with Samson to discuss options that the ILWU [had] discussed with [Matson]," including: (1) recognize ILWU jurisdiction at Pier II in Kodiak, while allowing Samson to continue operations at Womens Bay Terminal for the purposes of moving Samson equipment and cargo; (2) use ILWU members to perform all longshore services at Womens Bay Terminal, allowing Samson to pick up and deliver cargo via

---

[46] *Id.* at 18.
[47] Dkt. 270 at 20; Dkt. 270-23 at 10–11.
[48] Dkt. 63 (ILWU's Response in Opposition to Samson's Motion for Preliminary Injunction) at 11 (emphasis in original); *see* Dkt. 270-23 at 11.
[49] Dkt. 270 at 21; Dkt. 270-15 (Petition to Vacate Arbitration Decision) at 70.
[50] Dkt. 270 at 21–22; Dkt. 270-13 at 19 (providing email from Dennis Young to MEBA employees).

truck; or (3) terminate Samson's lease of the Womens Bay Terminal.[51] However, ILWU asserts that Matson never responded to this proposal.[52]

On June 16, 2020, Samson entered into a Terminal Services Agreement with Matson to continue its cargo operations at Womens Bay Terminal with its MEBA employees, so long as Samson reimbursed Matson and paid additional "time in lieu" wages for ILWU-claimed work ("Terminal Services Agreement").[53]

In October 2020, Samson filed a Complaint against ILWU for damages under Section 303 of the Labor Management Relations Act ("LMRA").[54] In its Complaint, Samson alleged ILWU violated National Labor Relations Act ("NLRA") Sections 8(b)(4)(ii)(A), (B), and (D), and 8(e) by threatening, coercing, or restraining an employer with the objective of forcing it to assign work to a particular union instead of another.[55] Samson argued ILWU acted coercively by "seeking an arbitration order, in a proceeding to which Samson was not a party, that sought to require Samson's landlord [Matson] to use its substantial leverage to force Samson to hire ILWU members."[56]

ILWU alleges it first learned of Samson and Matson's Terminal Services Agreement on December 7, 2020, through a filing in this case.[57] Before then, it alleges, "Matson did not inform ILWU of the agreement's existence, of its terms generally, of its terms allowing for Samson to continue using its own labor at Womens Bay Terminal, of its terms for Matson to pass time in lieu charges to Samson, of its terms for Samson to indemnify Matson, or of its terms specifying that

---

[51] Dkt. 270-13 at 19.
[52] *Id.* at 28; Dkt. 225-6 (Young Email).
[53] Dkt. 270-14 (Terminal Services Agreement) at 95–103; Dkt. 270 at 26.
[54] Case No. 3:20-cv-00248-TMB, Dkt. 1 (Complaint). This is Samson's sole remaining claim. The Court dismissed Samson's petition to vacate an arbitration award and claim for injunctive relief. Case No. 3:20-cv-00108-TMB, Dkt. 82 (Order); Dkt. 85 (Order).
[55] Case No. 3:20-cv-00248-TMB, Dkt. 1.
[56] Dkt. 143 (Memorandum in Support of Second Motion to Amend Complaint) at 3.
[57] Dkt. 270 at 26; Dkt. 270-23 at 12–13.

Samson's sole remedy would be against ILWU."[58] On December 29, 2020, ILWU sought a ruling from Coast Arbitrator Kagel asking him to enforce the February 2020 Award and find Matson in violation of its terms by entering into an agreement with Samson that allowed Samson's employees to continue performing work Matson was required to designate to ILWU-represented longshore workers.[59]

On October 4, 2021, Coast Arbitrator Kagel granted ILWU's motion to enforce the February 2020 Award ("October 2021 Award").[60] Coast Arbitrator Kagel found Matson in violation of the Award's terms, noting that the agreement between Samson and Matson "purported to honor [LOU No. 12] . . . then [] effectively cancelled that provision by Samson's ability to 'request' to supply its own, non-ILWU cargo-handling labor, [] reimbursing Matson for Matson paying in-lieu to the ILWU[,] [and] . . . . provid[ing] that Samson would not sue Matson, and would also indemnify Matson, if necessary."[61] He ordered all AALA employers, including Matson, not to "permit or enter into any agreement permitting nonsignatory employees to operate cargo-handling equipment on any facilities they own or operate without reaching a written agreement with ILWU, designating an area where such nonsignatory employees may work in the Ports of Kodiak and Dutch Harbor."[62]

On September 13, 2023, Young filed a Motion for Enforcement and Remedy requesting that Coast Arbitrator Kagel enforce the February 2020 Award and his October 2021 Award.[63] Young also asked Arbitrator Kagel to issue an order directing Matson to "(1) pay to ILWU any

---

[58] Dkt. 270 at 27.
[59] Id.
[60] Dkt. 270-17 (Coast Arbitrator's October 4, 2021 Decision) at 80–89; Dkt. 270 at 30–31; Dkt. 270-23 at 13.
[61] Dkt. 270-17 at 87–88.
[62] Id. at 81.
[63] Dkt. 270-40 (ILWU Motion for Enforcement and Remedy) at 2–4.

and all damages awarded to Samson, against ILWU, for the time in lieu payments invoiced by Matson to Samson pursuant to the Terminal Services Agreement and (2) reimburse ILWU for any legal fees and costs incurred in defense of this lawsuit—both prospectively and retrospectively."[64] On September 22, 2023, Matson provided Samson with ILWU's request and notified Samson of Matson's intent to seek indemnity from Samson for costs and damages resulting from ILWU's claims, pursuant to Samson's contractual obligations to Matson under the Terminal Services Agreement.[65]

On October 6, 2023, Samson moved to amend its Complaint to add factual allegations that ILWU filed the September 2023 Motion for Enforcement Remedy and that Matson notified Samson of its intent to seek indemnity.[66] Samson also moved to update its damages to include "such other damages relating to and caused by the claims arising from" these allegations and to remove all allegations against International Longshore and Warehouse Union, which was no longer a party to the case.[67] Samson claimed that ILWU misuse[d] . . . the arbitration process" and "interpret[ed] [the AALA] to require Matson [to] use its substantial leverage to force Samson to hire ILWU members," which it argued "makes [the AALA] an illegal 'Hot Cargo' agreement under 29 U.S.C. §§ 158(b)(4)(ii)(A) and 158(e)."[68] Samson maintained that in filing the Motion for Enforcement and Remedy, ILWU "[sought] enforcement of an illegal hot cargo agreement

---

[64] *Id.* at 4; Dkt. 270 at 52; Dkt. 270-23 at 14.
[65] Dkt. 270-41 (Matson Letter) at 2–3; Dkt. 270 at 52; Dkt. 270-23 at 14; Dkt. 270-38 (Tungul Email) at 25–26.
[66] Dkt. 212 (Motion to Amend Second Amended Complaint for Damages) at 10–11.
[67] *Id.* at 14–15.
[68] Dkt. 213 (Memorandum in Support of Motion to Amend Second Complaint for Damages) at 3. A "hot cargo agreement" is an unfair labor practice defined under 29 U.S.C. § 158(e) as a contract or agreement prohibiting an employer from conducting business with any other person or employer. 29 U.S.C. § 158(e). Hot cargo agreements are "unenforceable and void" unless an exception applies. *Id.*

-10-

which would result in further monetary damages to Samson."[69] Construing Samson's motion as a motion to supplement, the Court granted Samson's Motion to Amend.[70] Samson filed its Third Amended Complaint on February 20, 2024, "incorporat[ing] these recent actions by Defendants in the factual bases for Samson's claims for relief."[71]

On October 9, 2023, Young sent another letter to Coast Arbitrator Kagel, "urging him to also order Matson to (1) cease and desist from enforcing or applying Article VII of its [Terminal Services Agreement] with Samson; (2) withdraw its notice of indemnification to Samson; and (3) inform Samson that pursuant to his October 4, 2021 award, Matson is prohibited from enforcing or applying Article VII of the [Terminal Services Agreement]."[72]

### B. ILWU's Motion for Summary Judgment.

On April 30, 2024, ILWU filed the present Motion requesting summary judgment, arguing that "there are no genuine issues of material fact warranting trial, and that ILWU is entitled to judgment as a matter of law."[73] ILWU provides four reasons.[74]

First, it argues that "Samson's Section 303 claim fails as a matter of law."[75] It submits that its "work preservation objective is a complete defense to Samson's claims because [it] had a colorable claim that the work in dispute is fairly claimable and Matson had the right to control it."[76] Pointing to United States Supreme Court and National Labor Relations Board ("NLRB") precedents routinely upholding work preservation agreements, ILWU argues that the "ILWU

---

[69] Dkt. 213 at 4.
[70] Dkt. 224 (Order Granting Motion to Amend/Correct).
[71] Dkt. 225 (Third Amended Complaint).
[72] Dkt. 270-42 (Young October 2023 Letter) at 2.
[73] Dkt. 232; Dkt. 270.
[74] Dkt. 270 at 2.
[75] *Id.* at 35.
[76] *Id.* at 32.

Alaska longshore bargaining unit has always been similarly recognized as comprising the state-wide 'pool of longshore workers' represented by the ILWU and employed by various employers, including carriers like Matson and APL, under the AALA in all covered ports throughout Alaska."[77]

Further, ILWU argues that the February 2020 Award does not violate Section 8(e) of the NLRA because it "is a lawful work preservation application of the AALA" and "merely preserves traditional longshore work for ILWU bargaining unit employees" but "does not satisfy secondary union objectives."[78] Specifically, ILWU notes that the Award is lawful under the work preservation doctrine because it is "fairly claimable in that it has been traditionally performed by ILWU longshore workers, and Matson had the right to control the work," i.e., "the power to assign cargo[-]handling work at Womens Bay Terminal to ILWU longshore workers."[79]

Moreover, ILWU suggests that regardless of whether the February 2020 Award was lawful, Samson's claims fail because "ILWU lost bargaining unit cargo[-]handling work at the exact location of the work in question."[80] Therefore, it asserts, it "had a colorable claim for lawful work preservation in enforcing its collective bargaining agreement against Matson," which "leaves Samson without a triable material question of fact."[81]

ILWU also argues that Samson's claims fail because ILWU did not violate Section 8(b)(4)(D).[82] Citing NLRB decisions, it suggests that "it is not unlawful for a union to file 'arguably meritorious work assignment grievances prior to the issuance of the Board's

---

[77] *Id.* at 35–36.
[78] *Id.* at 37.
[79] *Id.* at 36–41.
[80] *Id.* at 43.
[81] *Id.* at 41–43.
[82] *Id.* at 43–44.

10(k) determination.'"[83] Aside from ILWU lawfully pursuing its own grievance, it submits that "Samson cannot point to any action causing its purported damages other than the pursuit and enforcement of the Coast Arbitrator's Award and there is no Section 10(k) award affecting the work in question."[84] Therefore, "[its] theory under Section 8(b)(4)(D) also fails as a matter of law because under *Georgia-Pacific,* there is no NLRA coercion as that term is understood and applied by the NLRB."[85]

Second, ILWU argues that Samson is not a neutral employer and therefore cannot make a Section 303 claim.[86] Rather, as a "third party company to whom an employer might divert work to escape the contract with a union," Samson "[became] entangled in the vortex of the primary dispute between the contractor [Matson] and the union [ILWU]" by "knowingly assist[ing] [Matson] in connection with the labor dispute."[87] It alleges that "Samson (1) coordinated with Matson on preparing, filing, and litigating this lawsuit in support of their joint venture to repudiate the Coast Arbitrator's Award; (2) entered into an agreement with Matson to enable Matson to avoid its contractual obligations to ILWU; and (3) manufactured its purported damages by agreeing to pay time in lieu to Matson with the intent to sue ILWU to recover the money."[88] As such, it argues Samson cannot make a Section 303 claim because it is not a neutral employer.[89]

Third, ILWU suggests that even if there is a triable issue on ILWU's work preservation and neutrality affirmative defenses, "Samson's intervening actions further preclude a jury from

---

[83] *Id.* at 43–44 (quoting *Longshoremen ILWU Loc. 7 (Georgia-Pac.)*, 291 NLRB 89, 90 (1988)).
[84] *Id.* at 44.
[85] *Id.*
[86] *Id.* at 44–47.
[87] *Id.* at 45.
[88] *Id.* at 46.
[89] *Id.*

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 13 of 63

finding that ILWU caused any of its claimed damages."[90] Instead, it asserts that "Matson's and Samson's actions, not ILWU's[,] are superseding causes to Samson's alleged damages of paying Matson time in lieu," and "[t]here is no genuine dispute that ILWU did not cause Samson to enter into the agreement with Matson that allowed Matson to charge Samson for time in lieu" and that it "could not have done so as [ILWU] [was] completely unaware that the agreement even existed."[91]

Fourth, ILWU argues that "Samson cannot avoid summary judgment by relying on other allegations in the [Third Amended Complaint] because none are supported by evidence."[92] Rather, it notes that Samson can only point to ILWU lawfully "(1) pursuing the grievance against Matson to Coast Arbitrator Kagel, and (2) enforcing the resulting Coast Arbitrator's Award" as the cause of its damages.[93] ILWU indicates that, as Samson concedes, there is no evidence in the record that ILWU made any demands on Samson nor insisted Matson charge Samson for time in lieu.[94] Moreover, ILWU argues that Samson incurred no damages as a result of ILWU seeking enforcement of the February 2020 and October 2021 Awards.[95] Rather, it suggests that any damages Samson incurred were caused by "Matson['s] violat[ion] [of] the Award by entering into the agreement with Samson instead of complying with the [A]ward by ensuring ILWU labor was used for all cargo[-]handling at Women's Bay Terminal."[96]

---

[90] *Id.* at 47–48.
[91] *Id.* at 48.
[92] *Id.* at 48–52.
[93] *Id.* at 48.
[94] *Id.* at 49–51.
[95] *Id.* at 51–52.
[96] *Id.*

-14-

*C.  Samson's Opposition.*

Opposing, Samson argues that "ILWU fails to satisfy the requirements of either [the work preservation or neutrality] affirmative defense" and asks the Court to "deny ILWU's and grant Samson's [partial summary judgment] motions" as to these defenses accordingly.[97]

1.  <u>Work historically performed by Samson's MEBA union bargaining unit employees, and which ILWU never performed, is not fairly claimable by ILWU.</u>

First, Samson argues that ILWU cannot meet either prong of the work preservation affirmative defense.[98] Regarding the first prong, whether the work in dispute is "fairly claimable," it asserts that "work historically performed by Samson's MEBA union bargaining unit employees, and which ILWU never performed, is not fairly claimable by ILWU" because "it is not possible to preserve work ILWU had never performed."[99] Further, Samson suggests that the work preservation defense is unavailable because ILWU used the AALA as "a sword to achieve to an unlawful secondary object—here not work preservation but rather work acquisition" by "appropriat[ing] 'work that is not theirs' historically performed by another bargaining unit."[100]

2.  <u>Matson did not have a legal right to control Samson from utilizing its MEBA-represented employees.</u>

Regarding the second prong, whether the employer had the "right to control" the work in question, Samson argues that "Matson did not have a legal right to control Samson from utilizing its MEBA-represented employees who had performed Samson's cargo[-]handling work at Womens Bay for over 35 years."[101] Characterizing Matson and Samson's relationship as that of

---

[97] Dkt. 274 at 12–13.
[98] *Id.*
[99] *Id.* at 13, 38.
[100] *Id.* at 22, 38.
[101] *Id.* at 21.

"landlord" and "tenant," Samson argues that "a landlord does not, absent some contractual terms absent here, have the right to control its tenant's workforce."[102] Rather, it alleges "ILWU engaged in a classic boycott by submitting a grievance that was then used to exert unlawful pressure on Samson's union and on Matson to exert secondary pressure Samson," constituting coercive practices in violation of Section 8(b)(4).[103]

> 3. ILWU cannot establish Samson's loss of neutrality under the ally doctrine.

Second, Samson argues that ILWU cannot establish Samson's loss of neutrality under the ally doctrine.[104] It quotes NLRB decisions articulating that "absent employment controls not present here, a building owner is a person separate and apart from [the contractor performing services on the property, even if they share economic interests.]"[105] Instead, arguing that "ILWU must establish that the neutral company 'exercises substantial, actual, and active control over the working conditions of the primary's employees' to relinquish the protections of Section 8(b)(4)," Samson maintains that ILWU "wholly fails to provide any evidence" of Matson's control over Samson.[106] It further submits that "Samson and Matson [are not] so intertwined as to be a single employer under the NLRA" and that "ILWU does not even allege that there [is] any common ownership between [them]," nor "any common management, any centralized control of labor relations, or any interrelationship of operations."[107] Samson also suggests that ILWU's cites to NLRB cases involving "struck work" to support its neutrality defense are inapposite because "there was no strike or struck work" here.[108]

---

[102] *Id.* at 43.
[103] *Id.* at 43–44.
[104] *Id.* at 44–52.
[105] *Id.* at 45 (quoting *SEIU (General Maintenance Co.)*, 329 NLRB 638, 640 n.19 (1999)).
[106] *Id.*
[107] *Id.* at 51.
[108] *Id.*

-16-

4. <u>Events are sufficient to create a question of material fact on whether ILWU's conduct materially contributed to damages that should be resolved by a jury.</u>

Further, Samson argues that "[t]he issue of whether ILWU's misconduct materially contributed to damages suffered by Samson is a question of fact for the jury" and that "ILWU's contention on causation of [its] damages is misguided."[109] Rather, it asserts that ILWU's grievance produced the February 2020 Award, which in turn prompted Matson to force Samson to pay time in lieu invoices to continue Samson's operations at Womens Bay Terminal.[110] It suggests these events "are sufficient to create a question of material fact on whether ILWU's conduct materially contributed to damages" "that should . . . be resolved by a jury."[111]

5. <u>Assertion that a grievance alone cannot be coercion under Section 8(b)(4)(D).</u>

Samson also argues that ILWU cannot invoke *Georgia-Pacific Corp v. NLRB*[112] for its assertion that a grievance alone cannot be coercion under Section 8(b)(4)(D).[113] It notes that the Court previously held that "29 U.S.C. § 158(b)(4)(ii)(D) does not limit the avenues for such grievances" and "Section 303 provides concurrent jurisdiction to hear Samson's claims."[114] Moreover, it alleges ILWU did not merely file a grievance but engaged in "substantial economic coercion" by "demand[ing] that Samson either recognize ILWU jurisdiction in unrelated facilities, replace ILWU workers with MEBA workers, or be evicted."[115]

---

[109] *Id.* at 52.
[110] *Id.*
[111] *Id.* at 52–53.
[112] 982 F.2d 130 (D.C. Cir 1989).
[113] Dkt. 274 at 53–54.
[114] *Id.* (quoting Dkt. 85 (Order Granting in Part and Denying in Part Motion to Dismiss) at 20)).
[115] *Id.*

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 17 of 63

6. <u>Samson is entitled to discovery on the Third Amended Complaint</u>.

Separately, Samson argues that it is entitled to discovery on the Third Amended Complaint and "respectfully requests that the Court defer consideration of this part of ILWU's motion and allow Samson to take discovery" accordingly.[116] It also alleges that "ILWU mischaracterized the conduct of [Samson's President, George Baggen] and Samson's counsel and took their statements out of context."[117] Specifically, it alleges that ILWU misrepresented statements from Baggen's deposition testimony.[118]

D. *ILWU's Reply*.

Replying to Samson's Opposition, ILWU maintains that "there are no genuine, disputed material facts that would preclude summary judgment."[119] It argues that its Motion must be granted for three reasons.[120]

1. <u>Samson "fails to apply governing law setting forth the limited conditions where a union's successful prosecution of a grievance violates LMRA Section 303."</u>

First, ILWU argues that Samson "fails to apply governing law setting forth the limited conditions where a union's successful prosecution of a grievance violates LMRA Section 303."[121] Regarding Samson's Section 8(e) claim, ILWU argues that Samson "fails to respond [to its argument] . . . that Section 8(e) only prohibits agreements restricting an employer's business relations if the union has a secondary objective" and "wrongfully conflates the outcome of a work preservation agreement with the motive of the agreement."[122] Citing Supreme Court precedent and

---

[116] *Id.* at 54–55.
[117] *Id.* at 55.
[118] *Id.* at 55–59.
[119] Dkt. 289 (ILWU's Reply in Support of ILWU's Motion for Summary Judgment).
[120] *Id.* at 9–10.
[121] *Id.* at 9.
[122] *Id.* at 10–12.

NLRB authority, it suggests instead that where "the purpose of the grievance or arbitration award is work preservation, the resulting award does not violate Section 8(e) 'even though it may seriously affect neutral third parties.'"[123]

### 2. The only arguable coercion is ILWU's successful pursuit and enforcement of an arbitration decision against Matson.

Further, ILWU notes that Samson agrees that Samson's claims "fail if *either* the Award does not violate Section 8(e) *or* ILWU had a colorable work preservation object in pursuing the Award."[124] However, it argues "Samson contorts this straightforward description of the legal framework" to claim that ILWU argues "Samson does not have a valid Section 303 claim because [it] has made no separate allegation of coercion."[125] ILWU disputes this characterization and clarifies that "[u]nder the evidence, the only arguable coercion is ILWU's successful pursuit and enforcement of an arbitration decision against Matson."[126]

### 3. Samson is precluded from arguing any "coercion" by ILWU other than the pursuit of the Coast Arbitrator's Award.

ILWU also contends that "Samson is precluded from arguing any 'coercion' by ILWU other than the pursuit of the Coast Arbitrator's Award and, regardless, further fails to identify any admissible evidence supporting such conduct."[127] Although it argues Samson sought to "expand the alleged coercive conduct at issue in the instant matter to 'any form of economic pressure of a compelling or restraining nature' and 'economic pressure outside of the arbitration,'" ILWU notes that Samson "fail[s] to identify any conduct [in discovery] by ILWU other than the pursuit of the

---

[123] *Id.* at 10 (quoting *NLRB v. ILA ("ILA II")*, 473 U.S. 61, 78 n.18 (1985); citing *NLRB v. ILA ("ILA I")*, 447 U.S. 490, 507 (1980)).
[124] *Id.* at 13 (emphasis in original).
[125] *Id.*
[126] *Id.*
[127] *Id.* at 13–14.

grievance against Matson and enforcement of the arbitration award against Matson."[128] Moreover, ILWU suggests that even if the Court were to allow Samson to introduce evidence of alleged coercive conduct outside of discovery, "the evidence Samson points to establishes nothing more than (1) the existence of the Coast Arbitrator's Award, (2) the fact that ILWU contacted MEBA in an effort to reach a jurisdictional compromise prior to the NLRB's issuance of the Section 10(k) Award regarding assignment of work at Pier II in Kodiak, (3) the fact that Matson had control over cargo[-]handling at Womens Bay Terminal in part through threat of eviction, and (4) the fact that Samson paid large sums of money to Matson under a terminal services agreement that ILWU did not know existed."[129] Pointing to George Baggen's declaration, ILWU alleges that "Samson attempts to convert evidence that Matson indeed had and exercised control over Samson's cargo[- ]handling[] into evidence that the ILWU exercised coercion beyond the mere pursuit and enforcement of the arbitration award."[130] ILWU argues that this "only shows Matson's economic coercion of Samson—not any coercion by ILWU."[131]

Further, regarding Samson's Section 8(b)(4)(D) claim, ILWU notes that it "has not pursued its grievance following a contrary Section 10(k) Award" and argues that "Samson fails to acknowledge the change in facts from its motion to dismiss, where Samson alleged other economic coercion, to summary judgment, where there is no admissible evidence of other economic coercion."[132] Because "Samson has conceded . . . that ILWU engaged in no such other economic

---

[128] *Id.* at 14–15.
[129] *Id.* at 15.
[130] *Id.* at 16–17.
[131] *Id.* at 17.
[132] *Id.* at 18.

coercion and Samson has failed to introduce admissible evidence of other economic coercion," ILWU argues that it is entitled to summary judgment.[133]

4. Samson fails to apply governing law concerning ILWU's work preservation object and maintains there is no genuine dispute that ILWU had a colorably lawful claim to the work in dispute.

Second, turning to its affirmative defenses, ILWU argues "Samson fails to apply governing law concerning ILWU's work preservation object" and maintains "there is no genuine dispute that ILWU had a colorably lawful claim to the work in dispute."[134] Regarding the first prong, ILWU asserts that "[t]here is no dispute that the work [it] claimed in its grievance against Matson was traditional longshore work that is not only unambiguously covered by the AALA, but also is work that AALA unit employees traditionally have and do perform throughout the state, including in Kodiak."[135] It contests Samson's claim that the work cannot be fairly claimable because ILWU has never performed the exact work at Womens Bay Terminal.[136] Rather, it suggests the fairly claimable test turns on whether "it is of the type traditionally performed by the bargaining unit, regardless of exact location because the units are multi-port and multi-employer."[137] It also asserts Samson misinterprets and misapplies relevant case law, and that other authorities upon which it relies are readily distinguishable on the facts.[138]

---

[133] *Id.* at 17–18.
[134] *Id.* at 18–19.
[135] *Id.* at 25.
[136] *Id.* at 20.
[137] *Id.* at 22 (citing *Bermuda Container Lines, Ltd. v. ILA*, 192 F.3d 250, 257 (2d Cir. 1999); *California Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987) (enforcing in relevant part *Longshoremen ILWU (California Cartage)*, 278 NLRB 220, 220, 223–24 (1986)); *Longshoremen & Warehousemen Local 10 (Howard Terminal)*, 147 NLRB 359, 360 n.2 (1964); *Longshoremen & Warehousemen (Ind.) Local 19 (American Mail Line, Ltd.)*, 144 NLRB 1432, 1434, 1440–42 (1963); *Alaska Steamship Co. (ILWU Local 62)*, 172 NLRB 1200, 1201 (1968)).
[138] Dkt. 289 at 23 n.8, 24.

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 21 of 63

5. Matson had and exercised its right to control work in dispute.

Regarding the second prong, ILWU maintains that "Matson had and exercised its right to control work in dispute."[139] It notes that Matson "instruct[ed] Samson to stop handling APL cargo, even going so far as to prevent Samson from powering APL's refrigerated containers there" and "dictate[d] the terms under which Samson performed cargo[-]handling at Womens Bay Terminal, including choosing to require Matson perform all cargo[-]handling work at the terminal."[140] Contesting Samson's claim that this test requires a "legal right to control," ILWU cites *NLRB v. ILA ("ILA II")*[141] for the proposition that "the longshoremen's employers . . . have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers."[142] Thus, it submits, "by virtue of its ownership of the Womens Bay Terminal and lease with Samson, Matson had the right to control how cargo is handled at the terminal, *i.e.* the work in dispute."[143] It further disputes Samson's claims that ILWU exerted pressure on Samson, noting that ILWU instead "pressured Matson through the pursuit of the grievance, the primary employer, to comply with the AALA."[144] Therefore, ILWU argues, the work preservation doctrine offers a complete defense to Samson's claims.[145]

6. Samson forfeited its neutrality by intentionally entangling itself in the dispute with Matson.

Third, turning to its neutrality defense, ILWU maintains that Samson "forfeited its neutrality by intentionally entangling itself in the dispute with Matson."[146] ILWU contests

---

[139] *Id.* at 25.
[140] *Id.* at 25–26.
[141] 473 U.S. 61, 74, n.12 (1985).
[142] Dkt. 289 at 28.
[143] *Id.*
[144] *Id.* at 27.
[145] *Id.* at 28.
[146] *Id.* at 29.

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 22 of 63

Samson's argument that ILWU's affirmative defense is limited to the ally doctrine and that struck work and single employer tests are the only ways in which neutrality may be lost.[147] ILWU clarifies that it "*is NOT asserting that Samson is an 'ally' of Matson*"[148]; rather, because Samson "was clearly taking a position in favor of [the primary employer]," it "was not a neutral secondary employer entitled to the protections of § 8(b)(4)."[149] Further, although Samson "attempts to explain away its extensive collaboration with Matson by asserting that its counsel and Matson's counsel have been colleagues for years," ILWU notes that "[t]here is no explaining away the extensive evidence that Samson knowingly entangled itself into Matson's dispute with ILWU" and the "factual relationship between Samson and Matson" indicates that Samson lost its status and accompanying NLRA protections as a neutral third party.[150]

> 7. Samson has failed to provide evidence of causation to support a viable claim under Section 303.

Separately, ILWU argues that Samson has failed to provide evidence of causation to support a viable claim under Section 303.[151] Disputing Samson's claim that "causation is a question of fact for the jury," ILWU cites *Celotex Corp. v. Catrett*[152] and submits that "summary judgment must be granted if ILWU shows an absence of evidence of causation."[153] Reasoning that ILWU did not, and could not have, caused Samson to enter into an agreement that ILWU did not even know about, ILWU instead asserts that "Samson's voluntary actions entering into the agreement with Matson, making payments to Matson, and collaborating on this lawsuit before

---

[147] *Id.* at 29–31.
[148] *Id.* at 29–30 (emphasis in original).
[149] *Id.* at 30–31 (quoting *T.H. Eifert, Inc. v. United Association of Journeymen*, 422 F.Supp.2d 818, 835–36 (W.D. Mich. 2006)).
[150] *Id.* at 31.
[151] *Id.* at 31–32.
[152] 477 U.S. 317 (1986).
[153] Dkt. 289 at 32 (citing *Celotex Corp.*, 477 U.S. at 322–24).

filing it were superseding acts breaking the chain of causation."[154] Therefore, a reasonable jury could not find that ILWU caused Samson's damages.[155]

ILWU also alleges Samson made "intentionally misleading statements to the Court" by "characterizing [the testimony of George Baggen] as 'technically' or 'arguably' true."[156] It alleges that Baggen "repeatedly presented sworn testimony to this Court which at least appears to misleadingly omit material information in an effort to obtain a favorable ruling on its first motion for preliminary injunction," and suggests that he even admitted to adjusting his responses in subsequent questioning to attain a favorable ruling.[157] It notes that although Samson dismisses these statements as being "taken out of context" and "technically true," "Baggen's prior offen[s]e provides further grounds to grant ILWU's motion to strike [his] sham declarations."[158]

### E. *Samson's Cross-Motion for Partial Summary Judgment.*

Filed concurrently with ILWU's Motion, Samson's Cross-Motion asserts ILWU's "affirmative defenses are misguided and without legitimate support."[159]

1. There was no common ownership and no common management [by Matson] of Samson's day-to-day activities at the terminal.

First, regarding ILWU's neutrality defense, Samson argues that the "defense does not apply because (1) ILWU did not strike the Womens Bay [T]erminal in Kodiak, and (2) Samson was not owned by and did not have an integrated business operation with the Womens Bay [T]erminal landlord that required treatment as a single employer."[160] It suggests that the "ally doctrine

---

[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Id.*
[158] *Id.* at 33.
[159] Dkt. 249 at 8.
[160] *Id.*

defense" only applies in two instances: (1) when there is "struck work," and (2) when there is "common ownership control" over the disputed work, such that the primary and second employers are sufficiently integrated to constitute a single employer or enterprise.[161] Noting that there was no struck work in this case, Samson argues that "[t]here was no common ownership and no common management [by Matson] of Samson's day-to-day activities at the terminal," nor was there "integration of the two companies."[162]

## 2. This is not a work preservation case, but instead a work acquisition one.

Second, regarding ILWU's work preservation defense, Samson argues this defense also "does not apply because (1) ILWU used the arbitration process as a work acquisition sword to acquire cargo[-]handling work at the Womens Bay terminal performed by Samson's MEBA union employees for over 35 years, and (2) Samson's landlord did not have the power to assign the cargo[-]handling work performed by Samson's union employees to ILWU members."[163] It suggests that the standard for determining whether a contracting clause violates Section 8(e) or "merely preserv[es] . . . work traditionally done by bargaining unit employees" is "whether the ILWU employees historically performed Samson's cargo[-]handling work at Womens Bay."[164] Because ILWU had never performed Samson's cargo-handling work at Womens Bay, Samson argues "this is not a work preservation case, but instead a work acquisition one."[165] Moreover, Samson argues that "it is beyond dispute that Matson as the contracting employer did not have the power to assign the work at the Womens Bay terminal from Samson's MEBA union employees to

---

[161] *Id.* at 21.
[162] *Id.* at 24.
[163] *Id.* at 8–9.
[164] *Id.* at 29 (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–46 (1967); *Marrowbone Dev. Co. v. District 17, UMW*, 147 F.3d 296, 302 (4th Cir. 1998)).
[165] *Id.* at 29–30.

ILWU members."[166] Thus, "it is reasonable to infer that the arbitration proceeding had an unlawful secondary objective to influence whoever had such power over that work," rendering the work preservation defense unavailable to ILWU.[167]

### F. ILWU's Opposition.

Opposing, ILWU argues that Samson's Cross-Motion "fails to address the relevant facts or governing legal standard."[168]

#### 1. ILWU is entitled to a work preservation defense.

Regarding its work preservation defense, ILWU suggests Samson errs in "focus[ing] on the work of employees outside the bargaining unit, specifically Samson's MEBA-represented employees, instead of the work of the state-wide ILWU bargaining unit."[169] Rather, in light of the Supreme Court's holding in *ILA II*,[170] ILWU notes that "[t]he effect of work preservation[] agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant."[171]

#### 2. ILWU is entitled to a neutrality defense.

Regarding its neutrality defense, ILWU argues that the factual record demonstrates that "Samson knowingly and intentionally inserted itself within the vortex of ILWU's primary dispute with Matson through extensive collaboration and coordination to file this lawsuit, entered into agreements that caused Samson's alleged damages, and otherwise assisted Matson in avoiding its contractual obligations to ILWU."[172] It suggests these interactions deprive Samson of the

---

[166] *Id.* at 31.
[167] *Id.* at 30–31.
[168] Dkt. 271 at 9.
[169] *Id.* at 8 (international quotations omitted).
[170] 473 U.S. 61 (1985).
[171] Dkt. 271 at 8 (quoting *ILA II*, 473 U.S. at 78).
[172] *Id.* at 9.

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 26 of 63

protections of NLRA Section 8(b)(4) and LMRA Section 303.[173] Moreover, although Samson argues the "ally" doctrine is unavailable to ILWU, ILWU clarifies that it does not premise its defense on the ally doctrine.[174] Instead, it suggests "the [neutrality] defense applies more broadly where an employer who would otherwise be neutral 'engaged in a common course of conduct subversive of the purposes of [the NLRA]' together with the primary employer."[175] Thus, for a "third party who 'has entangled himself in the vortex of the primary dispute' between union and employer," ILWU argues there are no such protections under the NLRA.[176]

*G. Samson's Reply.*

Replying, Samson argues that ILWU's Opposition fails to sustain either of its affirmative defenses.[177] As to the work preservation defense, citing *U.S. Naval Supply Center*,[178] it again asserts that "a longshore union with a multi-employer agreement cannot try to appropriate the work at a terminal historically performed by another union bargaining unit" and suggests that ILWU's reliance on cited case law is misplaced.[179] Rather, because "ILWU never performed the more involved cargo[-]handling work of unloading, and reconfiguring cargo for efficient discharge at subsequent ports that was performed by Samson's MEBA-represented employees for over 35 years at the Womens Bay [T]erminal," Samson argues ILWU cannot not fairly claim such work.[180] Further, Samson contests ILWU's arguments regarding Matson's right to control Samson, alleging

---

[173] *Id.*
[174] *Id.* at 40.
[175] *Id.* at 38 (quoting *Local 363, International Brotherhood of Teamsters (Roslyn Americana Corp.)*, 214 NLRB 868, 873–74 (1974)).
[176] *Id.* at 38–39 (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 627 (1967)).
[177] Dkt. 294 (Samson's Reply to ILWU's Opposition to Motion for Partial Summary Judgment as to ILWU's Non-Neutral and Work Preservation Affirmative Defenses) at 7–8.
[178] 195 NLRB 273 (1972).
[179] Dkt. 294 at 11 (citing *ILA Local 1248 (U.S. Naval Supply Center)*, 195 NLRB 273, 274 (1972)).
[180] *Id.* at 15–16.

that "ILWU tries to invent a new rule out of whole cloth about Matson's leverage over Samson because of the month-to-month lease."[181] Instead, it suggests the lease conferred upon Matson a "de facto power" that involved "no contractual power or legal right to dictate the terms of employment of Samson's employees, or who would perform Samson's cargo[-]handling work at the terminal."[182]

As to the neutrality defense, Samson again asserts that a third party may only lose its neutrality under the ally doctrine or the single enterprise doctrine, arguing that ILWU's "attempt to invent a new doctrine" should be rejected.[183] It argues that neither of the two doctrines applies because "there is no strike or struck work involved here, and Samson has not taken over any work that had been done by Matson," and because Samson and Matson are separate entities and their relationship was, at its core, one of landlord and tenant.[184] And, even if the employers retain "some economic interdependence," Samson argues this is insufficient to deprive the third party of its neutrality.[185] It also seeks to distinguish ILWU's cited authority, arguing that such cases "involved performance of struck work or concerted refusal to handle goods" or the "actual and active control over the management policies and/or labor relations of the primary employers," and are therefore distinguishable.[186]

---

[181] *Id.* at 17–18.
[182] *Id.*
[183] *Id.* at 23.
[184] *Id.* at 21.
[185] *Id.* at 24 (quoting *NLRB v. Service Employees Union Local 77*, 1986 WL 236051, at *23 (9th Cir. 1986)).
[186] *Id.* at 23–25 (citing *SEIU (General Maintenance Co.)*, 329 NLRB 638 (1999), *enf'd*, 52 Fed. Appx. 357 (9th Cir. 2002)).

-28-

## III.    LEGAL STANDARD

*A.  Summary Judgment.*

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[187] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[188] Material facts are those which might affect the outcome of the case.[189] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[190] "There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion."[191] A movant's burden may be met by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."[192]

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial.[193] "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."[194] Finally,

---

[187] *Scott v. Harris*, 550 U.S. 372, 378 (2007).
[188] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).
[189] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").
[190] *Id.* at 248.
[191] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).
[192] *Celotex*, 477 U.S. at 325.
[193] *Id.* at 323–24.
[194] *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

-29-

"[w]here . . . the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy is a question of law suitable for disposition on summary judgment."[195]

B. *Relevant Provisions.*

Section 303 of the LMRA, codified at 29 U.S.C. § 187, provides a private cause of action in district court to a party injured by a union's unfair labor practice, as that term is defined by the NLRA.[196] Section 8(b)(4) of the NLRA, codified at 29 U.S.C. § 158(b)(4), makes it an unfair labor practice to "threaten, coerce, or restrain any person[197] engaged in commerce or in an industry affecting commerce."[198] Specifically, Section 8(b)(4)(ii) prohibits the use of coercion to "forc[e] or requir[e]":

> (A) . . . any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by § 8(e);

> (B) . . . any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such

---

[195] *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1262 (9th Cir. 2016) (quoting *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011)).

[196] 29 U.S.C. §§ 187(a) ("It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title."), (b) ("Whoever shall be injured in his business or property by reason or [1] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."); *see Atchison, Topeka & Santa Fe RR v. Teamsters Local 70*, 511 F.2d 1193, 1195 (9th Cir. 1975).

[197] "The term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11, or receivers." 29 U.S.C. § 152(1).

[198] 29 U.S.C. § 158(b)(4)(ii).

labor organization has been certified as the representative of such employees under the provisions of section 9;

…

(D) . . . any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work[.][199]

Further, Section 8(e) prohibits "hot cargo agreements" as an unlawful labor practice, stating that:

any labor organization and any employer [from] enter[ing] into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void.[200]

## IV. DISCUSSION

ILWU moves for summary judgment primarily on two bases: (1) ILWU is entitled to the work preservation defense because the work in dispute at Womens Bay Terminal was fairly claimable by ILWU, and Matson had the right to control it; and (2) Samson is not a neutral third party protected by the NLRA because it intentionally involved itself in the ongoing dispute between ILWU and Matson.[201]

Samson cross-moves for partial summary judgment, asserting that neither affirmative defense is available to ILWU because (1) work historically performed by Samson's MEBA-represented employees is not fairly claimable and Matson lacked the legal right to control it, and

---

[199] 29 U.S.C. §§ 158(b)(4)(ii)(A), (B), (D).
[200] 29 U.S.C. § 158(e).
[201] Dkt. 270 at 32–47.

(2) Samson and Matson are separate entities without an integrated business operation, and thus Samson is a neutral third party entitled to NLRA protections.[202]

The Court concludes that ILWU is entitled to summary judgment. First, the Court considers whether ILWU is entitled to the work preservation affirmative defense, including whether it had a colorable claim for lawful work preservation, whether the work in dispute is fairly claimable, and whether Matson had a right to control it. For the reasons described below, the Court concludes that ILWU is entitled to the work preservation affirmative defense, which provides a complete defense to Samson's Section 303 claims.

Next, the Court turns to whether ILWU is also entitled to the neutrality affirmative defense, including whether Samson was a neutral third-party employer. After reviewing the factual record and relevant case law, the Court concludes that Samson is not a neutral employer. Therefore, Samson is barred from making a Section 303 claim.

Finally, the Court considers the parties' remaining arguments, including whether there is sufficient evidence of ILWU's coercive behavior or causation to sustain Samson's Section 303 claims, and whether further discovery regarding ILWU's Motion for Enforcement and Remedy would furnish evidence to overcome ILWU's affirmative defenses. The Court concludes that, based on the record before it, there are no genuine issues of material fact warranting trial, and further discovery is unnecessary because ILWU's recent actions are not coercive within the meaning of the NLRA. Therefore, the Court grants ILWU summary judgment.

*A.  ILWU is entitled to a complete defense under the work preservation doctrine.*

The Court concludes that Samson's Section 303 claims fail because there is no triable issue of fact that ILWU's pursuit of its grievance and enforcement of the Award violated Section 8(b)(4).

---

[202] Dkt. 249 at 17–24.

ILWU's interpretation of its contract rights is colorable given case law applicable to collective bargaining agreements involving multi-employer, multi-port longshore work. Moreover, given that the cargo-handling work in Kodiak is fairly claimable by ILWU and that Matson has the power to assign such work to ILWU workers, the interpretation of the AALA advanced by ILWU and adopted by the Coast Arbitrator in the February 2020 Award and October 2021 Award is a lawful work preservation interpretation, and thus, there is no violation of Section 8(b)(4)(ii). Therefore, Samson's Section 303 claim fails as a matter of law.

1. Samson does not identify "substantial economic coercion" outside of ILWU's pursuit of its grievance.

As a threshold matter, the Court finds that Samson has not alleged or produced evidence to substantiate any prohibited coercion within the meaning of Section 8(b)(4) beyond allegations that ILWU's grievance was coercive.

Samson is suing ILWU pursuant to Section 303 of the LMRA to recover damages stemming from the arbitration instigated by ILWU, which Samson alleges was an illegal unfair labor practice under Sections 8(b)(4)(ii)(A), (B), and (D) of the NLRA.[203] All three subsections prohibit union coercion.[204] Subsection (A) prohibits coercing an employer to enter into an agreement which is prohibited by Section 8(e) of the NLRA.[205] Section 8(e) prohibits "hot cargo" agreements, in which a union and an employer agree that the employer will not handle the goods of another or will cease doing business with another person, and include "union signatory" agreements that prohibit an employer from subcontracting with any business who does not use

---

[203] See generally Dkt. 225.
[204] See 29 U.S.C. § 158(b)(4)(ii).
[205] 29 U.S.C. § 158(b)(4)(ii)(A).

union labor.[206] Subsection (B) prohibits coercing any employer to cease doing business with another party, regardless of any agreement.[207] And subsection (D) prohibits coercive activity for the purpose of forcing an employer to assign work to workers represented by one union over another.[208]

Although Samson broadly alleges ILWU went beyond merely filing a grievance and engaged in "substantial economic coercion,"[209] it has not identified any actions taken by ILWU, other than pursuing its grievance and enforcing the Coast Arbitrator's Awards, that are coercive or caused its damages. Samson suggests that Young's March 2020 email to MEBA is coercive by "demand[ing] that Samson either recognize ILWU jurisdiction in unrelated facilities, replace ILWU workers with MEBA workers, or be evicted."[210] However, this email was directed to MEBA employees and appeared to be ILWU's attempt to seek resolution in the wake of arbitration to preserve both entities' workforces.[211] Samson has not proffered evidence to support how Young's email impacted or directly or indirectly caused Samson's alleged damages. As ILWU notes, Samson could not identify how this email "threatened, coerced, or restrained" it during its Rule 30(b)(6) deposition.[212] Rather, the only actions Samson points to in its Third Amended Complaint and interrogatories are ILWU's "interpretation of the AALA," "proceeding to arbitration with the objective of using the AALA and [LOU No. 12] . . . to cause Matson to cease doing business with Samson, and to cause Samson to cease doing business with its non-ILWU

---

[206] 29 U.S.C. § 158(e); *see also Am. President Lines, Ltd. v. Int'l Longshore and Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1152 n.3 (9th Cir. 2013).
[207] 29 U.S.C. § 158(b)(4)(ii)(B).
[208] 29 U.S.C. § 158(b)(4)(ii)(D).
[209] Dkt. 274 at 53–54.
[210] *Id.*
[211] Dkt. 270-13 at 19.
[212] Dkt. 270 at 48–49; Dkt. 270-3 (G. Baggen Depo. Vol I), 101:3–10, 102:8–14, 103:20–107:21, 110:18–111:25, 233:11–234:15).

-34-

represented employees," and ILWU's subsequent Motion for Enforcement and Remedy seeking to enforce the February 2020 and October 2021 Awards.[213] Thus, the Court's analysis is limited to ascertaining whether these specific actions constituted coercion within the meaning of Section 8(b)(4)(ii).

Further, although Samson alleges that "[t]he undisputed material facts show ILWU exerted economic pressure outside of arbitration to threaten and coerce Matson and Samson," its remaining allegations point solely to Mation's and Samson's actions.[214] Although Samson claims it was pressured into such an agreement to avoid being evicted under its lease, such effects were attributable directly to Samson's and Matson's actions, notably: (1) Samson's decision to amend its lease agreement with Matson; (2) the Terminal Services Agreement between the parties to enforce the February 2020 Award requiring Samson to pay time in lieu wages for ILWU-claimed work, and (3) Matson's exercising control and influence over Samson's cargo-handling work. Such actions are not attributable to ILWU. Further, if they were attributable, the factual record reflects that the only identifiable actions ILWU took to support such claims are its pursuit of its grievance and its efforts seeking subsequent enforcement of the arbitration awards.

Having concluded that Samson failed to allege or substantiate claims of "substantial economic coercion" outside of arbitration, the Court must then determine whether ILWU's pursuit of its grievance, including the arbitration awards and its efforts to enforce them, constitute "coercion" within the meaning of NLRA Sections 8(b)(4)(ii)(A), (B), and (D).

---

[213] Dkt. 225 at 7–11.
[214] Dkt. 274 at 19.

-35-

2. <u>ILWU's grievance presented a colorable claim for work preservation and was not unlawful within the meaning of Section 8(b)(4).</u>

The Court finds that ILWU's grievance and subsequent pursuit of the February 2020 and October 2021 Awards did not constitute "coercion" under Section 8(b)(4)(ii) and presented a colorable claim for lawful work preservation in enforcing its collective bargaining agreement against Matson.

Section 303 provides a damages remedy for a union's unfair labor practices.[215] "In rare cases, the union can commit a predicate unfair labor practice through its conduct in an arbitration proceeding."[216] The United States Supreme Court has clarified that "[Section] 303 provides a remedy only for violations of [Section] 8(b)(4) of the Act, which, in turn, requires proof of coercion."[217] Coercion for the purposes of Section 8(b)(4) claims does not mean "only strikes or picketing, but . . . any form of economic pressure of a compelling or restraining nature."[218] For instance, if a union acts with "forbidden secondary purpose" in arbitration proceedings,[219] such as "disrupt[ing] the business relations of a neutral employer,"[220] "claim[ing] work [] different from that traditionally performed by the bargaining unit employees,"[221] "acquir[ing] completely new jobs,"[222] or "benefit[ting] other than the signatory employer's employees,"[223] this constitutes illegal "secondary" activity and is coercive within the meaning of Section 8(b)(4).[224] A union may

---

[215] *Shepard v. NLRB*, 459 U.S. 344, 351 (1983).
[216] *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1149 (9th Cir. 2013)
[217] *Shepard*, 459 U.S. at 351.
[218] *Associated Gen. Contractors of Cal., Inc. v. NLRB*, 514 F.2d 433, 438 (9th Cir. 1975).
[219] *ILA II*, 473 U.S. 61, 79 (1985).
[220] *Id.*
[221] *Id.* at 81.
[222] *California Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987) (citing *NLRB v. Enterprise Ass'n*, 429 U.S. 507, 521–23 (1977)).
[223] *Id.* (citing *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 645 (1967)).
[224] *ILA II*, 473 U.S. at 79; *California Cartage Co.*, 822 F.2d at 1207.

-36-

also violate Section 8(b)(4) by pursuing a grievance through arbitration if it advances an improper interpretation of a contractual clause with an unlawful secondary purpose or pursues an agreement "tactically calculated to satisfy union objectives elsewhere."[225] Such a violation "occurs the moment the union pursues arbitration with an unlawful secondary motive . . . not if or when the union succeeds in persuading the arbitrator to sustain its grievance."[226]

However, a union's actions are not coercive for the purposes of Section 8(b)(4) if they are aimed at "primary union activity," such as preserving work for the union's bargaining unit employees.[227] Indeed, "bona fide work preservation agreements and their enforcement may constitute protected primary goals" under the NLRA.[228] If a grievance presents a colorable claim for work preservation, its pursuit does not constitute coercion under Section 8(b)(4) and is a complete defense to Section 303 claims.[229] "The relevant inquiry is whether the union's efforts are

---

[225] *Nelson v. Int'l Bhd. of Elec. Workers, Local Union No. 46*, 899 F.2d 1557, 1562 (9th Cir. 1990), *overruled on other grounds by Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (quoting *Nat'l Woodwork*, 386 U.S. at 644) (finding "no evidence . . . that the Union engaged in any other conduct aimed at coercing compliance with its interpretation of the Agreement by the Chapter or by any other party" where the Union's "conduct enjoined by the district court goes beyond that 'persuasively related' to the Union's efforts to enforce the CIR's arbitration award through the grievance procedure"); *see also Truck Drivers, Union Local 705 v. NLRB*, 820 F.2d 448, 452 (D.C. Cir. 1987) (remanding to the NLRB to "explicitly deal with petitioner's primary argument that by filing a grievance it was merely seeking enforcement of a lawful provision of its collective bargaining agreement"); *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1043 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015) ("A union's pursuance of a grievance through arbitration can be considered coercive under section 8(b)(4) if that grievance is based on an interpretation of a collective bargaining agreement that furthers an unlawful object. That is, it is coercive if a union pursues an interpretation of a collective bargaining agreement in arbitration that promotes secondary union activity and not primary work preservation activity.").

[226] *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1155 (9th Cir. 2013).

[227] *See ILA II*, 473 U.S. 61, 74–76, 78–79 (1985); *see also Am. President Lines, Ltd.*, 997 F. Supp. 2d at 1043.

[228] *ILA II*, 473 U.S. at 79.

[229] *See Nat'l Woodwork*, 386 U.S. at 644–46 (noting that whether a union violated Sections 8(b)(4)(ii)(A) and (B) "cannot be made without an inquiry into whether, under all the surrounding

directed at matters involving the labor relations of the contracting employer vis-à-vis his own employees."[230] "The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer."[231]

The NLRB has consistently held that union grievances made for the purpose of preserving work present "colorable claims" and are not coercive within the meaning of Section 8(b)(4).[232] Absent evidence of unlawful threats, a union's efforts to enforce contract provisions to preserve bargaining unit work are lawful, despite impacts on third party contractors.[233] Regarding the longshore industry, courts have held that a union's efforts to require signatory employers to comply with work preservation clauses in multi-port, multi-employer agreements were primary union

---

circumstances, the Union's objective was preservation of work for [the union's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere" and that "the Union's maintenance of [a bargaining agreement] provision was not a violation" of either subsection); *ILWU v. NLRB (Kinder Morgan)*, 978 F.3d 625, 637 (9th Cir. 2020) ("A valid work preservation objective provides a complete defense against alleged violations of [S]ection 8(b)(4)(D).").

[230] *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1043 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015).

[231] *ILA I*, 447 U.S. 490, 507 n.22 (1980).

[232] *See Heavy, Highway, Bldg. & Const. Teamsters*, 227 NLRB 269, 274 (1976) ("We do not agree, however, that the filing and processing of grievances limited to seeking enforcement of . . . the contract was also violative of Section 8(b)(4). It does not appear from the record that the grievances were filed for the purpose of accomplishing an unlawful object. Rather, it appears that they were filed as a means of enforcing a colorable contract right. Such conduct is not, in our view, the kind of tactic calculated to restrain or coerce employees or employers in the exercise of rights guaranteed by the Act." (internal citations omitted)); *In re Newspaper and Mail Deliveries Union*, 337 NLRB 608, 608 (2002) (finding union violated Section 8(b)(4) because it "brought its grievance to the impartial chairman in order to accomplish an unlawful object—preventing the subcontracting of delivery work to a nonunion company"; *Teamsters Local 83 (Cahill Trucking)*, 277 NLRB 1286, 1290 (1985) ("Threats to file a grievance and the filing of a grievance to enforce a colorable contract claim do not violate the Act.").

[233] *Teamsters Local 83 (Cahill Trucking)*, 277 NLRB at 1290.

activity and did not violate the NLRA, even if the union sought an interpretation that prevented subcontracting outside the bargaining unit.[234]

Here, ILWU asserts that "there is no genuine dispute that [it] had a lawful, colorable claim" because its "objective was to preserve bargaining unit work by enforcing its contract with Matson, APL, and other AALA Employers."[235] It notes that it has performed such cargo-handling work in Kodiak for decades, and that the AALA and LOU No. 12 broadly restrict cargo-handling by non-ILWU workers at Womens Bay Terminal without its express written consent.[236] As such, it submits its grievance was filed for the lawful purpose of preserving work for the bargaining unit and was not coercive within the meaning of Section 8(b)(4).[237] Samson argues that ILWU's interpretation of the AALA and LOU No. 12 is unlawful because it seeks to "aggrandize" and

---

[234] *See Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1044 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015) (citing *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*, AFL-CIO, 192 F.3d 250 (2d Cir. 1999)); *id.* at 1045 (holding that although "ILWU's interpretation of the AALA amount[ed] to a prohibition," it was one "directed at the primary employers collectively, on subcontracting out work covered under the AALA" for the purposes of "contracting employers to hire bargaining unit employees either directly or indirectly through other signatory employers" and "[was] colorable [in the context of] collective bargaining agreements involving multi-employer, multi-port longshore work" because it pursued "a lawful work preservation agreement."); *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 611 F. App'x 908, 912 (9th Cir. 2015) (affirming this district in *American President Lines*, and holding that "[t]he ILWU did not pursue an impermissible secondary objective when engaging in its arbitration efforts to require APL to honor [the AALA] and therefore did not violate the NLRA" because such an interpretation of the award was "permissible . . . [and] not repugnant to the NLRA."); *see also Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 192 F.3d 250, 257 (2d Cir. 1999) (holding that union's grievance to enforce subcontracting prohibition under multi-employer, multi-port longshore agreement was lawful under NLRA because bargaining unit was comprised of union-represented employees on a "coast-wide basis" and union's grievance and interpretation of agreement sought to "preserve the work of [union] employees in the coast-wide bargaining unit and was directed at [the employer] by virtue of its status in the multi-employer bargaining association.").
[235] Dkt. 270 at 42.
[236] *Id.* at 42–43.
[237] *Id.* at 43.

expand ILWU's existing cargo-handling work by forcing Matson to cease doing business with Samson or require Samson to join the AALA.[238]

The Court finds that ILWU's grievance had a colorable claim for work preservation and was not unlawful within the meaning of Section 8(b)(4). *American President Lines v. Int'l Longshore & Warehouse Union*[239] and *Bermuda Container Line v. Int'l Longshoremen's Association*[240] are instructive. In those cases, unions had colorable claims for work preservation because they filed grievances to enforce subcontracting prohibitions in longshore bargaining agreements for the purpose of preserving work for employees in the coast-wide bargaining units.[241] Here, ILWU lost bargaining unit cargo-handling work at Womens Bay Terminal, including approximately 3,600 hours of work per year and the loss of 21 casual truck drivers.[242] As a result, ILWU filed its grievance for the purpose of enforcing bargaining longshore agreements—the AALA and LOU No. 12—to preserve work for its ILWU-represented employees in the bargaining unit at Womens Bay Terminal in Kodiak, an AALA-covered port.[243] Contrary to Samson's assertions, the factual record reflects that ILWU's efforts to enforce the bargaining agreement were motivated by a lawful primary union activity—work preservation—and not by "an unlawful secondary objective to interfere with Samson's business."[244]

Moreover, although ILWU's interpretation may effectively prevent Matson from subcontracting with employees outside the bargaining unit (such as Samson's), this is a

---

[238] Dkt. 274 at 32.
[239] 997 F. Supp. 2d 1037 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015).
[240] 192 F.3d 250 (2d Cir. 1999).
[241] *See Am. President Lines*, 611 F. App'x at 912; *Bermuda Container Line*, 192 F.3d 257–58; *Am. President Lines*, 997 F. Supp. 2d at 1044.
[242] Dkt. 270-22 at 4–5.
[243] *See* Dkt. 270-23 at 8–9.
[244] Dkt. 274 at 20.

consequence of Matson's status as a signatory to a multi-employer collective bargaining agreement. As noted by the Supreme Court in *ILA II*, impacts on third party employers like Samson are irrelevant absent evidence of secondary union activity.[245] Indeed, the Ninth Circuit has noted that "[s]ome disruption of the business relationships between the primary and secondary employers 'is the necessary consequence of the purest form of primary activity.'"[246] Therefore, consistent with Ninth Circuit and NLRB authority, the Court finds ILWU had a colorable claim for work preservation in the context of a multi-employer, multi-port pool of longshore workers because it was aimed at preserving work for its employees in the bargaining unit, and therefore was not coercive under Section 8(b)(4). Further, because ILWU had a colorable claim for work preservation, it has a complete defense to Samson's Section 303 claims.

3. <u>ILWU's interpretation of the AALA and LOU No. 12 is a lawful work preservation agreement under Section 8(e).</u>

Having concluded ILWU had a colorable claim to work preservation to sustain its grievance, the Court next turns to whether the AALA and LOU No. 12 can be considered a lawful work preservation agreement as applied to the cargo-handling work in dispute.[247]

The Court finds that there is no triable issue that ILWU's interpretation of the AALA violated Section 8(b)(4)(ii)(A) or Section 8(e). Under Section 8(b)(4)(ii)(A), a union may not coerce an employer to enter a "hot cargo agreement" prohibited by Section 8(e).[248] A "hot cargo agreement" is an unfair labor practice defined under 29 U.S.C. § 158(e) as a contract or agreement

---

[245] *ILA II*, 473 U.S. 61, 78 (1985)).
[246] *Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, 780 F. App'x 467, 471 (9th Cir. 2019).
[247] *See Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1045 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015).
[248] *See* 29 U.S.C. §§ 158(b)(4), 158(e); *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1153 (9th Cir. 2013).

prohibiting an employer from conducting business with any other person or employer.[249] Hot cargo agreements are "unenforceable and void" unless an exception applies.[250] "A 'union signatory' clause, which prohibits the employer from subcontracting with all employers who are not union signatories, is one such agreement."[251]

To support a valid claim under Section 303, "[a]n alleged violation of Section 8(b)(4)(ii)(A) 'necessarily rises or falls' on a violation of Section 8(e)."[252] If the agreement or provision does not constitute a hot cargo agreement in violation of Section 8(e), a union's actions do not violate Section 8(b)(4)(ii)(A).[253] "[A] union's efforts to enforce—through arbitration—a clause that violates Section 8(e) may constitute . . . a violation of Section 8(b)(4)(ii)(A)."[254] Further, a contract may violate Section 8(e) if it is a "secondary agreement" "directed tactically toward a neutral employer in a labor dispute not his own."[255]

However, Section 8(b)(4) does not "reach employees' activity to pressure their employer to preserve for themselves work traditionally done by them" and Section 8(e) "does not prohibit agreements made and maintained for that purpose."[256] Rather, agreements that impose restrictions on an employer for the primary purpose of preserving work for the bargaining unit's workforce do not violate Section 8(e).[257] "If the union's sole objective is to influence the signatory employer's

---

[249] 29 U.S.C. § 158(e).

[250] *Id.*

[251] *NLRB v. Hotel & Rest. Emps. & Bartenders' Union*, 623 F.2d 61, 67 (9th Cir. 1980) ("[I]t is well settled that union signatory clauses violate section 8(e).").

[252] *Am. President Lines*, 611 F. App'x at 910.

[253] *ILA II*, 473 U.S. 61, 81–82 (1985) ("When the objective of an agreement and its enforcement is so clearly one of work preservation, the lawfulness of the agreement under §§ 8(b)(4)(B) and 8(e) [and Section 8(b)(4)(A)] is secure absent some other evidence of secondary purpose.").

[254] *Am. President Lines*, 611 F. App'x at 910.

[255] *California Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987).

[256] *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 635 (1967).

[257] *ILA II*, 473 U.S. at 74; *Nat'l Woodwork*, 386 U.S. at 635; *see also Newspaper & Mail Deliverers (Hudson News)*, 298 NLRB 564, 566–68 (1990) ("We find that the Union's action when it learned

labor relationship with his own employees, the employer clearly is not neutral and the agreement is primary rather than secondary."[258] Therefore, even where an agreement "may seriously affect neutral third parties," it does not violate Section 8(e) provided the union's actions in pursuing the agreement is motivated by work preservation.[259]

"Whether an agreement is a lawful work preservation agreement depends on 'whether, under all the surrounding circumstances, the Union's objective was preservation of work for [bargaining unit] employees, or whether the [agreement was] tactically calculated to satisfy union objectives elsewhere.'"[260] "In order for a clause to qualify as a lawful work preservation clause that does not violate Section 8(e)'s prohibition on hot cargo agreements, the clause must meet two elements: (1) the clause's objective must be the preservation of work for union members rather than a secondary goal; and (2) the employer must have a 'right [to] control,' i.e., the power to assign the work."[261] In other words, courts must assess whether the disputed work is "fairly claimable" by the union, and whether the employer has the "right to control" the disputed work.[262]

Here, Samson posits that ILWU's interpretation of the AALA, accepted by the Coast Arbitrator, transforms the AALA and the LOU No. 12 into an illegal "hot cargo agreement" because it requires Matson to refrain from doing business with Samson.[263] ILWU argues instead that its interpretation of the AALA and the arbitration awards incorporating its interpretation are lawful under the work preservation doctrine because cargo-handling at Womens Bay Terminal is

---

[of subcontracting in violation of the bargaining agreement] was with the object of preventing [the employer] from siphoning off the unit employees' work, a primary and lawful objective.").
[258] *California Cartage Co.*, 822 F.2d at 1207.
[259] *ILA II*, 473 U.S. at 78 n.18.
[260] *ILA I*, 447 U.S. 490, 504 (1980) (quoting *Nat'l Woodwork*, 386 U.S. at 644–45).
[261] *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union*, 611 F. App'x 908, 910 (9th Cir. 2015) (citing *ILA II*, 473 U.S. 61, 76 (1985)).
[262] *Id.*
[263] Dkt. 213 at 44.

-43-

fairly claimable and Matson had the power to assign it.[264] The Court concludes that ILWU's interpretation of the AALA is lawful under the work preservation doctrine because the evidence reflects ILWU had a work preservation object in preserving cargo-handling work at Womens Bay Terminal for its workforce, and Matson had the right to control the disputed work.

*a. Cargo-handling work at Womens Bay Terminal is fairly claimable.*

Turning to the first prong of the work preservation test, the Court finds that cargo-handling work at Womens Bay Terminal is fairly claimable because it is work traditionally performed by ILWU longshore workers. To determine whether disputed work is fairly claimable, courts consider whether it is "work traditionally performed by employees represented by the union"[265] "or the functional equivalent of that work."[266] "[T]he analytical focus must be 'on the work of the bargaining unit employees, not on the work of other employees . . . doing the same or similar work.'"[267]

In the context of the longshore industry, the Supreme Court in *NLRB v. International Longshoremen's Association, AFL-CIO ("ILA I")*[268] observed that "the work of longshoremen has historically been the loading and unloading of ships" and that this forms "the beginning of the analysis."[269] Moreover, the union seeking to preserve bargaining unit work need not have performed the exact work in dispute for a work preservation agreement to be lawful.[270] Indeed, an otherwise valid work preservation agreement is lawful even if "longshoremen have never

---

[264] Dkt. 270 at 36–41.
[265] *ILA I*, 447 U.S. 490, 504 (1980).
[266] *California Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987).
[267] *ILA II*, 473 U.S. at 77–78.
[268] 447 U.S. 490 (1980).
[269] *Id.* at 509.
[270] *See id.* at 508–09; *California Cartage Co.*, 822 F.2d at 1207 (finding "functional relationship between consolidating cargo onto pallets and stuffing containers" under longshore bargaining agreement).

-44-

previously performed work at the exact same location."[271] Where arbitrators make findings of fact in underlying arbitration regarding longshore work, "[i]t is up to the district court to determine whether to defer to or uphold those findings and, if it does, what effect those factual findings have on [the parties'] legal arguments."[272]

The Ninth Circuit affirmed that cargo-handling work in covered ports under the AALA is fairly claimable for the purposes of the work preservation doctrine. In *American President Lines, Ltd. v. International Longshore and Warehouse Union*,[273] a case similarly involving the rights of ILWU longshore workers under the AALA, this district considered whether cargo-handling work at Seward, a covered port under the AALA, was fairly claimable.[274] The court first cited findings by the Alaska Arbitrator concluding that ILWU work had previously performed the disputed cargo-handling work in Seward.[275] Next, the court noted that because "the bargaining unit employees include all longshore workers represented by the ILWU doing work at certain Alaska ports for multi-employers under the AALA," "the court must look to the work done by the bargaining unit employees as a whole and not with reference to the particular employment practices of an individual employer."[276] Looking at longshore work in Seward, the Court found that

> [i]t is undisputed that bargaining unit employees have performed cargo-handling work in covered Alaska ports, including Seward, pursuant to the AALA. [The employer] hired ILWU to perform such work in Seward prior to 2003. [The employer] was and is an employer bound by the AALA. Thus, the ILWU has

---

[271] *California Cartage Co.*, 822 F.2d at 1207.
[272] *Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1157 n.7 (9th Cir. 2013).
[273] 997 F. Supp. 2d 1037 (D. Alaska 2014), *aff'd*, 611 F. App'x 908 (9th Cir. 2015).
[274] *Id.* at 1046.
[275] *Id.* at 1045.
[276] *Id.* at 1046.

-45-

handled cargo in Seward under the AALA in the past. The work is fairly claimable.[277]

Affirming, the Ninth Circuit observed that "[i]n the shipping industry, the bargaining unit is comprised of the multiple employers who are signatory to the operative collective bargaining agreement" and that "ILWU historically performed stevedoring work in Seward for [a current signatory employer]."[278] Thus, "the stevedoring work in Seward [was] fairly claimable by the Union" and "no genuine issue of material fact remained on the issue."[279] The court also cited *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*[280] for the proposition that the work preservation doctrine applies to multi-port agreements governing longshore bargaining units.[281] In *Bermuda*, the Second Circuit held that a bargaining agreement "covering all ports on the Atlantic and Gulf coasts from Maine to Texas" "not only defined the bargaining unit but also the primary employment relationship on a coast-wide basis" and "was designed to preserve the work of [Union-represented] employees in the coast-wide bargaining unit and [] directed at [the employer] by virtue of its status in the multi-employer bargaining association."[282]

Further, the D.C. Circuit in *California Cartage Co. v. NLRB*[283] held that because a multi-port, multi-employer longshore bargaining unit defined the scope of fairly claimable longshore work, this broadly included the "functional equivalent" of such work.[284] In that case, the court considered whether a supplement to a longshore bargaining agreement between ILWU and a signatory employer violated Section 8(e) by requiring that employer-owned containers be packed

---

[277] *Id.*
[278] *Am. President Lines*, 611 F. App'x at 911.
[279] *Id.*
[280] 192 F.3d 250 (2d Cir. 1999).
[281] *Am. President Lines*, 611 F. App'x at 911.
[282] *Bermuda Container Line Ltd.*, 192 F.3d at 257.
[283] 822 F.2d 1203 (D.C. Cir. 1987).
[284] *Id.* at 1208.

and unpacked by ILWU longshore workers.[285] The court agreed with the NLRB that the supplement was legal under Section 8(e) because it "was intended to preserve the ILWU's traditional work—loading and unloading cargo on and off ship, including 'the unitizing of cargo to be shipped and the breaking down of cargo units for delivery—by securing the functional equivalent of that work, stuffing and unstuffing modern containers.'"[286] Further, the court observed that although some of the work claimed under the supplement was performed away from the docks, while the longshoremen's traditional work occurred at the docks, "the fact that longshoremen have never previously performed work at the exact same location does not prevent the work sought from being the functional equivalent of work the longshoremen have performed."[287]

Here, Samson argues that cargo-handling at Womens Bay Terminal is not fairly claimable because it is "work historically performed by Samson's MEBA union bargaining unit employees, and which ILWU never performed."[288] To support this claim, Samson notes that its MEBA-represented employees have performed cargo-handling work there for 35 years; Samson has never employed ILWU-represented longshore workers to perform Samson's cargo-handling work there; and Samson and MEBA are not parties to the AALA.[289] ILWU contends that such work is fairly claimable because the AALA covers such work; ILWU longshore workers historically have performed the cargo-handling on and off barges, including at the Port of Kodiak for decades; and they lost bargaining unit work at that location under Matson's agreement with Samson.[290]

---

[285] *Id.* at 1206–07.
[286] *Id.* at 1207.
[287] *Id.*
[288] Dkt. 274 at 13.
[289] *Id.* at 24–38.
[290] Dkt. 270 at 38–40.

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 47 of 63

The Court concludes that cargo-handling at Womens Bay Terminal in Kodiak is fairly claimable by ILWU. In the February 2020 Award, Coast Arbitrator Kagel made a factual determination that under the AALA, Matson must use ILWU-represented employees at Womens Bay Terminal for handling Matson's cargo if it ever used the terminal for its own cargo.[291] Additionally, he noted that, pursuant to an earlier arbitration, the AALA also required APL cargo to be handled by ILWU-represented personnel at Womens Bay Terminal.[292] Thus, Arbitrator Kagel concluded that ILWU workers had previously performed the disputed cargo-handling work in Kodiak.

Consistent with *American President Lines*, the Court agrees with ILWU that these findings should be given significant weight, particularly given Arbitrator Kagel's familiarity with the longshore industry.[293] However, even considering the issue independent of the Coast Arbitrator's findings, the Court concludes that the cargo-handling work is fairly claimable based on the factual record and substantial case law involving longshore bargaining agreements. When interpreting such agreements, courts routinely look to the work of the bargaining unit employees.[294] Here, the bargaining unit consists of all employees under the AALA, and it is undisputed that ILWU-represented employees have performed cargo-handling work for AALA employers, including Matson, at covered Alaska ports, including Kodiak, for several years.[295] Matson had previously

---

[291] Dkt. 270-13 at 12 ("Matson, apparently under the LASH dock lease with Samson which Matson as lessor now controlled, required Samson, as a condition of continuing to operate there, to drop any handling of APL cargo, which then occurred. Matson does not use the facility for its own cargo, and has admitted that if it ever did, such work would be handled by ILWU-represented personnel under the Agreement.").

[292] *Id.* at 11–12.

[293] *Am. President Lines, Ltd.*, 997 F. Supp. 2d at 1045; *Am. President Lines, Ltd. v. Int'l Longshore and Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1157 n.7 (9th Cir. 2013).

[294] *See ILA I*, 447 U.S. at 507.

[295] Dkt. 270-23 at 6 ("As required by the work preservation provisions of the AALA, longshore workers have loaded and unloaded containers, including empty and cargo-laden, for AALA

hired ILWU workers to perform cargo-handling work in Kodiak and is an employer bound by the AALA.[296] Moreover, it is undisputed that ILWU lost work opportunities at Womens Bay Terminal for its represented employees because of Matson's elimination of the neutral zone and subsequent agreement with Samson.[297] Because ILWU has performed cargo-handling work in Kodiak in the past, and Womens Bay Terminal is owned by Matson, the cargo-handling work there is fairly claimable by ILWU.[298]

Citing to case law largely outside the longshore industry, Samson argues that the disputed work is not fairly claimable because ILWU has not historically performed work *for Samson* at Womens Bay Terminal, and that its efforts amount to "job aggrandizement" and "an attempt to acquire new work" from Samson's MEBA employees.[299] However, this position is not aligned with how courts routinely interpret work preservation agreements in multi-employer, multi-port longshore bargaining disputes. Contrary to Samson's assertions, under *American President Lines, Bermuda, and California Cartage*, disputed longshore work may be fairly claimable under a multi-employer, multi-port agreement even if longshoremen have never previously performed work at the precise location and even if such work is the functional equivalent of work historically performed. Here, the Court must determine whether cargo-handling in Kodiak is fairly claimable under the AALA, considering the work of the Alaska-wide, multi-employer bargaining unit. As noted in *Bermuda*, cargo-handling work may be fairly claimable if the coast-wide bargaining unit has traditionally performed such work. The Court is not persuaded by Samson's attempts to

---

signatory employers, including Matson and APL, at ports throughout Alaska, including the Port of Kodiak for decades.").

[296] *Id.*

[297] Dkt. 270-22 at 5.

[298] *See Am. President Lines, Ltd.*, 997 F. Supp. 2d at 1046; *Am. President Lines, Ltd.*, 611 F. App'x at 1154.

[299] Dkt. 274 at 30–31.

distinguish substantial case law interpreting longshore agreements and declines to adopt Samson's narrow view of fairly claimable work. Thus, the work is fairly claimable.

### b. *Matson had the right to assign cargo-handling work at Womens Bay Terminal to ILWU.*

Turning to the second prong of the work preservation test, the Court finds that Matson also had the right to assign cargo-handling work in the Port of Kodiak to ILWU. Under the right to control test, "the contracting employer must have the power to give the employees the work in question."[300] "The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work."[301] "Were the latter the case, [the contracting employer] would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary."[302] The critical inquiry is whether "the pressures exerted were directed at the right person, *i.e.*, at the primary in the dispute."[303] In the context of the longshore industry, the Supreme Court in *ILA II* held that "the longshoremen's employers . . . have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers."[304] This right to control exists because employers "prescribe the conditions under which [the containers they own or lease] may be released to shippers, consolidators, truckers, and warehousemen who might otherwise choose to utilize the containers so as to violate the Rules."[305]

---

[300] *ILA I*, 447 U.S. 490, 504 (1980).
[301] *Id.* at 504–05.
[302] *Id.* at 505 (quoting *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45 (1967)).
[303] *Loc. 438 United Pipe Fitters*, 201 NLRB 59, 64 (1973), *enf'd* 490 F.2d 323 (4th Cir. 1973).
[304] *ILA II*, 473 U.S. 61, 74, n.12. (1985).
[305] *American Trucking Associations, Inc. v. NLRB*, 734 F.2d 966, 978 (4th Cir. 1984).

Case 3:20-cv-00108-TMB   Document 305   Filed 08/22/24   Page 50 of 63

Here, the undisputed facts show that Matson had the right to assign cargo-handling work to ILWU. First, Coast Arbitrator Kagel noted in his February 2020 Award that "the record showed that while Matson did collect rent from Samson, it also had substantial leverage over Samson, including by the terms of its lease, as demonstrated by Samson ceasing APL operations there on Matson's demand."[306] Further, in deposition testimony, Samson acknowledged that Matson determined "how [Samson] handled cargo, with the choice that [it] would leave" Womens Bay Terminal, and the evidence reflects that Matson instructed Samson to cease handling APL cargo, including powering APL's refrigerated containers.[307] Matson also acknowledged that it exercised control over the cargo-handling work and informed ILWU that it would abide by the February 2020 Award by employing ILWU-represented workers at Womens Bay Terminal.[308] As Matson wielded and exercised control over and "prescribe[d] the conditions under which [the containers they own or lease] may be" handled at Womens Bay Terminal, beyond merely receiving rent from Samson, the Court concludes it had the right to control such work.[309]

Samson instead argues that "Matson's role as landlord did not allow it to dictate Samson's relationship with its employees" and as such it "did not have a legal right to control Samson from utilizing its long-time MEBA union employees."[310] However, Samson fails to provide authority to support this argument and ignores leading case law on the issue. Under *ILA II*, the Supreme Court characterized the right to control not as a "legal" right, but rather as the practical right to

---

[306] Dkt. 270-13 at 17.

[307] Dkt. 270 at 40; Dkt. 270-3 at 45–46; Dkt. 270-13 at 70; *see also* Young Depo., 71:9–17, 72:15–73:7; Kniaziowski Depo., 55:5–11, 56:11–18, 57:25–58:5; Tentis-Major Depo., 40:7–17; Morgan Depo., 113:20–114:2, 115:9–21.

[308] Dkt. 270-23 at 8; Young Depo., 127:12–128:10; 130:18–131:8; Tungul Depo., 94:24–95:4.

[309] *See American Trucking Associations, Inc. v. NLRB*, 734 F.2d 966, 978 (4th Cir. 1984).

[310] Dkt. 274 at 43.

decide and exercise constructive control over the conditions under which cargo was handled.[311]

Further, in *American President Lines, Ltd. v. International Longshore and Warehouse Union*,[312] the Ninth Circuit held that APL had the right to control because it could choose whether and under what terms to contract with a connecting carrier such as Samson and how its cargo would be handled.[313] As ILWU notes in its briefing, Matson exercised a similar right to control how cargo was handled at Womens Bay Terminal by virtue of its ownership of the terminal and its lease with Samson.[314] Therefore, consistent with these Supreme Court and Ninth Circuit decisions, the Court concludes that Matson had a right to control cargo-handling at Womens Bay Terminal.

Finding that both prongs of the work preservation test are satisfied, the Court concludes that ILWU's interpretation of the AALA is not a "hot cargo agreement" but a lawful work preservation agreement, and therefore that ILWU is entitled to a complete defense under the work preservation doctrine. Because there is no material dispute that ILWU's pursuit and enforcement of the Award violated Section(e), it has a complete defense to Samson's Section 303 claims.

4. Even if the AALA and Awards were not lawful under Section 8(e), there is insufficient evidence of coercion to sustain a valid Section 8(b)(4)(ii)(A) claim against ILWU.

The Court also finds that even if ILWU's interpretation of the AALA violated Section 8(e), its "colorable claim" for lawful work preservation provides a complete defense to Samson's claims of coercion under Section 8(b)(4). The Ninth Circuit and the NLRB have routinely held that even

---

[311] *ILA II*, 473 U.S. 61, 81 (1985) ("It must not be forgotten that the relevant inquiry under §§ 8(b)(4)(B) and 8(e) is whether a union's activity is primary or secondary-that is, whether the union's efforts are directed at its *own employer on a topic affecting employees' wages, hours, or working conditions that the employer can control*." (emphasis added)).

[312] 611 F. App'x 908 (9th Cir. 2015).

[313] *Id.* at 911 (finding employer had right to control cargo-handling where it admitted "[it] "control[led] where . . . containers go, when they go, how many go, where they go when they get there, and who takes them there" and that it "ha[d] a choice in deciding whether or not to employ a connecting carrier who refuses to hire ILWU labor in [the AALA-covered port]."").

[314] Dkt. 270 at 40–41.

-52-

if collective bargaining agreements violate Section 8(e), Section 303 claims may still fail where there is no separate allegation or evidence of coercion.[315]

As previously discussed, there is no material dispute that ILWU had a colorable claim to work preservation to sustain its grievance and enforce the February 2020 Award.[316] ILWU is a single, multi-port, multi-employer bargaining unit that performs cargo-handling work in Kodiak.[317] Moreover, its work preservation clause in the AALA, notably LOU No. 12, broadly protects cargo-handling work for ILWU-represented workers at Womens Bay Terminal, unless ILWU expressly agrees otherwise.[318] Further, it is undisputed that ILWU lost bargaining unit cargo-handling work at Womens Bay Terminal as a result of Matson's agreement with Samson.[319] Therefore, the Court concludes that regardless of whether the AALA and subsequent February 2020 Award violated Section 8(e), ILWU had a colorable claim for work preservation that precludes Samson's Section 8(b)(4)(ii)(A) claim.

---

[315] *See Atchison, T. & S. F. Ry. Co. v. Locs. Nos. 70, 85, & 315, of Intern, Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 511 F.2d 1193, 1195 (9th Cir. 1975 ("Plaintiff argues that in order to effectuate fully the Congressional purpose expressed in [Section 303], the court should read this highly specific provision as embracing [Section 8(e)] as well as [Section 8(b)(4)] within the grounds for suit in the district court. Congress is perfectly free to broaden the scope of [Section 303] in the manner urged by plaintiff; this court is not free to do so. The court must presume that Congress, in its 1959 amendments adding [Section 8(e)] to the NLRA, could have amended [Section 303] with equal facility, had it chosen to do so."); *Teamsters (California Dump Truck*), 227 NLRB 269, 274 (1976); *In re Newspaper and Mail Deliveries Union (NYP Holdings, Inc.),* 337 NLRB 608, 608 (2002); *Teamsters Local 83 (Cahill Trucking)*, 277 NLRB 1286, 1290 (1985).

[316] *See supra* section IV.A.2.

[317] Dkt. 270 at 11.

[318] *Id.* at 13.

[319] *Id.* at 18; *see* Dkt. 270-22.

5. <u>There is no evidence of coercion to sustain a valid Section 8(b)(4)(ii)(D) claim against ILWU.</u>

The Court also concludes that there is no material dispute as to whether ILWU violated Section 8(b)(4)(ii)(D). Under that provision, a union may not engage in coercive activity for the purpose of forcing an employer to assign work to workers represented by one union over another.[320] A valid work preservation objective provides a complete defense against alleged violations of section 8(b)(4)(ii)(D).[321] "The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis his own employees."[322] "The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer."[323] "In a word, the dispositive measure is purpose, not effect."[324] "Given this clear primary objective to preserve work in the face of a threat to jobs, extra-unit effects of a work preservation agreement alone provide an insufficient basis for concluding that the agreement has an unlawful secondary objective. Absent some additional showing of an attempt 'to reach out to monopolize jobs,' that is, proof of an attempt 'not to preserve, but to aggrandize,' such an agreement is lawful."[325]

---

[320] 29 U.S.C. § 158(b)(4)(ii)(D).

[321] *ILWU v. NLRB (Kinder Morgan)*, 978 F.3d 625, 637 (9th Cir. 2020) ("A valid work preservation objective provides a complete defense against alleged violations of [S]ection 8(b)(4)(D).").

[322] *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 645 (1967).

[323] *ILA I*, 447 U.S. 490, 507 n.22 (1980); *see The N.Y. Presbyterian Hosp.*, 354 NLRB 71, 77 (2009) ("[U]nions and employers are entitled to negotiate contracts that 'preserve' unit work by way of no-subcontracting or similar clauses, even if the enforcement of such agreements may cause the contracting employer to cease doing business with someone else.").

[324] *Int'l Longshore & Warehouse Union v. Nat'l Lab. Rels. Bd.*, 978 F.3d 625, 637 (9th Cir. 2020).

[325] *ILA II*, 473 U.S. 61, 79 (1985).

Further, courts have held that a union does not violate Section 8(b)(4)(D) by filing "grievances against an employer for money payments in lieu of work performed by members of another union which the grievant claimed should have been assigned to it under the contract, so long as the Board had not awarded that work to the other union in a proceeding under [Section] 10(k) of the Act."[326] The NLRB has further held that it is not unlawful for a union to file "arguably meritorious work assignment grievances prior to the issuance of the Board's 10(k) determination."[327]

For Samson to have a viable claim under Section 8(b)(4)(ii)(D), there must be evidence to suggest ILWU engaged in some degree of coercion, other than permissible activity like filing its grievance with lawful motivation and enforcing the February 2020 Award.[328] Here, though, there is no evidence ILWU engaged in any coercive behavior in pursuing its lawful grievance or that it pursued its grievance for any other purpose than preserving work for its bargaining employees. This Court previously held in this case that "coercion" supporting the Section 8(b)(4)(ii)(D) claim can include the grievance itself and "economic pressure outside of the arbitration."[329] However, the grievance was lawfully motivated by work preservation, and Samson has failed to point to anything other than the grievance and ILWU's efforts to enforce the resulting award. Thus, despite

---

[326] *Georgia-Pacific Corp. v. NLRB*, 892 F.2d 130, 131 (D.C. Cir. 1989), *affirming Longshoremen ILWU Local 7 (Georgia-Pacific)*, 291 NLRB 89 (1988); *ILWU v. NLRB*, 884 F.2d 1407, 1413 (D.C. Cir. 1989).
[327] *Georgia-Pacific*, 291 NLRB at 89.
[328] Alternatively, Samson could support a claim by showing that the February 2020 Award deviates from a Section 10(k) decision. But there is no Section 10(k) decision affecting the disputed work in this case.
[329] *See* Dkt. 129 (Order Denying ILWU's Motion for Certification & Stay) at 13; *Samson Tug and Barge Co., Inc. v. ILWU*, 2022 WL 94411, at *4-6 (D. Alaska Jan. 10, 2022).

the Ninth Circuit's broad interpretation of "coercion,"[330] the factual record does not reflect any economic pressure exerted on Matson or Samson outside of arbitration to sustain this claim.

Moreover, as the Supreme Court noted in *ILA II*, even if the effect on non-union members as a result of the grievance may be severe, this is ultimately irrelevant to the validity of the agreement absent evidence of some secondary purpose.[331] As such, the Court concludes there is no evidence to sustain Samson's Section 8(b)(4)(ii)(D) claim. Because ILWU has satisfied the work preservation test, and there is no evidence of coercion, ILWU is entitled to a complete defense under the work preservation doctrine, and Samson's Section 303 claims fail.

### B. ILWU is entitled to a complete defense under the neutrality doctrine.

Having concluded that ILWU is entitled to a complete defense under the work preservation doctrine, the Court need not find that ILWU is entitled to a defense under the neutrality doctrine. However, even if the work preservation doctrine was not available to ILWU, the Court nonetheless concludes that Samson's Section 303 claims alternatively fail because the factual record before it reflects that Samson is not a neutral employer. As such, ILWU is also entitled to a complete defense under the neutrality doctrine, and Samson's Section 303 claims fail as a matter of law.

In *National Woodwork Manufacturers Association v. NLRB*,[332] the Supreme Court held that Section 8(b)(4) was drafted to protect a neutral employer "only from union pressures designed to involve him in disputes not his own."[333] "The rationale [behind Section 8(b)(4)] . . . was the inapplicability of the provision's central theme, the protection of neutrals against secondary

---

[330] *Associated Gen. Contractors of Cal., Inc. v. NLRB*, 514 F.2d 433, 438 (9th Cir.1975).

[331] *ILA II*, 473 U.S. 61, 78 (1985) ("The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant . . . so long as the union had no forbidden secondary purpose.").

[332] 386 U.S. 612 (1967).

[333] *Id.* at 625–26.

pressure, where the secondary employer against whom the union's pressure is directed has entangled himself in the vortex of the primary dispute."[334] In other words, "[t]he purpose of [Section] 8(b)(4) is to protect secondary employers who are neutral, not those who knowingly assist the primary employer in connection with the labor dispute."[335] Thus, there is no Section 8(b)(4) protection for a non-neutral employer against primary union activities.[336]

To determine whether an employer is neutral, courts "consider[] on a case-by-case basis the factual relationship . . . in light of Congress' intent 'to protect employers who are wholly unconcerned' and not involved in the labor dispute between the primary employer and the union.'"[337] In the case of third party companies to whom an employer might divert work, the third party is not a neutral employer if operations are sufficiently integrated with the employer such that they are "either a single employer, a joint or common venture, a 'straight line' operation within the Board's understanding of that term, or [share] an alliance of interest,"[338] or the companies "engage[] in a common course of conduct subversive to the purposes of [the NLRA]."[339] For instance, if an employer's conduct undermines a union's contractual bargaining agreement with its employers or "knowingly assists [an employer] in connection with [a] labor dispute," even if the companies are not operationally integrated, the employer is considered a non-neutral employer.[340] Such a finding provides a complete defense to Section 303 claims.[341]

---

[334] *Id.* at 627.

[335] *Kable Printing Co. v. NLRB*, 545 F.2d 1079, 1085 (7th Cir. 1976).

[336] *Id.*

[337] *NLRB v. Local 810, Steel, Metals, Alloys and Hardware Fabricators*, 460 F.2d 1, 6 (2d Cir. 1972) (quoting *Vulcan Materials Co. v. United Steelworkers of America*, 430 F.2d 446, 451, 453 (5th Cir. 1970)).

[338] *Painters Dist. Council 51 (Management Corp.)*, 299 NLRB 618, 634 (1990).

[339] *Loc. 363, Int'l Bhd. of Teamsters*, 214 NLRB 868, 872–73 (1974).

[340] *See Kable Printing Co. v. NLRB*, 545 F.2d 1079, 1085 (7th Cir. 1976); *Loc. 363, Int'l Bhd. of Teamsters*, 214 NLRB 868, 872–73 (1974).

[341] *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 627 (1967).

Here, the factual record is replete with extensive communications between Samson and Matson regarding this case and the underlying labor dispute. The record reflects that the employers had substantial communications about challenging the Coast Arbitrator's Award, developing this lawsuit against ILWU, engaging in agreements contravening the AALA and LOU No. 12, exchanging legal research, calculating damages in this case to account for time in lieu payments from Samson to Matson, and collaborating on Samson's motion for a preliminary injunction.[342] The Court concludes that, pursuant to *National Woodwork*, these facts are sufficient to determine that Samson "entangled [itself] in the vortex of" and "knowingly assist[ed] [Matson] in connection with" the underlying labor dispute between ILWU and Matson.

Samson incorrectly asserts that ILWU is not entitled to the neutrality defense because it is only limited to cases involving "struck work," which did not occur here, or where the primary and neutral employers are designed a "single employer."[343] Samson also suggests that merely sharing an economic interest with another company, such as that between landlord and tenant, is insufficient to deprive a third party of its neutrality and that ILWU must establish that it "exercises substantial, actual, and active control over the working conditions of the primary's employees."[344]

The Court disagrees with this limited interpretation of the scope of Section 8(b)(4) neutrality. Rather, the Supreme Court in *National Woodwork* noted that Section 8(b)(4) only protects third parties from "union pressures designed to involve him in disputes not his own."[345]

---

[342] Dkt. 270-3 at 280:15–22, 284:15–285:17, 289:1–3; Dreyfus Depo., 88:13–89:13; G. Baggen Depo., Vol. II, 582:22–583:13; G. Baggen Depo. Vol. II, 563:16–569:25, 583:14–585:25, Kniaziowski Depo., 82:6–84:1; *see* Dkt. 270 at 27–30.
[343] Dkt. 274 at 13.
[344] *Id.* at 45.
[345] *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 625–26 (1967); *see also Associated Gen. Contractors of California, Inc. v. NLRB*, 514 F.2d 433, 437 (9th Cir. 1975) ("Congress enacted Section 8(b)(4)(B) and Section 8(e) to shield unoffending employers from union pressures designed to involve them in disputes not their own. The other subsections of Section 8(b)(4) were

Moreover, other courts[346] and numerous NLRB decisions have held that an employer may lose neutrality in cases where there is no struck work or the third party and primary employer are "single employers."[347] Indeed, courts have held that a third party loses its Section 8(b)(4) neutrality where it "clearly tak[es] a position in favor of [the primary employer]."[348] Therefore, based on the factual record before it, the Court agrees that Samson is not a neutral employer entitled to protections under Section 8(b)(4). As such, ILWU is entitled to a complete defense under the neutrality doctrine, and Samson's Section 303 claims fail.

C. *Samson fails to provide evidence it was injured "by reason of" a Section 8(b)(4) violation.*

The Court separately concludes that Samson's Section 303 claims fail because Samson has not identified how ILWU's actions caused its alleged damages. Subsection (b) of Section 303 provides that whoever is injured "by reason of any violation of subsection (a) of this section shall

---

similarly intended to protect employers in the position of neutrals between contending parties." (internal citations omitted)).

[346] *See Kable Printing Co. v. NLRB*, 545 F.2d 1079, 1085 (7th Cir. 1976) (affirming NLRB decision "reject[ing] [plaintiff's] argument that the ally doctrine cannot apply if the work being done by the secondary employers is not 'struck work' because the primary employer does not intend to do the work again at any time in the future," and noting that although "the ally doctrine was developed in cases in which there was struck work in the sense in which [plaintiff] uses that term . . . . the rationale of those cases supports the Board's decision here: The purpose of s 8(b)(4) is to protect secondary employers who are neutral, not those who knowingly assist the primary employer in connection with the labor dispute.").

[347] *See Painters Dist. Council 51,* 299 NLRB 618, 634 (1990) (listing "single employer" as but one example among many of when an employer may be deprived of its neutrality for the purposes of Section 8(b)(4)); *Roslyn Americana Corp.*, 214 NLRB 868 (1974)).

[348] *See T.H. Eifert, Inc. v. United Association of Journeymen*, 422 F.Supp.2d 818, 835–36 (W.D. Mich. 2006) (holding that employer "was in no way neutral to the dispute" because it "vigorously [sought] to ensure that [its] employees went to work for [plaintiff] after [employer] ceased operating its own business" and thus "even if the Court were to find that [defendant union's] conduct was not primary in its purpose, it would conclude that [the employer] was not a neutral secondary employer entitled to the protections of [Section] 8(b)(4)").

recover the damages by him sustained and the cost of suit."[349] The injured party "[may] not recover damages under [S]ection 303 by showing only that the Union violated [S]ection 8(b)(4)[] and that [it] [was] within the class of persons afforded a remedy by [S]ection 303."[350] Rather, it "must also show [it] [was] injured in [its] business or property by reason of the violation."[351] "Reading [S]ection 303 in this manner, injury occurred 'by reason of' particular unlawful conduct if such conduct 'materially contributed' to the injury . . . or was a 'substantial factor' in bringing it about, 'notwithstanding other factors contributed also.'"[352] "The requirement that the unlawful objective must have 'materially contributed' to the loss or have been a 'substantial factor' in bringing it about[] will prevent windfall recoveries by employers negligibly affected by a violation, and protect the union's right to strike for primary objectives where such objectives, standing alone, would have caused the strike, but the unlawful objective, standing alone, would not."[353] However, a "superseding cause relieves the actor of liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm."[354] A party is entitled to summary judgment if there is an absence of evidence showing causation.[355]

---

[349] 29 U.S.C. § 187(b); *see Mead v. Retail Clerks Int'l Ass'n, Loc. Union No. 839, AFL-CIO*, 523 F.2d 1371, 1376 (9th Cir. 1975) (noting that "[i]n the antitrust context, the 'by reason of' language is read as incorporating common law principles of causation").

[350] *Mead*, 523 F.2d at 1376.

[351] *Id.*

[352] *Id.*

[353] *Id.* at 1379.

[354] *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir. 1995) (quoting Restatement (Second) of Torts § 440 cmt. b (1965)).

[355] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to

Here, Samson broadly asserts that ILWU caused its alleged damages because "ILWU's grievance led to the Coast Arbitrator's award and the award led directly to Samson being forced to pay time in lieu invoices from Matson in order to continue its operation at the terminal.[356] However, even absent ILWU's affirmative defenses, the Court concludes that any damages sustained by Samson were attributed to Samson's and Matson's actions, not ILWU's. ILWU sought a grievance to enforce the AALA and LOU No. 12, and subsequently engaged in communications with Matson to enforce the February 2020 Award at Womens Bay Terminal.[357] In contrast, Samson and Matson entered into a lease[358] and the Terminal Services Agreement,[359] allowing Matson to charge Samson for time in lieu, and the entities appeared to engage in substantial communications in developing Samson's lawsuit against ILWU.[360] As ILWU reasons, "[t]here is no genuine dispute that ILWU did not cause Samson to enter into the agreement with Matson" because ILWU "could not have done so as [it] [was] completely unaware that the agreement even existed."[361] Moreover, as ILWU notes, Matson informed Samson of its intent to seek indemnity largely because "Matson violated the Award by entering into the agreement with Samson instead of complying with the award by ensuring ILWU labor was used for all cargo

---

which she has the burden of proof."); *Sacramento Valley Chapter of the Nat. Elec. Contractors Ass'n (NECA) v. Int'l Bhd. of Elec. Workers (IBEW)-Int'l Off. (I-O)*, 637 F. Supp. 1417, 1426 (E.D. Cal. 1986) (finding that "Union has made a prima facie showing that none of the clauses in issue was a weighty motive for either initiation of the strike or its prolongation, thus shifting the burden to plaintiff under summary judgment practice to show a 'genuine' issue of material fact. Because . . . plaintiffs have not produced evidence sufficient to require trial, the Union's motion for summary judgment will be granted.").

[356] Dkt. 274 at 52.

[357] Dkt. 270 at 19; Dkt. 270-13 at 19.

[358] Dkt. 270-13 at 32–34.

[359] Dkt. 270-14 at 95–103.

[360] *See* Dkt. 270 at 20–25; Maglio Dec., ¶ 13, Dreyfus Depo., 61:9–14, 62:15–22, 63:19–65:7, 73:9–11; G. Baggen Depo. Vol. II, 535:14–537:19; Young Dec., ¶ 31; Tungul Depo., 95:8–25, 100:23–101, 142:22–144:3.

[361] Dkt. 270 at 48.

handling at Women's Bay Terminal.[362] Thus, the Court concludes Matson's and Samson's own actions are superseding events in the chain of causation, and that Samson's alleged damages were not "by reason of" ILWU's actions in lawfully pursuing its grievance.

Samson separately suggests that question of causation is a question of fact appropriate for a jury's determination.[363] But there is no genuine issue of material fact that ILWU's conduct materially contributed to Samson's damages. On this record, a reasonable jury could not find that ILWU caused Samson's damages under Section 303, and therefore summary judgment is appropriate.

### D. Further discovery is unnecessary in light of ILWU's affirmative defenses.

Finally, turning to Samson's argument that further discovery regarding its allegations in its Third Amended Complaint and ILWU's Motion for Enforcement and Remedy would provide further evidence of coercive behavior, the Court concludes that such discovery is unnecessary because it could not overcome ILWU's affirmative defenses. Although sufficient to sustain a supplemental pleading to amend Samson's complaint under the liberal pleading standards of Rule 15,[364] ILWU's recent actions in pursuing enforcement of the February 2020 Award and October 2021 Awards were part of its continuing efforts to preserve work for bargaining unit members under the AALA.

Further, Matson's claim for indemnity arose from its prior agreement with Samson regarding time in lieu payments,[365] and as such would not furnish evidence pointing to ILWU's

---

[362] *Id.* at 51–52.
[363] *Id.* at 52–53.
[364] *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258–59 (9th Cir. 2010) ("[Rule 15] is to be liberally construed to effectuate the general purpose of seeing that cases are tried on the merits."); *see also AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (noting that Rule 15 is construed liberally).
[365] Dkt. 270-41 at 2–3.

coercion of either Matson or Samson. Indeed, Samson acknowledged that it could not identify specific evidence that ILWU forced Matson to charge Samson or add a time in lieu requirement to the terminal services agreement between them, nor explain how the February 2020 Award forced Matson to enter into such an agreement.[366] Thus, the Court concludes that ILWU's subsequent actions to enforce the February 2020 and October 2021 Awards did not constitute economic coercion within the meaning of Section 8(b)(4), and further discovery would not supply such evidence to overcome ILWU's affirmative defenses.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** ILWU's Motion at Dockets 232 and 270 and **DENIES** Samson's Cross-Motion at Dockets 231 and 249. Accordingly, all remaining motions are hereby **DENIED AS MOOT.** Therefore, all of Samson's claims in its Third Amended Complaint are **DISMISSED with prejudice** and the Clerk of Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 22nd day of August, 2024.

/s/    *Timothy M. Burgess*
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[366] Dkt. 270-3 at 158:3–10, 180:4–13.